*In the matter of the Petition of* L. C. GUNN *for a Writ of Habeas Corpus.*

1. SUPREME COURT—*Jurisdiction.* The constitution of the state ordains that the supreme court shall have original jurisdiction in proceedings in *habeas corpus.*

2. CONTEMPT—*Commitment—Inquiry.* Under the statutes of this state, no court or judge shall inquire into the legality of any judgment or process whereby the petitioner is in custody, or discharge him, when the term of commitment has not expired, upon any process issued for any contempt of any officer or body having authority to commit, if such contempt does not arise upon proceedings to enforce the remedy of a party.

3. HABEAS CORPUS—*Inquiry.* The supreme court has power to inquire on *habeas corpus* into the lawfulness of imprisonment by an order or resolution of the house of representatives of the state.

4. HOUSE OF REPRESENTATIVES—*May Compel Witnesses to Attend.* The house of representatives of Kansas has power to compel witnesses to attend and testify before the house, or one of its committees, having an election contest concerning a member thereof properly pending before it for investigation.

5. CONTUMACIOUS WITNESS—*Arrest and Imprisonment.* If a witness duly subpœnaed in this state to testify before the house of representatives of Kansas, or a committee of that house, having a contest of election concerning the seat of a member thereof properly pending before it for investigation, willfully refuses to attend or testify, he is in contempt of the authority of the house, for which the house may cause him to be arrested and brought before that body, and

*In re* Gunn, *Petitioner.*

such body may, upon proper proceedings, lawfully imprison the contumacious witness.

6. REPRESENTATIVES—*Quorum—Rules.* The constitution of the state ordains that the legislative power of the state shall be vested in the house of representatives and the senate; that the number of representatives shall never exceed 125; that a majority of each house shall constitute a quorum; and that each house shall establish its own rules.

7. QUORUM—*Sixty-three.* Under the constitution and statutes, the house of representatives consists of 125 members, and 63, being a majority, constitute a quorum.

8. HOUSE—*Organization—Certified Members.* When a number of persons come together at the hall of the house of representatives in the state capitol, at a regular session, commencing on the second Tuesday of January of each alternate year, claiming to be members of the house of representatives, those persons who hold certificates of membership from the secretary of state, certified by him under his seal of office, in accordance with the determination of the state board of canvassers, are the only persons entitled to participate in the organization of the house. Such certificates of election confer title upon the holders thereof, governing their associates and everybody who has a lawful duty to determine who are elected representatives, until there can be an adjudication by the house itself to the contrary.

9. HOUSE JOURNAL—*Absolute Verity—Witness—Contempt—Imprisonment.* Where a majority of the members of the house of representatives in this state, each one of whom holds a certificate of membership, prescribed by the statute, meets at the usual and customary hour in the hall of the house of representatives at the state capitol, at the regular time for the commencement of a session of the legislature, and perfects an organization as a house, appoints its committees, and initiates legislation, such body is duly organized, and is the constitutional house of representatives, although the governor, or senate, or both, refuse to communicate with or recognize it as the house of representatives. Such a house of representatives, so constituted and organized, may keep and publish a journal of its proceedings, and such journal, when properly kept and published, imports absolute verity. Such a house also has the power, under the constitution and laws, to imprison for contempt contumacious witnesses, in proper proceedings pending before it.

10. CONSTITUTIONAL HOUSE—*Not Ousted, When.* The constitutional house of representatives of the state, regularly organized, having a quorum, and transacting business in the hall of the house of representatives at the capitol, provided for its sessions, cannot be ousted

*In re* Gunn, *Petitioner.*

or destroyed as a house by the refusal or neglect of the governor, or of the state senate, or of both, to communicate with it.

11. OFFICE OR BODY *De Jure—No Ouster, When.* If an office is filled, and the duties pertaining thereto are performed by the officer or a body *de jure*, another person or body, although claiming the office under color of title, cannot become an officer or body *de facto*, and an officer or body claiming to be such *de facto* cannot oust or destroy the power of an officer or body *de jure* by taking partial possession of the room or office where the officer or body *de jure* is in possession and transacting business.

12. CONSTITUTIONAL HOUSE —*Its Power not Usurped or Destroyed, When.* Where the constitutional house of representatives of the state convenes at the time and place provided by law, perfects its organization, appoints its committees, and initiates legislation, and continues to transact business, its power is not usurped or destroyed as the house of representatives by the organization in the same room of another pretended house of representatives composed of 58 members, having certificates of election, but being less than a constitutional quorum, although such body is recognized by the governor of the state and by the state senate as a house, or as a *de facto* house of representatives. Nor can such pretended body forbid or prevent the constitutional house of representatives from exercising its power, under the constitution and laws, to imprison for contempt.

13. SUPREME COURT *May Review the Action of the House of Representatives.* "The house of representatives is not the final judge of its own powers and privileges in cases in which the rights and liberties of the subject are concerned; but the legality of its action may be examined and determined by this court. That house is not the legislature, but only a part of it, and is therefore subject in its action to the laws, in common with all other bodies, officers and tribunals within this state. Especially is it competent and proper for this court to consider whether its proceedings are in conformity with the constitution and laws, because, living under a written constitution, no branch or department of the government is supreme; and it is the province and duty of the judicial department to determine, in cases regularly brought before them, whether the powers of any branch of the government, and even those of the legislature in the enactment of laws, have been exercised in conformity with the constitution, and, if they have not been, to treat their acts as null and void." (*Burnham v. Morrissey,* 14 Gray, 226.)

NOTE.— The oral opinion in this case, containing the substance of the written opinion as handed down, was delivered on Saturday, February 25, 1893. On Tuesday, February 28, at 10 o'clock A. M., 54 members of the Dunsmore house, headed by L. F. Dick bearing the American flag, followed by Hon. J. M. Dunsmore and Hon. R. H. Semple, appeared in the hall of the house of representatives occupied by the Douglass house and took their seats. The house thereafter consisted of 65 republicans, 54 populists, three democrats, and one independent republican, making a total of 123 members. The legislature continued in session and transacted business, until its final adjournment on March 13, 1893.

*Original Proceeding in Habeas Corpus.*

ACTION by *L. C. Gunn* to obtain his discharge from an arrest made by C. C. Clevenger, acting sergeant-at-arms of the house of representatives of the state, on the ground that such house was an illegal body, and such officer had no authority to make the arrest. Writ denied. A copy of the body of the petition is as follows:

"*To the Honorable Judges of the Supreme Court of the State of Kansas:*

"Your petitioner, L. C. Gunn, complains and respectfully represents that he is unlawfully restrained of his liberty by C. C. Clevenger; that the pretended cause of his arrest and restraint from liberty is as follows, to wit: On or about the 13th day of February, 1893, certain members of the Kansas house of representatives assembled together, and pretended then and there to act as the regularly-constituted and organized house of representatives under and by virtue of the laws of the state of Kansas, and passed a resolution declaring your petitioner to be in contempt of said body, for not obeying a certain pretended subpœna to appear before the said body. Your petitioner further alleges, that under and by virtue of said resolution, one George L. Douglass, who then and there pretended to be acting as the speaker of the house of representatives of the state of Kansas, did issue and cause to be issued, over his signature, a warrant directed to the said C. C. Clevenger, who was then and there acting as sergeant-at-arms of the said pretended organized or pretended house of representatives; that the said warrant was then and there duly certified by one Frank L. Brown, who was acting as clerk of the said pretended house of representatives. Your petitioner further says, that on or about the 15th day of February, 1893, the said C. C. Clevenger, under and by virtue of said pretended warrant issued by the said George L. Douglass as aforesaid, forcibly, and against the protest of your petitioner, apprehended your petitioner and took him into custody, in the city of Parsons, county of Labette, state of Kansas. Your petitioner further alleges, that the said C. C. Clevenger, acting under and by virtue of said pretended warrant, still holds your petitioner in custody, and in restraint of his liberty, a copy of which said warrant is hereto attached and marked 'Exhibit A,' and made a part of this petition. Your

petitioner states that the said arrest is illegal in this, that the said George L. Douglass had no authority or power in law to issue said warrant; that the said George L. Douglass is not the speaker of the regularly-organized house of representatives of the state of Kansas, and that the said C. C. Clevenger has no right or authority to restrain your petitioner by reason of such pretended warrant issued as aforesaid. Wherefore, your petitioner asks that a writ of *habeas corpus* may be granted, and that he may be discharged from such unlawful imprisonment."

A copy of the return made by Clevenger, justifying the arrest of Gunn, is as follows:

"C. C. Clevenger, sergeant-at-arms of the house of representatives of the state of Kansas, to whom the within writ is directed, returns the same, and has now here before the court the body of L. C. Gunn, therein named, as thereby commanded. And I certify that the cause of the restraint and detention of the said L. C. Gunn is by virtue of a certain warrant issued by George L. Douglass, as speaker of the house of representatives, a true copy of which is attached to the petition herein in this case as 'Exhibit A,' and issued in the manner and under the circumstances set forth in the petition. But the respondent alleges that said detention is lawful, and in support hereof alleges that said warrant of arrest was issued and placed in the hands of respondent as sergeant-at-arms of the house of representatives of the state of Kansas, because of certain proceedings had by the committee on elections of said house of representatives, which had been regularly appointed by the speaker subsequent to the organization of said house; that said committee on elections was regularly investigating and considering certain contest cases then pending before it, wherein one D. M. Bender was contestant and John L. Humphrey was contestee, and claiming to be a member of said house of representatives; that in furtherance of the investigation of said committee in said case, and for the purpose of securing testimony therein, said house of representatives caused a subpœna to be issued commanding said L. C. Gunn to appear before it as a witness to testify in said contest case, which said subpœna was duly served on said L. C. Gunn on the 21st day of January, 1893, by delivering to him a copy thereof at the place of his residence, in Labette county, Kansas; that said witness refused and failed to obey the command of said subpœna, and did not appear as a wit-

ness, but refused so to do; that thereafter, on the 13th day of February, 1893, said committee on elections reported said facts with reference to the serving of the subpœna upon said witness, and his refusal to appear; that thereupon said proceedings were had in said house of representatives with reference thereto; that a resolution was duly adopted by said house on the 13th day of February, 1893, and it is set out in said warrant, and pursuant to said resolution said warrant was issued, and said L. C. Gunn placed under arrest, and is now held; that said respondent has not had time previous to the issuance of the writ in this case, subsequent to the arrest of said L. C. Gunn, to present him at the bar of the house of representatives, as in said warrant commanded. Said respondent further says, that at the time of the issuance of said warrant, and that at the time of the proceedings had previous thereto, concerning the matters out of which the issuance of said warrant grew, said George L. Douglass, who issued said warrant, was the legally-elected and qualified speaker of the house of representatives, and that Frank L. Brown was the legally-elected and qualified chief clerk of the house of representatives of the state of Kansas, it theretofore having been duly organized as the house of representatives, and that at the time of the doing of all of the matters herein referred to there being a majority of all the members of said house of representatives present and participating in the proceedings of said house."

A copy of the traverse filed to a part of the return is as follows:

"And now comes said L. C. Gunn, petitioner herein, and controverts the return made by said C. C. Clevenger to the writ of *habeas corpus* herein, in these particulars, to wit: Said petitioner denies, first, that said George L. Douglass is or has been speaker of the house of representatives of the state of Kansas; second, that said Frank L. Brown is or has been chief clerk of the house of representatives of the state of Kansas; third, that said C. C. Clevenger is or has been sergeant-at-arms of the house of representatives of the state of Kansas; fourth, that there is or has been at any time pending before the committee on elections of the house of representatives of the state of Kansas any contest proceeding or case between said D. M. Bender and said John L. Humphrey; fifth, that the house of representatives of the state of Kansas ever caused any subpœna to be issued commanding

your petitioner to appear before said house or said committee to testify in any case or proceeding whatsoever; that any such subpœna was ever served upon your petitioner by any person or in any.manner; or that your petitioner ever failed or refused to obey any subpœna issued by or under the direction of the house of representatives of the state of Kansas; sixth, that the committee on elections of the house of representatives of the state of Kansas, on the 13th day of February, 1893, or at any other time, made any report to said house that your petitioner had been served with a subpœna and had refused to appear, nor any other fact or statement whatever concerning the issuing or service upon the petitioner of any subpœna, nor concerning any refusal of his to obey any subpœna or to appear; seventh, that the house of representatives of the state of Kansas, on the 13th day of February, 1893, or at any other time, ever adopted any resolution adjudging said petitioner to be in contempt of said house for any cause or matter whatsoever, or authorizing or requiring the speaker of said house to issue his warrant to the sergeant-at-arms of said house, or to any other person, commanding the arrest of your petitioner to answer as for a contempt of said house in refusing to comply with any order of the committee on elections of said house, or in any other respect, or commanding his arrest for any cause or for any purpose whatsoever; eighth, said petitioner further denies generally each and every statement in said return save that he is restrained of his liberty by the said C. C. Clevenger; ninth, said petitioner further avers, that he is by said C. C. Clevenger restrained of his liberty in violation of the fourteenth amendment to the constitution of the United States, and is by said C. C. Clevenger deprived of his liberty without due process of law."

All other material facts are stated in the opinion, filed March 11, 1893.

*Eugene Hagan,* for petitioner.

*Noah Allen,* assistant attorney general, *G. C. Clemens, Frank Doster,* and *W. C. Webb,* for the governor.

For the petitioner, points were made and authorities cited, as follows:

It is a settled rule that, even where courts have power to inquire into the right of an officer to perform official acts,

11 — 50 KAS.

they will not do so collaterally.    They will freely investigate
the legality of any particular act, but they will never, in so
doing, inquire into the right of the officer to act as such at
all.  *M. & A. Rld. Co. v. Little,* 45 Ga. 402, 404–407;  see, also,
*Robertson v. The State,* 109 Ind. 158.

The governor is part of the lawmaking power.  61 Miss.
102; 48 Am. Rep. 77.    The decision of the governor is con-
clusive.  29 Mich., 18 Am. Rep. 89; 1 Story, Const., § 375,
p. 276; 19 Minn., 18 Am. Rep. 330.

See, also, *Prince v. Skillin,* 71 Me. 361; same case, 36 Am.
Rep. 325; Cooley, Const. Lim. (6th ed.), p. 787, note 4; *Jones
v. United States,* 137 U. S. 202.

The case of *Luther v. Borden,* 7 How. (U. S.) 1, is decisive
of the principles here involved.

Authorities that question is political: Chase's Dec. 412;
44 Ga. 88–97; 45 id. 380–399; 10 N. E. Rep. 575–580;
same case, 109 Ind.; 137 U. S. 202; 6 Wall.; 11 Colo. 400.
*Luther v. Borden,* affirmed by citation in *Behring Sea Case,*
143 U. S. 503.

See, also, 56 N. H. 577; 5 Wis. 308; 4 Hume's Hist. Eng.,
ch. 45; 19 Am. Dec. 63, note; 47 Pa. St. 296, *et. seq.;* 1
Story, Const. (5th ed.), § 375, note *a;* Lincoln's Views, p. 277.

*T. F. Garver, Chester I. Long, W. H. Rossington,* and *David
Overmyer,* for respondent.

*T. F. Garver:* We recognize the constitutional provision
which makes each house of the legislature the judge of the
election and qualifications of its own members, and would
detract nothing from its force and effect.    We must, however,
avoid giving construction to this provision, as, though it pro-
vides that the members of each house should be the judges
of the election and qualifications of each other, the members,
when considered merely as members elected to a house of rep-
resentatives, have no such authority, and never before in the
history of this state have they asserted any such power.    It is
the members when acting in their organized capacity that have
this power.    The "house" is the judge.    When a house of

representatives is legally organized, the members, through this legally-organized body, and by virtue of their connection with it, may act; and this legal organization may admit or expel individual members without question or right of appeal.

Here it is claimed that each of two bodies is a house of representatives. It must be admitted that there can be only one legal house under our constitution. One of these bodies is not the house of representatives; neither may be a legal house; both cannot be. Who shall decide? Until we have in some way ascertained which is the legal house, one body has as much right to decide this question as another. Submitting it to them, therefore, settles nothing. The statement of this proposition is enough to show the absurdity of such contention, and the necessity of determination by some other tribunal. Under our form of government, the only other tribunals vested with power to determine such questions are the courts. In all our investigation, and the investigation of counsel on the other side so far as disclosed, no case has been found in which it has been held that it is not a question for the courts to decide which of two bodies, as in this case, is the legal one. On the contrary, there are many decisions upon the principle of law here involved, all to the effect that the courts not only may, but that it is their duty to, decide. Cases that have been cited to the contrary are where there was a legislative body admitted to have a legal organization. Such decisions we may, in this case, accept as correct expositions of the law, and still our position is unassailed. Our position is sustained by the following cases: 70 Me. 609; 71 id. 367; 14 Gray, 238; 107 Mass. 184; *Prouty v. Stover*, 11 Kas. 235; *The State, ex rel., v. Francis*, 26 id. 724; *In re Vanderberg, Petitioner*, 28 id. 243; 23 Pac. Rep. 733, 734, 736; 4 Wis. 467; 61 Conn. 287; same case, 23 Atl. Rep. 186; 12 S. C. Rep. 507. Let us inquire then, which, if either, of these bodies was legally organized as the house of representatives. Who can effect such organization, and out of their efforts evolve a house of representatives? Naturally, we answer this by saying, the members elect are the ones who have, by virtue

of their election, the power of organization.   How shall it
be known, before there is a "house" to pass upon the question,
who are members elect having this right?   It cannot be sub-
mitted to the house, for as yet there is none.   It cannot be
submitted to the members themselves, for they have no sem-
blance of authority to act in that respect.   The constitution
of this state has provided a tribunal, the state board of can-
vassers, which shall examine the returns of elections, canvass
the vote, and declare the result.   There is no other tribunal
known to the law that has authority to inquire into this mat-
ter, or to change the result thus regularly declared by such
board from the face of the returns of an election for represent-
atives, except the house of representatives.   Hence, the dec-
laration made by this board must, of necessity, be taken as a
determination of the rights of the several claimants to election,
until this other tribunal — the house — has been created.
That the person holding a certificate of election is, in the first
place, entitled to the office to which he was declared elected,
is settled by numerous decisions of the courts of other states,
as well as by the decision of this court.   Until legally tried
and otherwise declared, the face of the returns governs.  *The
State, ex rel., v. Buckland,* 23 Kas. 259; 33 N. Y. 603; 35
Pa. St. 263; 41 id. 396; 10 Minn. 369; 15 id. 455; 23 Pac.
Rep. 733; 25 Ill. 287; 10 Cal. 376; 16 Mich. 56; 14 Wis.
134; McCr. Elect., § 586; 21 Pick. 153.

A majority of members thus appearing to be elected can
organize.   The house of representatives consists of 125 mem-
bers.   That number was elected, and assembled on January
10, 1893, to organize.   Sixty-four of them proceeded to or-
ganize, and elected Geo. L. Douglass as speaker, and other-
wise perfected an organization.   Two days afterward, three
other members joined them, and these 67 regular members
have since been acting as a legislative body.   As against these,
were 58 members who held certificates, and 10 others who did
not appear by the returns to be elected, but who were on the
roll at the suggestion of outsiders, and acted with the 58 in
effecting an organization.   These 68 men assumed to organize

a house of representatives, though it was well known that 10 of them had no legal right or standing whatever. Until some tribunal had favorably passed on their claims to membership, they stood as defeated candidates. Without these 10, or some of them, the 58 were only a minority, and could do nothing, much less create a "house."

No one will seriously claim that the senate and the governor can create a house of representatives out of such material as the Dunsmore body furnished. Under the constitution and the laws, there is to-day only one legal house of representatives in Kansas, and that is the Douglass house.

The question of a *de facto* house cannot arise in this case as against the legal house, for, the Douglass house being both the *de jure* and the *de facto* house, there is no room for another mere *de facto* organization. There cannot be a *de facto* officer when the lawful officer is in possession. *McCahon v. Comm'rs of Leavenworth Co.*, 8 Kas. 441.

The so-called house journals of the Dunsmore house are of little importance in the determination of the question in this case. But a journal cannot make a legal house. The inquiry must always be open, so that it may be known who makes the journal. If made by a constitutional body, it is conclusive; otherwise it is nothing.

The house may punish for contempt, and issue its warrants of arrest. 44 Ohio St. 142; 14 Gray, 227; 107 Mass. 184; 7 Wis. 630; 37 N. H. 450; 99 N. Y. 463; 21 Pick. 151; 6 Wheat. 204.

*Chester I. Long:* A certificate of election, based upon the determination of a legally-constituted canvassing board, authorizes the holder to take possession of the office to which he was elected, and to occupy it to the exclusion of any claimant, until there has been an adjudication by the proper tribunal that he was not in fact elected. McCr. Elect. (2d ed.), §§ 204, 509; Cush. Leg. Ass., §§ 229, 240; Cong. Rec., 1st Ses. 51st Cong., p. 2906; *The State v. Kenney*, 9 Mont. 223; 23 Pac. Rep. 733; 1 Bl. Com. 150, 151; *Ex parte Screws*, 49 Ala.

57; *Crowell v. Lambert,* 10 Minn. 369; *The State v. Churchill,* 15 id. 221–455; *People v. Miller,* 16 Mich. 56; *Swinburn v. Smith,* 15 W. Va. 483; *Halseman v. Rems,* 41 Pa. St. 396; *Kerr v. Trego,* 47 id. 292; *Com. v. Baxter,* 35 id. 263; *De Armond v. The State,* 40 Ind. 469; *Hadley v. City of Albany,* 33 N. Y. 613; *The State v. Governor,* 25 N. J. Law, 331; *People v. Callaghan,* 83 Ill. 128; *People v. Head,* 25 id. 325; *Hunter v. Chandler,* 45 Mo. 452; *Marbury v. Madison,* 1 Cranch, 137; *People v. Stevens,* 5 Hill, 616; *Ex parte Heath,* 3 id. 42; *Supervisors of Town v. O'Malley,* 50 N. W. Rep. 521; *The State, ex rel., v. Buckland,* 23 Kas. 259.

Section 8, article 21, of the constitution, says that a majority of each house shall constitute a quorum. Under the present law, the house is composed of 125 members; so that it requires 63 members holding certificates of election to organize the house of representatives.

The house over which George L. Douglass presides as speaker consists of 67 members, all of whom hold certificates of election from the state board of canvassers, except Rosenthal, conceded to have been elected; and the house over which J. M. Dunsmore presides as speaker consists of 58 members holding certificates of election. Which, under the constitution, is the lawful house of representatives of the state of Kansas?

That is the lawful house of representatives in the organization of which participated a majority of those holding certificates from the state board of canvassers. *McCahon v. Comm'rs of Leavenworth Co.,* 8 Kas. 437; *Braidy v. Theritt,* 17 id. 468; Mech. Pub. Off., §§ 322, 323; *Supervisor of Town v. O'Malley,* 50 N. W. Rep. 521, and cases cited; *The State v. Blossom,* 10 Pac. Rep. 430; *Morgan v. Quackenbush,* 22 Barb. 80; *Boardman v. Holliday,* 10 Paige, 232; *Cohn v. Beal,* 61 Miss. 399; *The State, ex rel., v. Buckland,* 23 Kas. 259; *Morton v. Lee,* 28 id. 286; McCr. Elect. (2d ed.), § 517.

In case of a division of a legislative body that ought to be a unit, and in determining which is the legal and which is the illegal assembly, the following is the true test: "That is the

legal organization which has maintained the legal forms or organization according to the laws and usages of the body, or, in the absence of these, according to the laws, customs and usages of similar bodies in like cases or in analogy to them." *Kerr v. Trego*, 47 Pa. St. 292; McCr. Elect., §§ 514, 517, 518; Cong. Rec., 1st Ses. 51st Cong., pp. 2907, 2910; *Clough v. Curtis*, 134 U. S. 367; 10 Sup. Ct. Rep. 573; 56 N. H. 570; *The State, ex rel., v. Buckland*, 23 Kas. 261.

When a house has been lawfully organized, then it is the judge of the elections and qualifications of its own members, and a court will not inquire into the question whether persons acting as members and recognized by the house were in fact elected. Cong. Rec., 1st Ses. 51st Cong., p. 3238; *Auditor General v. Board of Supervisors*, 51 N. W. Rep. 483; *The State v. Smith*, 44 Ohio St. 348; 7 N. E. Rep. 447; *The State v. Gilmore*, 20 Kas. 551; *The State v. Tomlinson*, 20 id. 692.

The opinion of the court was delivered by

HORTON, C. J.: On the 15th of February of the present year, L. C. Gunn was arrested by C. C. Clevenger, and soon thereafter he presented his petition to one of the justices of this court, asking to be discharged from restraint, upon the ground that Clevenger had no authority to arrest or detain him. He alleged that Clevenger was acting as the sergeant-at-arms of an alleged house of representatives which had no authority to act. The warrant issued to Clevenger as sergeant-at-arms for the arrest of Gunn was signed by George L. Douglass, as speaker, and attested by Frank L. Brown, as chief clerk, and was attached to the application. Subsequently a return was filed by Clevenger, as sergeant-at-arms, justifying the arrest of Gunn, and alleging that his detention was lawful, upon the ground that he (Clevenger) was the sergeant-at-arms of the constitutional house of representatives of the state of Kansas, duly organized by the election of Douglass as speaker, Brown as chief clerk, with other proper officers, and that Gunn refused to obey a subpœna personally served upon him to appear before the committee on elections, and

testify as a witness in a proper investigation then pending before such committee. To a part of the return, a traverse has been filed by the petitioner, who has associated with his attorney, counsel representing the governor of the state. Upon the allegations of the pleadings thus framed, this court

1. Supreme court— jurisdiction.

has a proper matter before it to hear and determine. The constitution of the state gives this court original jurisdiction in *habeas corpus*, and this is a proceeding of that character.

The liberty of a citizen is in controversy. But a statute of this state provides that no court or judge shall inquire into

2. Contempt— commitment —inquiry.

the legality of any judgment or process whereby a party is in custody, or discharge him, when the term of commitment has not expired, in the following case, among others: "Third. For any contempt of any court, officer or body having authority to commit." Therefore we have before us, necessary for our determina-

3. Habeas corpus—inquiry.

tion, the question whether the body or the house which authorized Clevenger as sergeant-at-arms to arrest and detain Gunn had any legal or constitutional authority so to do. If there were one house only, or the proceedings of one house only, to consider, our duty in this matter would be plain and easy; but it appears from the journals presented to us that on January 10, 1893, (the day appointed for the organization of the house of representatives of the state of Kansas,) there met and attempted to organize at the capitol, in representative hall, two houses, which since that time have acted separately and independently of each other.

We may remark in this connection that oral evidence was offered upon the trial concerning various matters, which was objected to by the petitioner. In deciding this case and declaring the law thereon, we have sustained the objections to the evidence as to all matters occurring after the organization of the two houses referred to, except the evidence of Hon. J. M. Dunsmore in regard to the hall or room where the two bodies held their sessions and transacted business, the

evidence that the two bodies or houses acted separately and independently of each other, the journals of the state senate, of the Douglass house and of the Dunsmore house, and the official records of the office of the secretary of state concerning the returns of the election and the issuance of certificates to members of the house for 1893.

Before referring to the organization, or attempted organization, of the two alleged houses, it is best to understand how a house of representatives may be legally organized. Judge McCrary, in his work upon Elections, in § 509, says:

"It is to be observed in the outset, that when a number of persons come together, claiming to be members of a legislative body, those persons who hold the usual credentials of membership are alone entitled to participate in that organization; for it is, as we have had occasion several times to repeat, a well-settled rule, that where there has been an authorized election for an office, the certificate of election, which is sanctioned by law or usage, is the *prima facie* written title to that office."

Judge McCrary, the writer of these words, occupied for several terms a seat in the house of representatives at Washington. He was chairman for many years in that body of the committee upon elections. Subsequently, he was a member of President Hayes's cabinet, and later he was the honored judge of the United States circuit court for the eighth circuit, embracing Kansas. His book, both from his ability and experience, is acknowledged to be the leading authority in this country upon the questions therein discussed.

But, again, we have what is known as a "standard work" on parlimentary or legislative practice. It is found in almost every public library, is examined and referred to by every legislative assembly and every congressional body. Its title is "Cushing's Law and Practice of Legislative Assemblies." Section 229 reads:

"The right to assume the functions of a member in the first instance, and to participate in the preliminary proceedings and organization, depends wholly and exclusively upon the returns or certificates of election."

And in section 240 it is said:

"The principles of parlimentary law applicable to the question are perfectly simple and plain, founded in the very nature of things, established by the uniform practice and authority of parliament, confirmed by reason and analogy. These principles are as follows: First, that every person duly returned is a member, whether legally elected or not, until his election is set aside; second, that no person who is not duly returned is a member, although legally elected, until his election is established; third, that conflicting claimants, both in form legally returned, [that would be where two persons had equal certificates,] are neither of them entitled to be considered as members until the question between them has been settled; fourth, that those members who are duly returned, and they alone—the members whose rights are to be determined being excluded—constitute the judicial tribunal for the decision of all questions of this nature."

Upon this question of certificates, we also cite the contest in the United States senate from Montana, which is the latest utterance of the highest legislative body in this land. In the report of the committee it is said:

"The majority of the committee are of the opinion that, if this body of persons had lawful and constitutional certificates of their election, that title is a good title against all the world, governing their associates in that body, governing the senate, governing everybody who has a lawful duty to determine who are lawfully elected representatives, until there can be an adjudication by the house itself to the contrary; and that nobody can be heard to say, and that no authority can be permitted to inquire into or determine, the actual facts of the election as against that title." (51st Cong. 1st Sess., 21 Cong. Record, pt. 3, pp. 2906–2910.)

The majority of the committee were all republican members of the United States senate; but Senator Gray, from Delaware, one of the most distinguished lawyers and democrats of that body, made a minority report, and in such report admitted the rule proclaimed by the majority of the committee concerning certificates of election issued to members of a legislature. In his report he stated:

"I may say, for the minority of the committee, that we

accept as a postulate the proposition laid down by the senator from Massachusetts, and do not differ at all, in considering this case, from him in the position, that we should seek here, in the first place, to discover the lawful body clothed with legislative power who has chosen a senator, and that, to determine whether it be such lawful body, we shall be bound, in the first instance, by the fact that such body is composed of members who hold credentials from an officer or board clothed with authority in the premises to make such credentials."

The American and English Encyclopedia of Law summarizes the law of the worth of a certificate of election as follows:

"It is settled that when it is made the duty of certain officers to canvass the votes, and issue a certificate of election in favor of the successful candidate, a certificate of such officers, regular upon its face, is sufficient to entitle the person holding it to the possession of the office during an action to contest the right." (Vol. 6, p. 373, c. 17; *Clough v. Curtis,* 134 U. S. 367; 10 Sup. Ct. Rep. 573; *The State, ex rel., v. Buckland,* 23 Kas. 259.)

This subject has also received the recent attention of the supreme court of Nebraska, in a case in which the opinion was handed down as late as the 17th of January of the present year, upon a matter involving the certificate of the election of a member of the legislature. The court say:

"It is contemplated that each house of the legislature shall be organized by the persons who are *prima facie* members thereof. It requires no argument to prove the disastrous consequences of a different construction of the constitution." (*The State v. Van Camp,* 54 N. W. Rep. 114.)

We may add that the scenes which have occurred in this capitol during the past four weeks are sufficient justification for the view of the supreme court of Nebraska. But, more than this, our own statutes clearly provide that the legislature — that the senate and the house of representatives, when they convene — shall, in the first instance, be constituted only of those members who have certificates of election. They provide that, after an election is held, in November, speedy steps shall be taken for the returns of the county canvassing boards. Then the clerks of these boards shall make returns to the state

board of canvassers; and then, after a certain length of time, the state board of canvassers shall make an examination of these returns, and order certificates to the persons appearing to be elected. Further, the state of Kansas has been in existence over 30 years. It is recognized everywhere that practice and usage are to be considered upon questions of this character. It has been the universal practice and usage of the legislative houses of Kansas to be organized by the admission, in the first instance, of persons holding certificates of election. This has been the practice. Now, against this, · what can be said, and what authorities are brought?

A case is cited from Maine (70 Me. 609), and, in our view, with the exception of a few words in the opinion, we concur in all that is said by the supreme court of that state. In that state the returns were made to the state canvassing board. Under the authority of the constitution, the state officials submitted certain questions to the supreme court as to their duty concerning the canvass of those returns. The supreme court of Maine gave advice, which in substance was, that the state board should canvass those returns as they appeared upon their face; that they were ministerial officers only, and had no authority whatever to go back of the returns, or to hear and act upon other evidence. In violation of the constitution of that state, in violation of the statutes of the state, and contrary to the express advice of the supreme court of the state, the board of canvassers refused to accept the returns duly filed with them. Under such a condition of affairs, the supreme court of Maine ruled that those returns were better evidence than the fraudulent certificates issued by the state board of canvassers, in violation of the constitution, in violation of the statutes, and contrary to the advice of the supreme court. The language of that court is to be applied to the facts of that case—to fraudulent certificates. All else is really *obiter*.

In this case no such condition of affairs appears. There has been offered in evidence the certified list of members who appear to have been elected. Accompanying that certificate

is a statement of the returns on file in the office of the secretary of state, with the number of votes each member received. We may here say that, while there has been much discussion about what fraudulent canvassing boards might do, and what frauds canvassing boards might commit, there has not been presented in this case any evidence showing that the returns of election on file in the office of the secretary of state could have been canvassed in any manner other than they were canvassed and declared.

But, more than this, there has been presented what is known as the "Revised Journal of the Dunsmore House." We suppose that this journal has been carefully prepared, and that it is attempted therein to state fully what occurred, according to the views of the parties or of the body under whose order it was prepared and approved; yet the journal, day after day, seems to recognize that only certified members have authority to act. We read: "On the call of the roll received from the secretary of state, the following members were present, and answered to their names." And it gives the names of 58. "The following members were present, and did not respond to the call of the roll," 57. Then it says: "Total number of members present, 115;" being more than a constitutional quorum. Therefore this journal counts only the members who appear upon the roll of the secretary of state. It says the number was 115—"58 voting, answering the call, and 57 not answering the call." It then states: "The following-named contestants for seats were present;" but it does not include them in the quorum or in the number of 115. It says they numbered 10.

Again, on the second day of the meeting of what is known as the "Dunsmore House," we read: "The house met pursuant to adjournment; Speaker Dunsmore in the chair. The roll was called, and the following-named members answered to their names;" and the number is 57. That is all that answered. Then it says: "The following members were present, but did not answer to the roll call;" and they were 16. And then it says: "The whole number of members

present was 73"—16 and 57, being 10 more than a constitutional quorum; and every day of this journal the same record is kept up, until after the report of the committee on elections, when certain other persons were admitted.  So, not only do the authorities hold that the persons having the certificates of election are the ones to participate in the organization of the house of representatives, but the revised journal of the Dunsmore house shows that its members recognized that rule, if this revision is correct.  We know that Mr. Rich has made some different statements.  We know that a certain journal presented here, of the same body, reads differently.  In that journal, contestants are reported as voting before any examination of their claims to seats.  This is probably the truth in the early organization of the Dunsmore house, for the protests of senators, coincident with such organization, refer to 10 persons having no credentials as participating in that body; but reference to this has been omitted in the "doctored" or revised journal prepared in the place of the one originally kept by Mr. Rich, the chief clerk of the Dunsmore house.

We accept the revised journal as the true statement of the condition of affairs in the Dunsmore house.  Of course, the petitioner cannot object to that journal, as he introduced it in evidence.  So we say, not only do the authorities, parliamentary and legislative, sustain the theory that the persons having certificates are the ones to organize; not only do the practice and the usage prevailing in Kansas since its admission as a state sustain that rule, but the newly-prepared journal of the Dunsmore house recognizes this, and states, not that the contestants voted, not that the contestants appeared for the purpose of being counted, but excludes them all the time, until after they were admitted upon a report of the election committee, and it counts only those who answered the roll call, and then counts several who did not answer.  It seems that while 10 contestants are marked in the Dunsmore journal as present but not voting, 10 names on the certified roll are wholly omitted. Any rightful reason for such omission does not appear.  We

cannot perceive any valid reason for such omission, even if 10
certified members had their seats contested.    Every person
duly returned to a house of representatives, and having a cer-
tificate, is a member thereof, whether elected or not, whether
eligible or not, until his election is set aside.    And this must
be set aside by the house, not by the individual members be-
fore organization, not by any one member, not by any contest-
ant, not by a mob. ´ Before organization, a few members prop-
erly elected, meeting in caucus or otherwise, cannot pass upon
the "elections, returns and qualifications" of the members of
the house to be thereafter organized.   If one member, before
organization, can object to any other member duly returned
and having a certificate, then all members can be objected to,
and there could be no one left to organize a house.   In Mc-
Crary on Elections (2d ed., § 204), the practice is thus stated:

"Where two or more persons claim the same office, and
where a judicial investigation is required to settle the contest
upon the merits, is is often necessary to determine which of
the claimants shall be permitted to qualify and exercise the
functions of the office pending such investigation.   If the
office were to remain vacant pending the contest, it might
frequently happen that the greater part of the term would
expire before it could be filled; and thus the interests of the
people might suffer for the want of a public officer.    Besides,
if the mere institution of a contest were deemed sufficient to
prevent the swearing in of the person holding the usual cre-
dentials, it is easy to see that very great and serious injustice
might be done.   If this were the rule, it would only be nec-
essary for an evil-disposed person to contest the right of his
successful rival, and to protract the contest as long as possible,
in order to deprive the latter of his office for at least a part
of the term; and this might be done by a contest having lit-
tle or no merit on his side, for it would be impossible to dis-
cover in advance of an investigation the absence of merit.
And, again, if the party holding the ordinary credentials to
an office could be kept out of the office by the mere institu-
tion of a contest, the organization of a legislative body —
such, for example, as the house of representatives of. the
United States — might be altogether prevented by instituting
contests against a majority of the members; or, what is more
to be apprehended, the relative strength of political parties in

such a body might be changed by instituting contests against members of one or the other of such parties. These considerations have made it necessary to adopt and to adhere to the rule that the person holding the ordinary credentials shall be qualified, and allowed to act pending a contest and until a decision can be had on the merits."

. Now, why should not this principle be followed? Why should not this rule, which is universal throughout the states of this union, and which is accepted and adopted by congress, be followed in the state of Kansas? It has history to sustain it. It has the wisdom of long years of legislative experience to sustain it. It has reason to sustain it. And let us here remark that in every state of this union where, through political excitement or personal contests, a different rule has been adopted, disturbance, violence and almost bloodshed have always occurred. In Alabama, it was attempted to hold two independent houses, and disastrous consequences followed, until public opinion compelled those two bodies to meet together and act in harmony. In Montana, where an attempt was made to disregard this well-settled rule, disturbance and conflict occurred. In Maine, where the state board of canvassers refused to canvass the returns on file in the office of the secretary of state as required by the statute, bloodshed seemed at times imminent; but public opinion in that state compelled those two separate bodies to unite and act together for the benefit of the state, and not for the benefit of any party. If we consider the disturbed condition at the capital of this state for the past three or four weeks, will anyone declare that the variation of this well-settled rule or recognized practice of all legislative assemblies has conduced to the peace, the quiet and the good order of the citizens of Kansas, or to the peace and good order of the legislative assembly? Then, why, if this court has the power — and we will come to that hereafter — why, if this court has the power, shall it not recognize that house which has a quorum and which has followed the usual and ordinary practice of all legislative assemblies in organizing? The reasons are stronger in this state for permitting only

those persons having certificates of election to participate in the organization of either house of the legislature because, under the rule declared by this court, a board of canvassers cannot act arbitrarily or fraudulently, if prompt proceedings are taken in the courts to compel them to discharge their duty properly.

"Where a canvassing board wrongfully neglects or refuses to canvass returns which are regular in form, the courts may, by *mandamus*, compel the board to canvass and declare the result from the face of the returns; and if a canvass has been wrongfully or improperly made, and the board has adjourned *sine die*, the courts may compel it to reassemble and make a correct canvass of all the returns before it at the time of the first canvass." (*Lewis v. Comm'rs of Marshall Co.*, 16 Kas. 102; *Rosenthal v. State Board of Canvassers*, ante, p. 129; 32 Pac. Rep. 129.)

In some of the states a contrary doctrine prevails; but the rule in this state affords protection against any canvassing board acting corruptly, fraudulently, or wrongfully. It may seem plausible, without full consideration, to say that only those members of the legislature who are actually elected, whether having certificates or not, are the persons that should organize either house. But some method of organization is necessary; some written evidence of title must be created or exhibited before any person can be regarded as having a *prima facie* right to a seat in the legislature. Those persons having certificates, and only those, must be permitted to organize, and no authority can change or overthrow that right or *prima facie* written evidence of title of a member except the house itself; and the members of the house cannot be regarded as a legal or constitutional house until there is some temporary or permanent organization by a majority thereof; that is, by 63 members having certificates of election. The certificates of election give a title to the members holding the same, which must govern their associates until there can be an adjudication by the house itself to the contrary; that is, by a constitutional house having a quorum.

The journal of the Dunsmore house states the number of

·persons who were present and answered the roll call, and then states how many persons were present who did not answer, and the quorum is made up by a very peculiar method. First, by counting the persons who answered to the roll call — that is right — sometimes 55, sometimes 57, and sometimes 58 ; and then by counting, in addition, as the journal says, persons upon the roll who were present but did not answer. Can this be lawfully done?

We know that very much has been asserted about the prevailing practice in Washington in the house of representatives, under what is known as the "Reed rule," and many persons who have not taken time to examine this question have said that, under the Reed rule, in any assembly, or in any legislature, or in any convention, if persons are present and do not vote or answer to their names, the speaker or the clerk may count them in order to make a quorum. It would seem that what is known as the "Dunsmore house," or the persons who prepared this revised journal, acted upon this theory, because in no other way could they count a quorum. But an examination of what is known as the "Reed rule" permits no such thing to be done. The Reed rule was a subject of investigation before the supreme court of the United States upon the "tariff bill." It is reported in *United States v. Ballin,* 144 U. S. 1; 12 Sup. Ct. Rep. 507. It appears from the decision that before the speaker or the clerk counted anyone present, not voting, the house of representatives had expressly adopted a rule upon that question, and the rule is as follows:

"On the demand of any member, or at the suggestion of the speaker, names of members sufficient to make a quorum in the hall of the house, who do not vote, shall be noted by the clerk, and recorded in the journal, and reported to the speaker, with the names of the members voting, and be counted and announced in determining the presence of a quorum to do business."

The supreme court says that after the house adopts such a rule, under the authority of the house itself, the speaker may order persons present and not voting to be counted to consti-

tute a quorum ; but that court did not hold, in the absence of
an express rule, that the speaker or the clerk, or any other
person, could assume that those persons, present in a house,.
who do not answer to their names on the roll call, or who do.
not vote, shall, for the purpose of a quorum, be counted as.
present.    There is no pretense that such a rule as the Reed
rule was adopted by either of the houses.    There is no claim
that the speaker of the Dunsmore house had any authority
from the house to do what was done in this case.    But, more
than that, the persons who were called and counted as present
and voting, in order to constitute a quorum in the Dunsmore
house, were never members of the Dunsmore house — never
recognized Mr. Dunsmore as speaker.    According to the evi-
dence of Mr. Dunsmore, each one of the bodies or houses,
after organizing, acted separately, and had nothing whatever
to do with the other.    Speaker Reed never called, in order to
constitute a quorum, the name of any person in the house of
representatives who was not a member of his house, or any
one who refused to recognize him as speaker.    Even under
such a rule as was adopted by congress, he would not have
called the name of any person who had not recognized that
body as the constitutional body — the legal house.    There-
fore, the counting of such votes in the journal of the Duns-
more house has no foundation to rest upon.

Something was said upon the argument of the admission in
the Douglass house of persons not eligible to seats in the leg-
islature.    That matter is wholly immaterial in this case.    The
house, after it is organized, "is the judge of the elections, re-
turns and qualifications of its own members;" but, before
organizing, the persons having certificates, whether eligible
or not, are the members to organize.    Before organizing, there
is no one — no house — to reject or oust a member holding a
sufficient certificate.    There is no one — no house

8. House—organ-
ization—certi-
fied members. — to pass upon his eligibility or election.    Until
the house is organized, the certificate is the evi-
dence of the lawful title that controls.

But in the case of *Privett v. Bickford,* 23 Kas. 52, this court said :

"Upon this question [eligibility] the weight of authority ·seems to be, and, in our opinion, is the better doctrine, that where the disability concerns the holding of the office, and is not merely a disqualification to be elected to an office, a person who is ineligible at the election will be entitled to enter upon and hold the office, if his disability be removed or cured before the issuance of the certificate, and before entering upon ·the discharge of the duties of th'e office for which he is elected. . . . If a person may hold the office, he may be elected while he is under disqualification; and if he becomes qualified after the election, and before the holding, it is sufficient. In the one case the disqualification strikes at the beginning of the mattter—that is, it prohibits the election of an ineligible ·candidate; in the other case the disqualification relates only to the holding of the office. The constitution expressly provides that the disability may be removed by a vote of two-thirds of all the members of both branches of the legislature. When the electors of Harper county voted for the plaintiff, they had the right to look at, and to build their expectations upon, this provision, because, although at the election the plaintiff was ineligible to hold office, yet they knew that the legislature · had the right to remove the disability, and, if removed, he was entitled to the possession of the office to which he was preferred by the majority of the electors. If ·our constitution provided that the plaintiff was ineligible to be elected, instead of being ineligible to hold office, the contention of the defendant would be good; but as the ineligibility is not as to the election, but only the holding of the office, such ineligibility is cured by the subsequent removal of the disqualification." (*Smith v. Moore,* 90 Ind. 299, 1883; *Vogel v. The State,* 122 id. 113, 1889; *Brown v. Cohen,* 122 id. 113, 1889; *People v. Hamilton,* 25 Ill. App. 609, 1886.)

The conclusion reached by us also fits the intimation in *Wood v. Bartling,* 16 Kas. 109, that where a majority of the electors vote for an ineligible candidate, the minority candidate, even if eligible, is not elected. In England, it has been held, that where electors have personal and direct knowledge of the ineligibility of the majority candidate, the votes cast for such candidate are void, and the minority candidate is elected. In this country, the great current of authorities

sustains the doctrine that the ineligibility of the majority candidate does not elect the minority candidate; and this without reference to the question as to whether the voters knew of the ineligibility of the person for whom they voted. It is considered that in such a case the votes, for the ineligible candidate do not elect him, because of his ineligibility; but the other or minority candidate cannot be considered as elected. There is a failure to elect. (*In re Corliss*, 11 R. I. 638; McCr. Elect., § 292.)

Let us examine the organization of the two alleged houses. First, the Douglass house. There can be no reasonable question but that George L. Douglass, the speaker who signed the warrant of arrest, Frank L. Brown, who attested the warrant as chief clerk, and C. C. Clevenger, the sergeant-at-arms who made the arrest we are now investigating, were elected to their several positions by 64 members of the house of representatives holding certificates of election, and that a majority of the 125 members voting for them held certificates in accordance with the returns on file in the office of the secretary of state. Mr. Justice BREWER, in delivering the opinion in *United States v. Ballin*, supra, said:

"The constitution provides that 'a majority of each [house] shall constitute a quorum to do business.' In other words, when a majority are present, the house is in a position to do business. Its capacity to transact business is then established — created by the mere presence of a majority — and does not depend upon the disposition or assent or action of any single member or fraction of the majority present. All that the constitution requires is the presence of a majority; and, when that majority are present, the power of the house arises."

The constitution of our state ordains that a majority of each house shall constitute a quorum. The house of representatives consists of 125 members; 63 is a majority and a quorum. When a majority or quorum are present, the house can do business; not otherwise. A quorum possesses all the powers of the whole body, a majority of which quorum must, of course govern. If less than 63 members are present in the house, there is no quorum. The body may ad-

7. Quorum—sixty-three.

journ from day to day, but cannot elect officers, transact business, or admit new members.   Less than a quorum cannot "judge of the elections, returns and qualifications" of the members of the house.   A major part of the whole of a house is necessary to constitute a quorum, and a majority of the quorum, of course, as we have said, may act; but if the major part withdraw so as to leave no quorum, the power of the minority to act ceases. (*Brown v. District of Columbia*, 127 U. S. 579; 8 Sup. Ct. Rep. 1314.)   Then, under the usual forms of law, under the universal practice adopted in this state, and in all the legislative bodies of all the states of the union, the Douglass house was organized by a legal and constitutional majority, as evidenced by the certificates of election.

There has been some contention that there were irregularities in the organization of the Douglass house.   Now, what was the irregularity, if any?   The statute of this state provides that, when the house of representatives convenes, the secretary of state shall lay before it a roll.   Of what?   A roll of the certified members of the house according to the returns in his office.   Upon the day that the house of representatives met, Secretary of State Osborn went into the hall about an hour and 20 minutes after the members had assembled, with a roll.   The statute says he might have brought that in and left it.   It does not declare that he shall preside or who shall preside.   There seems to have been a contention whether he should preside, and the secretary of state, probably desiring no trouble with these conflicting interests, stepped out.   All that Secretary Osborn had was a certified list of members from his office.   When he stepped out, a member presented another. Somebody has said that that was dated the day before.   It was a duplicate of the other roll.   Secretary Osborn read his roll in this court, and it was compared, in the presence of the court, with the roll certified to the day before.   There was no difference between these rolls.   The provision requiring the secretary of state to lay the list before the members is only directory.   It does not prevent a legislative body from organizing.   Of course, there might have been a little more

formality about this matter. There might have been a little more order. There might have been less excitement. But, when Secretary Osborn withdrew, another roll was produced— a roll which all admit was a duplicate of his roll. The house organized upon that roll.

We have said that Speaker Douglass and the other officers received more than a majority of the duly-certified members of the house. The speaker of the house known as the "Dunsmore house" received no votes from the 64 members. There does not seem to be any contention about that. How many Mr. Dunsmore did receive it is impossible to tell, because his was a *viva voce* vote. The two houses organized about the same hour, nearly simultaneously, but the elections of the temporary and permanent speakers of the Douglass house were prior in time to the election of officers of the Dunsmore house. The complete organization of the former was prior to that of the latter. After the Dunsmore house had elected a temporary speaker by a *viva voce* vote, Secretary Osborn returned to the hall of the house of representatives, and passed to such person the certified roll from his office of members of the house holding certificates of election; but, at the instance of some one in the Dunsmore house, all the names on this roll were not called. Ten members were omitted—not counted. After there was a temporary organization of the Douglass house, Joseph Rosenthal, of Haskell county, by general consent, was voted in as a member in the place of A. W. Stubbs, but he did not appear and answer as a member until after its permanent organization. He, therefore, was not admitted until after the permanent organization. On January 12, Joseph Rosenthal, Stephen Meagher, and T. G. Chambers, (all Democrats,) appeared in the Douglass house, filed their oaths of office, and recognized the Douglass house as the legal house of representatives of the state. At this time, both Meagher and Chambers held certificates of election. The returns in the office of the secretary of state showed that they were elected. Therefore, since January 12, the Douglass house has been composed of 66 members

with certificates of election, and also Joseph Rosenthal, who was admitted after the organization, making 67 members — more than a majority of the house, and more than a "quorum," as defined by the constitution of the state. All concede that Rosenthal was duly elected. The Douglass house, having more than a quorum of members with lawful certificates, could properly admit Rosenthal, or any other contestant, but the Dunsmore house, having less than a quorum, could not lawfully admit a contestant, or add, lawfully, anyone to its number. Under these circumstances, why was not the Douglass house a legally-organized house of representatives on the 10th and 11th days of January, 1893?

In this connection it is significant that the governor did not recognize the Dunsmore house until January 12, the third day of the session, and the senate did not formally recognize the Dunsmore house until January 14, the fifth day of the session. If the Douglass house was organized on the 10th of January, and was in session on the 11th day of January, before either house had been recognized, why was not that house at that time the properly-organized house? The constitution says that the legislature shall consist of a house of representatives and a senate. On the 10th the governor had not recognized the Dunsmore house; on the 11th the governor had not recognized the Dunsmore house; neither had the senate recognized either house; neither had the governor recognized either house. It is conceded that a house of representatives has other duties than mere legislative ones. Before it sends its communication to the governor, before it sends its communication to the senate, if it legally meets and organizes, is it not a house? Has it not the right to protect itself? Has it not the right to issue subpœnas? Has it not the right to examine those things which pertain solely and exclusively to the house itself? Supposing in this case there was no recognition of the Dunsmore house by the governor or the senate, and the Douglass house had issued its warrant upon proper resolutions: could it be said the Douglass house was not the constitutional house because it had not received

recognition from the governor, or because it had not yet received recognition from the senate? Up to this time, everybody admits that there might be some little delay about such things. It often occurs in legislative experience that one body is organized some days before the other. There may be conflicting interests about organization, sometimes in the senate, but more often, of course, in the lower house. Now, the point we desire to make is this, and it seems to us unanswerable: If the Douglass house had a constitutional majority of the certified members upon the 10th and 11th days of January, then during those two days it was the house, it was the legal house, it was the constitutional house, and had the right to do all those things necessary, outside of legislative matters, for its protection, for preventing disturbance, for purging itself of illegal members. It had the right, then, to punish parties for contempt, if they disobeyed its orders. Let us take an illustration: 125 members of the legislature meet together, and there is no conflict. They organize the house, and the senate is delayed in its organization, and the governor delays in answering its communications. Has not that house during the time of this delay all the rights of the legal and constitutional house of representatives? Has it not the right, the moment it is legally organized, to require order within its body? Has it not the right, the very minute it is organized, to say to any person within its hall who attempts to insult its speaker or disturb a member, "We will lay hands on you, because inhering in this body is the power of its own protection?" It was decided in *The State, ex rel., v. Hillyer,* 2 Kas. 17, that—

"There is no constitutional inhibition of the session of one branch of the legislature when the other is not in session; and, *semble,* the separate action of one body may be valid in the absence or non-organization of the other."

It was said by KINGMAN, J., in that case:

"If it be admitted, as claimed, that, when acting in their legislative capacity, the proceedings of one house, when the other is not in session, have no validity, it can only be upon the ground that their legislative power is a unit, though dis-

tributed, and the parts can only act in unison, and neither the reason nor principle would apply to this case; but the principle contended for cannot be admitted.    If, at the commencement of the regular session of the legislature, the senate for any cause should fail for weeks to organize, there can be no doubt that it would be perfectly competent for the house to perfect its organization, appoint its committees, and initiate legislation."

Then, if the Douglass house was legally organized, and had a constitutional majority, it had the right to keep a journal before the governor recognized it; it had the right to keep a journal before the senate recognized it.    The journal of a legislative body commences at its very organization. The journal of a legislative house does not commence with the recognition from the governor; it does not commence with the recognition from the senate.    If the Douglass house was legally and constitutionally organized, and was legally and constitutionally in session, is not the journal of the Douglass house, made on the 10th and 11th days of January, binding and conclusive upon this court?    This court has ruled that a journal properly made by the legislature is such evidence. (*Division of Howard Co.*, 15 Kas. 194.)    We are now referring to the journal of the Douglass house made on the 10th and 11th days of January, before any recognition of either body; before the recognition from the senate or governor of any house.    Either we must say that the house of representatives depends for its existence upon recognition from the governor, or depends for its existence upon recognition from the senate, or depends for its existence upon the recognition from both of these, or else we must hold that the journal kept by the house that is organized is the conclusive journal to this court up to the time of the recognition of the other house.    Then it seems to us that thus far in the case there ought to be no disagreement.

The Douglass house having been legally organized, and having made a journal for a day or two before any recognition of either house, it seems that this journal, for those days, must be received as evidence for all it recites.    As the Doug-

lass house has continued in existence ever since it was legally
and constitutionally organized, its journal must
import absolute verity, not only for the two days
before the recognition of the Dunsmore house,
but during all of the time of its existence, unless it has in
some way been ousted, destroyed, or dissolved.  Clearly, if
its legislative journal is good for January 10th and 11th, it
is good for all time, if the Douglass house was legally organ-
ized, and continued during the days of its journal to be a
legal and constitutional house.  At this time, without going
extensively into the transactions of the two bodies, it is suffi-
cient to say that the Douglass house has always met in the
hall of representatives in the capitol, where it has been usual
and customary, since the erection of that hall, for the house
of representatives to meet and transact business.  It is true
that another body, called the "Dunsmore house," with 58
members having certificates, met in a portion of the same
hall; and hence there were two alleged houses in the same
hall, doing or attempting to transact business.  The two al-
leged houses are the real cause of the contention now before
us.  If there were not, there would be no trouble in this
case, and there probably would not be this case for the court
to hear and decide.  It is also clear that, so far as it could do
business, the Douglass house has kept in session and carried
on business.

At this point, it is urged with great ability and zeal that
this court has no jurisdiction to pass upon the question of the
legality of either of these two houses, as it appears that there
were two alleged houses.  Its right to do so is denied by the
petitioner, and by the able counsel who represent the governor.
As was said by Chief Justice Marshall, in *Cohens v. Virginia,*
6 Wheat. 264, 404: "It is most true that this court will not
take jurisdiction if it should not; but it is equally true that
it must take jurisdiction if it should."  The judiciary cannot,
as the legislature may, avoid a measure because it approaches
the confines of the constitution.  We cannot pass it by be-
cause it is doubtful — because it is unpleasant.  With what-

.ever doubts or with whatever difficulties a case may be attended, we must decide it as best we can, if it be brought before us. We have no more right to decline to exercise the jurisdiction thus given than to usurp that which is not given.

Let us see what the authorities are upon this point. We refer again to the able work of Judge McCrary. He says:

"The cases in which the official acts or votes of members of a legislative body who are such *de facto* only, and not *de jure*, have been held valid are all cases in which there has been no question as to the legality of the body in which they sat. They are cases in which the body admitting such persons was, in doing so, acting within its admitted jurisdiction, and in such cases, the courts will not inquire into the title of such members to their seats. The courts in such cases will go no further than to inquire as to the legal status and the authority of the body as a whole; but where there are two bodies, each claiming to be the legislature, then the court, whose duty it is to respect and execute the acts of such legislature, must of necessity decide which is the legislature." (Section 517.)

Then, again, under the constitution of Maine, the legislature could propound questions to the supreme court of that state, and in a certain case they did propound questions, and this is what the supreme court of Maine said :

"When different bodies of men, each claiming to be and to exercise the functions of the legislative department of the state, appear, each asserting their title to be regarded as the lawgivers for the people, it is the obvious duty of the judicial department, which must inevitably, at no distant day, take up the question, and pass upon the validity of the laws that may be enacted by the respective claimants to legislative authority, to inquire and ascertain for themselves, with or without questions presented by the claimants, which of them lawfully represent the people, from whom they derive their power. There can be but one lawful legislature, and the court must know for itself whose enactments it will recognize as laws of binding force when brought judicially before it. In a thousand ways it becomes essential that the court should forthwith ascertain and take judicial cognizance of the question which is the true legislature." (70 Me. 609.)

In a Maine case concerning an office, not upon questions

submitted, but upon a case concerning an office, which was brought before the court in the regular way, the court repeats the identical language used in the advice given upon the former occasion. (*Prince v. Skillin*, 71 Me. 361.) If it is the obvious duty of the judicial department to pass upon the claims of two legislative bodies or assemblies, then it is much more the duty of the judicial department to pass upon the legality of two different houses, both claiming to be the house of representatives. A house is not the legislature. In 1859, George P. Burnham was imprisoned and restrained of his liberty by John Morrissey, at Boston, who justified such restraint upon the ground that he was the sergeant-at-arms, and that he had arrested and detained Burnham by virtue of a warrant from the speaker of the house of representatives, to answer for a contempt in refusing to comply with an order of a special committee of the house. Proceedings in *habeas corpus* were commenced by Burnham before the supreme court of Massachusetts for his discharge, and, after a hearing of the case, that court held that Burnham was lawfully in the custody of the sergeant-at-arms, by virtue of the warrant of the house of representatives. Hoar, J., speaking for the court, said, among other things:

"The house of representatives is not the final judge of its own powers and privileges in cases in which the rights and liberties of the subject are concerned; but the

13. Supreme court may review the action of the house of representatives.

legality of its action may be examined and determined by this court. That house is not the legislature, but only a part of it, and is therefore subject in its action to the laws, in common with all other bodies, officers and tribunals within the commonwealth. Especially is it competent and proper for this court to consider whether its proceedings are in conformity with the constitution and laws, because, living under a written constitution, no branch or department of the government is supreme; and it is the province and duty of the judicial department to determine, in cases regularly brought before them, whether the powers of any branch of the government, and even those of the legislature in the enactment of laws, have been exercised in conformity with the constitution, and, if they have not been, to treat their acts as null and void."

(*Burnham v. Morrissey,* 14 Gray, 226; *The State v. Kenney,*
23 Pac. Rep. [Mont.] 733; *The State v. Meadows,* 1 Kas. 91;
*The State v. Barker,* 4 id. 436; *Graham v. Horton,* 6 id. 343.)

It has been said that there are some views the other way,
and cases from Pennsylvania and Georgia are cited. (*Kerr v.
Trego,* 47 Pa. St. 292; *Gormly v. Taylor,* 44 Ga. 76; *Rail-
road Co. v. Little,* 45 id. 370–407.)    In the Pennsylvania
case, the exact question as to the division of the legislature
was not before the court.    If the court intended to say in
that case an injunction would not be granted against the su-
preme legislature, this court would readily concur with it.
If it intended to go further than that, this court then calls
attention to the fact that upon "political questions," as they
are denominated in Pennsylvania and Georgia and some other
states, this court has heretofore differed from the courts of
those states.

In the case which involved the late Governor Martin,
(38 Kas. 641), the question was raised whether he could be
compelled by writ of this court to organize a county in this
state.    Governor Martin had been advised that, under the de-
cisions of Georgia and Pennsylvania and other states, this
court had no authority by writ of *mandamus* or other pro-
ceedings to give him advice or direct him in a ministerial
matter.    He came before this court saying the court had no
authority to inquire into any matter against him as governor.
This court examined the matter patiently and carefully.
There were no politics in that case.    The governor believed
his duty to be one way, and this court, after examining the
matter, said that the rule laid down in Pennsylvania and Geor-
gia and in other states was not the correct rule, and was not the
one which should be recognized.    We referred directly to some
Pennsylvania and Georgia decisions upon this question. (*Ap-
peal of Hartranft,* 85 Pa. St. 433; *Low v. Towns,* 8 Ga. 372.)
The latter were to the effect that the court cannot compel the
governor to perform a ministerial act; that it cannot touch
anywhere his domain of duties of any kind or character.    It
is true dissenting opinions were filed in one or two of those

cases; but it is the majority of the court that always rules. A majority of the court in Pennsylvania. and Georgia held that neither the supreme court nor any other court had any right to inquire about the duty of the governor concerning any matter, whether ministerial or discretionary. In the case of *Martin v. Ingham*, found in 38 Kas. 641, the decisions are cited. They are all gone over, and in a most learned and able opinion by Mr. Justice VALENTINE this· whole question is examined, and the particular question discussed therein was then settled. This court differed from the supreme courts of the states of Pennsylvania and Georgia; and although the governor of this state said, "You have no right to give me advice," and although it was said the governor was beyond the power of this court, and we should hesitate before we attempted to enforce his duties, this court unanimously went upon the discharge of its work in the best way it could, and, in response to the suggestion that the governor would not obey, replied:

"It is said that, if the governor opposes the order or judgment of the court, it cannot be enforced, for he has entire control of the militia. But are the courts to anticipate that the governor will not perform his duties? Should not the courts rather presume, that when a controversy is determined by the courts—the only tribunals authorized by the constitution or the statutes to construe the laws and determine controversies by way of judicial determination—that the governor, as the chief executive officer of the state, would see that such determination should be carried into full effect? Such would be his duty, and no one should suppose that he would fail to perform his duty when his duty is made manifest by judicial determination of the courts. No department should ever cease to perform its functions for fear some other department may render its acts nugatory, or for fear that its acts may in some manner affect the conduct or the *status* of some other department."

In the Martin case the first point of the syllabus reads:

"Where purely ministerial duties are by statute imposed upon the governor, and such duties are only such as might be devolved upon any other officer or agent, the performance

of such duties may be controlled by *mandamus* or injunction."
(*Martin v. Ingham*, 38 Kas. 641.)

In the Pennsylvania case, parts one and two of the sylla-
bus read:

"1. The governor is the absolute judge of what official
communications, to himself or his department, may or may
not be revealed, and is the sole judge not only of what his
official duties are, but also of the time when they should be
performed.

"2. The governor is exempt from the process of the courts
whenever engaged in any duty pertaining to his office, and his
immunity extends to his subordinates and agents, when acting
in their official capacity." (85 Pa. St. 433.)

In the Georgia case, the third part of the syllabus reads:

"However clear it may be, as a general legal proposition,
that when a mere ministerial act is required to be performed,
by law, on the part of an executive officer, and individual
rights depend on the performance of that act, that the proper
tribunals of the county have no jurisdiction to compel its per-
formance; yet, for political reasons alone, the chief magistrate
of the state cannot be compelled, by mandamus, to perform
such ministerial act." (*Low v. Towns*, 8 Ga. 360.)

Warner, J., in delivering the opinion, among other things,
said:

"If, as has already been remarked, it was competent for
the legislature to impose this ministerial duty of issuing a
commission to a clerk on the executive office of the govern-
ment, wholly independent of and in addition to the other
functions devolved upon that officer by the constitution, why
may he not, when the performance of this ministerial act, so
required by law, is essential to the completion and enjoyment
of individual rights, be considered, *quoad hoc*, not as an exec-
utive, but as a merely ministerial officer, and, therefore, liable
to be directed and compelled to perform the act by *mandamus?*

"Viewed as strictly a legal question, we cannot offer any
satisfactory reason why he should not, according to the gen-
eral principles of the law; and it was in this point of view
alone this question was considered by this court in *Bonner
v. Pitts*. Indeed, no other view of it was presented for our
consideration on the argument of that case; but while we
are unable to give a satisfactory legal reason why the remedy
sought should be denied to the citizen, yet we are satisfied

that, for political reasons alone, the remedy by *mandamus* ought not to be enforced against the chief executive officer of the state.   The ultimate effect of this remedy, in case of refusal by the governor to obey the laws of the land, would be to deprive the people of the state of the head of one of the departments of the government.   This ministerial act, required by the law, is to be performed by the same officer who is by the constitution placed at the head of one of the departments of the government, and is required by the constitution to perform certain other duties of which the people may not be deprived."

In the case of *Martin v. Ingham*, supra, a part of the opinion was quoted to show how the question *should be viewed strictly as a legal question*, and how the question was viewed by the supreme court of Georgia as a legal question.   But the supreme court of Georgia, after admitting that it " was unable to give a satisfactory legal reason why the remedy [*mandamus*] sought [in that case against the governor] should be denied to the citizen," said *"that, for political reasons alone, the remedy by mandamus ought not to be enforced against the chief executive of the state." The supreme court of Georgia, therefore, upon the ground that the question was a political one, decided that the remedy by mandamus does not exist in that state to compel the performance of purely ministerial duties imposed by statute upon the governor. In Kansas, the supreme court, differing from the Georgia supreme court, held, that where purely ministerial duties are imposed by statute upon the governor, the performance of such duties may be controlled by mandamus or injunction.* (38 Kas. 641.)

In the Martin case, although this court held that it had the power to control the governor as to purely ministerial acts, it gave no direction, because the facts disclosed warranted no interference.   But this court asserted its power, if a case justifying its action were ever presented.   The cases now cited were not then examined, and we only incidentally refer to that opinion, and the decisions from Pennsylvania and Georgia therein stated, as showing the difference between this court and those courts in regard to the official acts

13—50 KAS.

of a governor. But if full force be given to all the language employed in *Kerr v. Trego*, supra, whether *obiter* or not, that decision is no authority in this case, because "the supreme legislature" is not involved. No supreme legislature is under review. In the Georgia cases, the supreme legislature was also under consideration; *not one house, or only a part of the legislature*, as in this case. As observed by the Massachusetts court, "The house is not the legislature, but only a part of it. It is not the final judge of its own powers." The constitution is controlling, and a member of a house cannot overstep its mandatory provisions; nor can 58 members do so.

In this case we are not called upon to make any order concerning the governor. In this case we are not called upon to make any order concerning the state senate. We are simply called upon to exercise our judicial judgment as to which is the legally-organized and constitutional house of representatives. There can be no conflict; there should be no conflict. The court is answerable to the people of this state. The governor is answerable to the people of this state. The house is answerable to the people of this state.

But again: In 1879 the house of representatives of this state associated with itself some persons above the number of 125. An act was passed by the legislature. It was passed by what was called the "house." It was passed by the senate, and approved by the governor. It was published in the state paper. And yet, when that act of the legislature came before this court for examination, it decided "that the house of representatives had no lawful authority to pass the act," by means of the votes of certain illegal members; and it wiped it out of existence. There was no conflict between the governor and the senate or the house in doing this. Supposing the legislature of 1879 had passed every act by votes of that character, and they had been proclaimed and published, this court would have declared all the acts void.

It is insisted that we cannot find a line in the constitution giving this court authority to pass upon this question of organization. It is the acknowledged power of this court to

finally pass upon every act of the legislature. It is the acknowledged power of this court to declare acts of the legislature void. In the case in 26 Kas. 724 (the Francis case), there was nothing upon the face of the act to show but that it was a legal enactment. It was properly signed. It was properly enrolled. It was properly published. But this court went into the house of representatives, and examined its journal, and ascertained that the house included four illegal members, not authorized to hold seats or vote, and it stamped out the so-called "act." It had the power to do it, and that decision has been followed ever since. Mr. Justice VALENTINE, speaking for the court in that case, said:

"Now, generally, under affirmative and mandatory constitutional provisions, the legislature may do more than is required; but it cannot do less, if it does its duty. Under negative and prohibitory constitutional provisions, however, the legislature may often refrain from doing things which are not prohibited; but it can never do what is prohibited. Under this negative and prohibitory clause of the section, the legislature may fix the number of representatives at less than 125, but it can never fix it at more; and there is no power in the state which can fix it at more. Therefore, whenever the house of representatives consists of more than 125 members, some of such members must be there illegally. Such was the case in 1879. The house of representatives at that time consisted of 129 members. Four of these members, to wit, the four from Rooks, Rush, Harper and Kingman counties, who were not provided for by law, and being the last members admitted, were not entitled to their seats. And the act in controversy was passed only by the assistance of their votes. Except for their votes, or at least three of their votes, the act would not have received a constitutional majority of the votes of the members of the house; and, not counting their votes, the act did not receive a constitutional majority. Now, we do not think that their votes should be counted, and therefore we think the act in controversy must be held as not having passed the house of representatives, and as void."

It is asserted that the court cannot inquire by *quo warranto* into the right of membership of these respective bodies. This court so ruled in the Tomlinson case, in 20 Kas. 692;

but when this court has the ultimate right and duty to pass upon acts of the legislature, it has also the right to pass upon the organization of the legislature, or either or both houses, although it has no right whatever, after the legislature is organized, to deal with any question concerning "the elections, returns and qualifications of its own members." Clearly, it has, in any event, the right to pass upon the powers of a house — only a part of a legislature. This proceeding is not a collateral attack, but a direct attack on the Douglass house. (*Vase v. Morton*, 4 Cush. 31.) Necessarily involved is the *status* of the Dunsmore house.

Whether Gunn is rightfully restrained of his liberty by a legal house of representatives is not a political, but a judicial, question, and this court, therefore, must have authority to inquire and determine whether the house has been properly organized, and is such a house as is authorized by the constitution of the state to establish its own rules, to keep and publish a journal, etc. (*Burnham v. Morrissey*, 14 Gray, 226; *The State v. Cunningham*, 53 N. W. Rep. [Wis.] 35; id. 51 N. W. Rep. 735; *Giddings v. Blacker*, 52 N. W. Rep. [Mich.] 914; *The State v. Kenney*, 23 Pac. Rep. [Mont.] 733; *Rice v. The State*, 7 Ind. 334; *Campbell v. Dwiggins*, 83 Ind. 473; Cooley, Const. Lim., 45.)

In *Prouty v. Stover*, 11 Kas. 235, Mr. Justice BREWER, speaking for the court, said:

"Three questions are presented, two of which, at least, must be decided in favor of the plaintiff before he will be entitled to the relief sought: First, could a majority of members present in the joint session, and voting, elect, or did it require a majority of all the members elected to the two houses? Second, did the house of representatives consist of more than 90 members? Third, can this court look back of the final declaration of the result by the joint convention, to see whether, upon either of the votes, anyone other than the one declared elected was in fact elected? These questions, as can readily be seen, are, so far as this court is concerned, of a delicate nature, for they concern the regularity of the proceedings of the legislative branch of the government; and they are also questions of great moment, for they

involve the rightfulness of the organization of at least one body of the legislature."

In that case this court decided:

"Where the legislature is made an electoral body, and a proceeding is had to contest the validity of an election by such body, the courts are not precluded by the action of the house in admitting members from inquiring into the legality of certain representative districts, and the rights of the members from those districts to vote at such election."

But it is claimed that the Douglass house has been destroyed, ousted or dissolved by the recognition of the Dunsmore house from the governor and the senate. The governor did not recognize the Dunsmore house until January 12, the third day of the session; and the senate did not formally recognize the Dunsmore house until the 14th day of January, the fifth day of the session. It is true that it appears the secretary of the senate went to the Dunsmore house and presented communications before that date, but that it was not by order of the senate. Taking the journals before us, the house that the governor recognized consisted of 58 members—not a constitutional quorum, not a constitutional majority; the house that the senate recognized consisted of 58 members—not a constitutional quorum, not a constitutional majority. It has been said that as the governor must act in this matter, and as the senate must act in this matter, should not their actions be final and conclusive? That seems to be one theory. If that were the correct view, the court's connection with the case would be very brief. All we would have to do would be to ask, "What did the governor do? What did the senate do?" We admit that for certain purposes recognition from the governor should be considered. We admit that for certain purposes recognition from the senate should be considered. All departments of the government should pay all proper respect to the acts of all other departments. The governor, overwhelmed with business, perplexed with the duties surrounding him, not having time to investigate, recognized a body which is not a constitutional body. The senate passed a resolution to investigate; but, examining the journal, we cannot

find any report upon that resolution. It recognized a body not a constitutional body. Is such a recognition final? Is it conclusive? Does it bind this court? Is the end of the duty of this court to simply inquire what are the records in the office of the governor and the state senate? Where two alleged houses are in contention, may we not go to the office of the secretary of state and ascertain from the official returns and certificates the names of the members who hold credentials to organize a house? May we not ascertain from the journals of these houses which house a constitutional majority organized? We think so. The constitution is paramount to the action of any governor. The constitution is paramount to the action of any senate. The governor and the senate are to yield obedience to the statute, when valid. They are not above the law. We admit if, after such recognition, the Douglass house had voluntarily departed from its room, and its members had gone their several ways to their homes, and the 58 members of the Dunsmore house had increased its membership in any way it pleased — by lawyers, by doctors, by anybody — and they had gone on and continued business without interference and without challenge, such recognition would have weight. But that is not the case presented here.

On January 13, Senator Baker presented to the state senate, of which he is a member, the following protest of himself and 13 other members, and asked to have it spread upon the journal:

"WHEREAS, At the general election held in the state of Kansas on the 8th day of November, 1892, there were chosen, by the electors participating therein, 125 members of the house of representatives of the state, each of whom received a plurality of the votes cast in their respective districts; that certificates thereof from the county clerks of the districts, certifying that, upon a canvass duly and legally made in their respective districts, said certain 125 representatives received certain votes, were filed with the secretary of state, as provided by law; that the state board of canvassers of Kansas, as provided by law, duly met on November 28, 1892, canvassed the returns, and determined that said 125 certain persons had been duly elected to the office of representative in

their respective districts, and a record was made of such determination by said board, and is now in the custody of the secretary of state of Kansas; that after making said full and complete canvass of said returns, and having fully and completely discharged its duties according to law, said state board of canvassers, on December 1, 1892, adjourned *sine die;* that, after said adjournment, the secretary of state, who was *ex officio* a member of said board, issued certificates of election to those ascertained by said canvass to have been elected members of said house of representatives; and

"WHEREAS, On Wednesday, January 4, 1893, the supreme court of Kansas, the same being the highest judicial tribunal in the state, in an action then and therein pending, wherein one Joseph Rosenthal was relator and the state board of canvassers was respondent, after carefully considering said case, decided, that after the state board of canvassers had once convened and duly canvassed the returns of all the votes before them and on file in the office of the secretary of state aforesaid, and had fully and completely discharged its duties, and had adjourned *sine die,* that the state board of canvassers could not on its own order reconvene for the purpose of making any different or further canvass of said returns, and that the court had no power or authority, under the statutes, to order the state board of canvassers to meet and further canvass the returns, so that other and different certificates of election might be issued, or for any other purpose; and

"WHEREAS, On Tuesday, January 10, 1893, at the time appointed by law for the assembling and organization of the state senate and the house of representatives of the state of Kansas, that said certain 125 persons, excepting Mr. A. W. Stubbs, the republican opponent of said Rosenthal, who declined to meet and act, met in representative hall, in the state-house, at Topeka, Kas.; that upon a call of the roll prepared by the secretary of state of the state of Kansas, containing a list of all those holding certificates of election, according to the determination of the state board of canvassers, it was ascertained that said 125 persons, excepting said Stubbs, were present at said time and place, and thereupon each of said persons, to the number of 64, whose names are hereinafter set forth, took the oath of office required by the constitution and laws of the state of Kansas, and duly qualified as representatives of said state; that thereafter said 64 proceeded to organize by the election of a temporary speaker, and, after a temporary organization had been effected, not only said 64,

*In re* Gunn, *Petitioner.*

but at least three others, recognized the organization; and said 64 participated in the election of a speaker for said house of representatives; and that 64, being a legal majority of all those holding certificates as aforesaid, voted for and elected the Hon. Geo. L. Douglass as speaker of said house of representatives, the names, numbers of district and politics of those participating in the election of Speaker Douglass being as follows, to wit: [Here the districts and names, etc., were copied]; and

" WHEREAS, Notwithstanding the above and foregoing facts, other persons of the said 124, and independent of said 64, together with some persons not holding certificates of election of said state board of Kansas, participated in selecting one J. M. Dunsmore as a pretended speaker, in violation of both statute and parliamentary law:

"*Now, Therefore,* We, the undersigned, being members of this senate, in the name of law, order, decency, and constitutional government, the good name and credit of the state of Kansas, most emphatically protest and object to recognizing the alleged house of representatives presided over by said Dunsmore as a lawful body.

|  |  |
|---|---|
|  | LUCIEN BAKER. |
| MILTON BROWN. | D. MCTAGGART. |
| S. T. DANNER. | W. A. MORGAN. |
| JAMES D. WILLIAMSON. | H. F. ROBBINS. |
| E. T. METCALF. | S. O THACHER. |
| JNO. C. CARPENTER. | W. E. STERNE. |
| K. E. WILLCOCKSON. | J. W. PARKER. |

CHAS. F. SCOTT."

Senator Taylor presented the following protest, and asked that it be spread upon the journal of the senate:

"*To the President of the Senate:* I hereby formally protest against the the recognition of the alleged secretary of the house, now claiming recognition on this floor, because it virtually decides the most important question that ever came before this senate without investigation and without debate.

EDWIN TAYLOR."

Senator O'Bryan presented the following protest, and asked that it be spread upon the journal of the senate:

"I, Ed. O'Bryan, senator from the 29th senatorial district, do hereby enter my protest against the action of the president of this body in recognizing Ben. C. Rich as chief clerk of a house of representatives of the state of Kansas, as I believe

the said house of representatives to be illegally organized, and is not the legal body, and should not be recognized.

ED. O'BRYAN."

Subsequently Senator Brown filed a further protest in the state senate, which concluded as follows:

"To recognize the Dunsmore house will be to defeat needed legislation, as that house is illegal and unconstitutional."

On January 14, Senator Parker filed a protest in the state senate against recognizing Mr. Rich as chief clerk and Hon. J. M. Dunsmore as speaker. On the same day, Senator Baker, with 13 of his associates, also filed a further protest in the state senate, which, among other things, stated:

"It will not, nor can it be, denied that on the 10th day of this month, at 12 o'clock noon, being the usual hour for organization of the legislature of Kansas, there assembled in the hall of the house of representatives 64 persons, constituting a constitutional majority of such house, each holding from the state board of canvassers a duly-authenticated certificate of election issued by such board; nor can it be denied that then and there, in a lawful and regular manner, these 64 members organized the house of representatives, by the election of George L. Douglass as speaker, and the choice of the other usual and necessary officers. It is also a fact that, prior to that time, the supreme court of the state of Kansas had, in a proper case before it, decided that no person not holding a certificate of election was entitled to participate in the organization of the house of representatives. At the same time there assembled in the hall 58 persons, each holding a certificate of election, who withdrew and separated themselves from the majority of the house above mentioned, and refused to and did not participate in the proceedings of the organization. Thereupon these 58 persons, being a minority of the house of representatives, unlawfully introduced among their own number 10 persons who held no certificates of election, and who were defeated at the polls in opposition to 10 of those constituting the majority. The minority of the legislature then assumed to produce and have qualified these 10 persons as members, and, in connection with them, assumed and pretended to organize the house of representatives. The names of these persons unlawfully introduced as members, and the majorities by which they were respectively defeated, is hereto

appended: J. W. Howard, beaten by 1,050 votes; D. M. Howard (Shawnee), beaten by 444 votes; Ed. Shellabarger, beaten by 193 votes; V. Gleason, beaten by 26 votes; W. H. White, beaten by 8 votes; H. Hellstrom, beaten by 8 votes; I. N. Goodvin, beaten by 5 votes; F. B. Brown, beaten by 42 votes; John Morrison, beaten by 15 votes; O. M. Rice, against whom a tie was decided in accordance with the law; that thereupon these 58 persons, acting together with the 10 persons who then and there respectively usurped the offices of representatives, without any form of trial or right thereto, or without submitting their claims of right to any tribunal, then and there unlawfully pretended to organize themselves as the house of representatives of the state of Kansas, and from that time up to the present the revolutionary body so organized has riotously and tumultuously seized and held the hall of the house of representatives, and has obstructed the lawfully-organized house of representatives in the transaction of any business."

Senator Taylor followed with a protest of his own, which stated, among other things, that —

" Previous to such organization it appears clear to me that no person or persons, however connected, have the right or the power to say that certain persons holding certificates are not elected, and certain other persons not holding certificates are elected. No matter how great a wrong may have been done to any individual by means of the mistaken or fraudu- lent issuance of a certificate of election, a greater wrong would inure to society itself if the contestee or his friends, acting not as a legally-constituted tribunal, were themselves in advance of organization to pass upon the issues joined, and set such certificates aside without due process of law. To whatever extent such irregular proceedings are counte- nanced or encouraged, to that extent the orderly course of society is jeopardized. The forms of law are a part of the law, and it appears clear to me, that if the forms of law had been adhered to in the organization of the house of repre- sentatives, there would be no question as to who constituted its membership. It may be that strict justice would 'have seated contestants, but the injustice of irregular ways of get- ting at justice would be intolerable."

Thereupon the following protest was presented to the state senate:

"I, W. P. Dillard, senator from the 8th district, do hereby protest against the action of the senate this 14th day of January, 1893, in passing the resolution called 'House Concurrent Resolution No. 1,' and for the reason that I am satisfied that said resolution was not passed and transmitted to the senate by a legally-constituted or constitutionally-organized house of representatives.          W. P. DILLARD, *Senator*."

All of these protests appear in the journal of the state senate, presented in evidence on the part of the petitioner. Senators Taylor, O'Bryan, and Dillard, who filed the foregoing protests, are not republicans, and were not elected as republicans. They are not members of the minority party of the senate, or of the majority party of the house presided over by Hon. Geo. L. Douglass. The journal of the Douglass house also shows that on January 10, before any recognition of the Dunsmore house, a committee, appointed to prepare a written address from the members of the Douglass house to the governor, called upon and presented the same to him. This was signed by 64 members of the house of representatives having certificates of election, setting forth the organization and officers of the Douglass house, and asking recognition. The members of that committee were Hon. W. M. Glenn, Hon. C. E. Lobdell, and Hon. J. K. Cubbison. Subsequently, and before any recognition of any house, the Douglass house appointed a special committee to prepare an address to the governor, which was presented in writing to him. That committee consisted of Hon. E. W. Hoch, Hon. J. B. Remington, Hon. J. K. Cubbison, Hon. James A. Troutman, and Hon. C. E. Lobdell. The address was signed by 64 members of the house of representatives having certificates of election, and concluded as follows:

"We, therefore, in behalf of the people of the state of Kansas, and on behalf of the good name and credit of our state, and in the name of law, order, decency, and good government, call upon you, as the governor of the state of Kansas, to recognize the Hon. George L. Douglass as the legal and qualified speaker of the house of representatives of the state of Kansas, and ask that the protection of the law be thrown around him in exercising the duties of his office.

We present to your excellency this memorial, because we believe it to be our duty that the governor and the good people of the state should be informed of the true condition of affairs now existing in the hall of the house of representatives, and be informed of the illegal and revolutionary actions of a portion of our fellow-citizens."

The state senate has 40 members. At the time of these protests, one John M. Price, a republican, was absent. The house of representative has 125 members. Therefore it appears from the journals of the senate and house of representatives that 17 senators having certificates of election, and 64 members having certificates of election, making a total of 81 members, objected to recognizing the Dunsmore house as the house of representatives, and subsequently, on January 12, 1893, with the 64 members of the Douglass having certificates of election, two others, Hon. Stephen Meagher and Hon. T. G. Chambers, also having certificates of election, and Hon. Joseph Rosenthal, admitted by motion in the Douglass house, united, making in all, with the senate protesting members, 84 members, being more than a majority of the entire membership of the legislature, as opposed to the recognition of the Dunsmore house as the house of representatives.

We refer to these matters in the journals as showing the vigorous opposition of the members of the legislature to the recognition of the Dunsmore house, and the official and public challenges to which that house was incessantly and continuously subjected. The constitution ordains, as before stated, that it takes a majority of each house to constitute a quorum. If 58 members—a minority of the house—with lawful certificates, acting with 10 men who have not any credentials, but who claim that they were really elected, may, before or after an organization, go behind the written credentials or *prima facie* title of the members duly declared elected to make up a quorum or house, then a dozen members, or any number less than a quorum, can do the same thing, and it would be impossible to organize or conduct a legislative government according to constitutional or orderly methods. Any person can set up the claim that he has been elected to the

house, regardless of the truth of the matter; and if a certificate of election does not clothe the person who receives it with the lawful and rightful authority to act as a member, subject only to the judgment of the house after there is an organization of the members having certificates into an actual and acting house, the organization and control of the house must be in the hands of those who, by physical force, have the superior power to seat themselves as members, whether elected or not. The ballots, the votes, the returns, the certificates in such a case, would count for naught. The governor cannot lawfully recognize as a house a body which has no quorum, which is not a constitutional house. The governor cannot create a house out of an unorganized or unconstitutional body, at his own will. He cannot abolish or destroy by his order any legal or constitutional house of representatives. The senate cannot create or abolish a house of representatives. It cannot recognize an unorganized or an unconstitutional body as a legal or constitutional house. Neither can the governor and the senate together create, at their own will, a legal or constitutional house. Neither can they both abolish or destroy a legal or constitutional house. The house of representatives is a body authorized by the constitution of the state, and for certain purposes is independent and separate from the senate or the governor. Each house keeps and publishes its own journal; each house establishes its own rules; and each house is the judge of the elections, returns and qualifications of its own members. The legislative power of this state is vested in a house of representatives and senate, not in the governor and senate alone.

10. Constitutional house, not ousted, when.

6. Representatives—quorum —rules.

But again: It is claimed that the Dunsmore house has become a *de facto* house by the recognition from the senate, the governor, the executive officers, and others. As has been said, if the house known as the "Dunsmore house" had full and unlimited possession of the hall of representatives, and the rival party had ceased its existence, the question of a

*de facto* legislature would have strong force in this case. There often comes a time in the conduct of all bodies and officers when, on account of public interests, irregularities and even wrongs are cured. There comes a time when usurpation is successful. There comes a time when revolution is accomplished, and must be recognized; but a *de facto* house, a *de facto* government, usurpation of power and unlawful

methods are not accepted if a constitutional house, a constitutional government, rightful authority and legal methods are existing, transacting business, as against defective, irregular,

12. Constitutional house — its power not usurped or destroyed, when.

unwarranted acts, and unconstitutional exercise of power. But here is a valid and constitutional house attempting to carry on business. Every day of its session, so far as its journals show, the Douglass house challenged the rightfulness of the Dunsmore house. It challenged the action of the governor. It challenged the action of the state senate, and the very first act of the senate and the Dunsmore house was seized by a court of this state and throttled. Although the temporary order of injunction was made by the district court of Shawnee county, until it is reversed or vacated by proper proceedings in this court it is as valid and binding between the parties as the order of the supreme court of the state. This court must take knowledge of all the usual and ordinary incidents which are transacted around it, and it is unnecessary to say that the challenges have been so successful that various bodies divided upon this question, and there has been no acquiescence and no general agreement among the people that the Dunsmore house is the house of representatives. "An officer *de facto* must be in the actual possession of the office, and have the same under his control. If the officer *de jure* is in

possession of the office — if the officer *de jure* is also the officer *de facto* — then no other person can be an officer *de facto* for that office. Two

11. Office or body de jure — no ouster, when.

persons cannot be officers *de facto* for the same office at the same time." (*McCahon v. Comm'rs of Leavenworth Co.,* 8 Kas. 438.) This court subsequently reaffirmed this rule in the

case of *Braidy v. Theritt*, 17 Kas. 468, using the following language: "We have already held that two persons cannot be officers *de facto* for the same office at the same time." (*McCahon v. Comm'rs Leavenworth Co.*, supra.) Practically it was again stated in the case of *The State v. Durkee*, 12 Kas. 309. The supreme court of Nevada, in the case of *The State v. Blossom*, reported in 10 Pac. Rep. 430, states the rule in this way : "If an office is filled, and the duties pertaining thereto are performed by the officer *de jure*, another person, although claiming the office under color of title, cannot become an officer *de facto*." Leonard, J., in delivering the opinion of the court in the above case, used the following language:

"The principal ground urged by relator in support of his petition is, that Harris and others were the *de facto* board, and that their acts as such were good and binding in law as to the public and third parties. The general principle stated by counsel for relator, that, as to the public and third parties, the acts of *de facto* officers are binding, is well-settled and admitted. . . . There were two boards, each claiming that the other was unlawful, each urging and maintaining the validity of its own. acts, each proceeding as though the other did not exist in the matter of employing teachers, etc. . . . It is undoubtedly true, as claimed by counsel for relator, that the new trustees would have become a *de facto* board, if the old ones had not acted as such; but, since they did, as above stated, were they not the *de facto* board? Two physical bodies cannot occupy the same place at the same time, and two persons cannot be officers *de facto* for the same office at the same time. If the office is filled, and the duties appertaining thereto are performed by an officer *de jure*, another person, although claiming the office under color of title, cannot become an officer *de facto*." (*McCahon v. Comm'rs of Leavenworth Co.*, 8 Kas. 441; *Boardman v. Halliday*, 10 Paige, 232; *Morgan v. Quackenbush*, 22 Barb. 80; *Cohn v. Beal*, 61 Miss. 399.)

In the case of *The State v. Comm'rs of Ford Co.*, 12 Kas. 441, it was ruled, that "where the legislature has seemingly recognized the existence of a county organization of a certain county by passing an act providing for the holding of terms

of the district court therein, but where such county, up to the time of such seeming recognition, never had any organization, *de facto* or otherwise, such recognition does not have the effect to create an organization." In *Murphy v. Moies*, 25 Atl. Rep. (R. I.) 977, which cites the leading cases upon the recognition of *de facto* officers, the law is thus stated: "Reputation and acquiescence are controlling elements in determining the validity of official acts as those of an officer *de facto*."

The Douglass house is the body or house *de jure;* is in possession of the office; is in possession of the hall — at least, it is holding its sessions and transacting its business in representative hall. Then the other body, the Dunsmore house — the minority, the so-called "*de facto* house" — has not the exclusive possession of the hall; has not the exclusive possession of the office; and has not ousted, destroyed or dissolved the Douglass house.

The reference to the two Georgia cases — *Gormly v. Taylor*, 44 Ga. 76, and *Railroad Co. v. Little*, 45 id. 370 — is not pertinent to the issues of this case. In both of those cases the principal question for decision was the validity of acts of the general assembly of Georgia under a section of the constitution of that state, which provides that "no session · of the general assembly, after the second under this constitution, shall continue longer than 40 days, unless prolonged by a vote of two-thirds of each branch thereof." Both decisions were rendered by a divided court, but in neither case were there two rival legislatures or houses in dispute. In neither case, was the house only the subject of the contention, but in both cases reference was had to the "general assembly" — to the supreme legislature. If we had a case like *Railroad Co. v. Little*, supra, before us, the question of a *de facto* law would be very strong. After going over all the matters connected with it, the court, among other things, says: "In this case there was a hot dispute over the matter. Men honestly differed as to the truth of the case, and the decision was made. It has been acted upon for two years by the people, by the executive, and by this court, until it has become an accomplished

fact." (45 Ga. 370.)   Whenever an act of the legislature is brought into this court, not in violation of the constitution, which has been acted upon by the people of the state for two years, and which has been acted upon by this court as a completed and binding enactment, a *de facto* law may come into existence.   When such a case comes, we will decide.   But there is no such case presented by the journals.   There is no such case presented by the argument.   There is no such case for us to pass upon.   The Dunsmore house never had but 58 constitutional members.   It never had the legal power to create any more members.   It therefore never had the legal power to enlarge its numbers.   So long as there is a legal and constitutional house of representatives carrying on business in the identical hall where it is usual and customary for its business to be transacted, it seems to us that this question of a *de facto* house of representatives has not arisen to that reputation or acquiescence worthy of serious consideration.   Is it possible that a body consisting of less than a quorum — less than a majority — can be a constitutional house of representatives under any circumstances, whether by recognition or otherwise?   We say not.   A majority of members elected to each house, voting in the affirmative, is necessary to pass any bill or joint resolution.   No act not having received a constitutional majority of the votes of the members of the house can ever become a law.   It is immaterial what the senate may do, what the governor may do.   A constitutional majority of the votes of the house of representatives is necessary for legislative action in any case.

The case of *The State v. Smith*, 44 Ohio St. 348, (7 N. E. Rep. 447, and 12 id. 829,) has been cited to establish the doctrine that certain persons may be *de facto* members of the house to which they belong, although not *de jure* members. That case, and similar cases from Michigan and other states, have no application.   There were not two houses or two legislatures in session in Ohio.   In that case the senate was legally organized, and for a time, it is conceded, a quorum was present, and its journal properly made.   Subsequently,

14 — 50 KAS.

about 20 members, being a majority, left the senate chamber; and it is asserted that 17 members, less than a quorum, proceeded to transact business—admitting other members, and continuing its journal as showing that a majority of the senate was present and acting. The supreme court held, under the circumstances, that the journal or record of the senate imported absolute verity, and could not be impeached by parol testimony tending to show less than a quorum was present. Whether that decision would be good law in this state, in view of the decision in *The State, ex rel., v. Francis,* 26 Kas. 724, we need not now inquire; but it is a case different from the one we are investigating, because the Dunsmore house never legally organized, never had a legal majority, never had a constitutional quorum, and therefore never had a legal journal to conclusively import anything. But even in the Ohio case the chief justice vigorously dissented, and, among other things, said:

"By the averments of this reply, there was no senate— simply a number of its members wholly without power to act. There was no senate journal, but a false and fraudulent pretense of one; and, for aught that appears in this case, this pretended journal might, if offered in evidence, or brought before us, be relied upon to establish, in part, the facts averred. . . . The attempt to sustain the act in question by the rule relating to officers *de facto* is a palpable misapplication of a familiar doctrine; . . . but, in the case before us, there was not the slightest color of authority to constitute the persons members of the senate who are relied upon to give vitality to the act. Their title to their seats has never risen higher than a deliberate plot to circumvent a plain command of the constitution. But it must be remembered that the averment of the reply is that less than a quorum (17 members) were present when this act was passed. There is another principle which is fatal to the view here contended for and adopted by the majority. There is no form of direct attack upon the authority of these pretended senators to act recognized by the law. The present is the only available form of attack upon their proceedings. *Quo warranto* would not lie to call in question their authority to exercise the functions of senators. The present is to be treated as a direct attack, for the reason that no other form of attack can be made. The

principle is well established, that where a direct attack upon a proceeding cannot for any reason be made, it may be collaterally questioned. ( *Vose v. Morton*, 4 Cush. 31, and cases there cited.)"

The Georgia, Ohio, Michigan and other similar cases are of the class referred to by McCrary on Elections ( 2d ed.), § 517: "The cases in which the official acts or votes of members of a legislative body who are such *de facto* only, and not *de jure*, have been held valid are all cases in which there was no question as to the legality of the body in which they sat." At least, those cases are of that class when there is only one body, or house — not two.

From all that we have said, our conclusion is, and must imperatively be, that the house known as the "Douglass house" is the legal and constitutional house of representatives of the state of Kansas, and, being such house it has the power to compel witnesses to appear and testify before it or one of its committees in election contests arising in that body. It has full power to punish for contempt any witness who refuses to appear when personally subpœnaed in an election contest, or other proper proceedings pending. It has also the power to protect itself from disorder, disturbance, or violence. It has never been destroyed, ousted or dissolved since its organization. It is a body or house "having authority to commit." ( *Anderson v. Dunn*, 6 Wheat. 204; *Burnham v. Morrissey*, 14 Gray, 226; *In re Falvey*, 7 Wis. 630; *People v. Keeler*, 99 N. Y. 463; 2 N. E. Rep. 615; Rap. Cont., § 2.)

*4. House of representatives may compel witnesses to attend.*

*5. Contumacious witness — arrest and imprisonment.*

It has been suggested that we should hesitate to give an opinion in this case upon the legality of either of the contending bodies claiming to be the house of representatives, because unpleasant complications might arise therefrom; and it has been even suggested that the governor and the senate will not find their way clear, after what has passed, to communicate and act with the legal house, known as the "Douglass house," and therefore, as a result, that appropriations may fail; that

the governor's office, and all the other departments of the government, including the judiciary, will have no funds with which to transact public business. More unfortunate still, it has been suggested that the educational, charitable and penal institutions of the state will be closed and the inmates discharged for want of money with which to operate them. We trust that such will not be the result. We assume that the governor of the state is honest and patriotic. We assume that the members of both houses and the senate are honest, and actuated by worthy motives; and we trust that in the end there may be some way, as in Alabama, as in Maine, by which the legal bodies and the governor can act harmoniously and unitedly. The questions involved in this case are above partisanship. They concern the public; they concern the state; and party and partisanship should be wholly disregarded by each and by all. Let the mistakes of the past be corrected, and the unfortunate differences pass without further comment into oblivion. Let mutual concessions prevail, and then, perhaps, amicable relations between the belligerent and discordant elements may be restored. "He serves his party best who serves his country most." The gravity of the subject we fully understand. Certainly no constitutional or public question can be more solemn than that arising from the present contention respecting the organization of the house of representatives. While we deplore the occasion which compels us to hear and determine this case, we feel constrained by the imperative command of the constitution, and by our own conscientious discharge of public duty, to declare these views, irrespective of policy or expediency. Entertaining the views we do, we cannot consent to rob the highest judicial tribunal of this state of its constitutional rights; nor can we consent to exalt the executive or the senate of the state above the demands of justice, of safety, or the welfare of the people.

But if all the unfortunate circumstances should arise which have been predicted, disastrous and fearful as they may be, we believe the consequences will be more unfortunate to the people of this state, and put all the people in greater peril, if this

court shall, by a majority of its members, declare and proclaim that the refusal of the governor or the senate, or of both, to recognize the constitutional house of representatives wipes the house out of existence, when it is attempting to carry on its duties in a legal and lawful way; wipes out the house, and takes from the people their most popular branch of the legislature, that body which is closest and dearest to their hearts. In all history, at all times, in a representative government, the lower house, or the "popular branch," as it is called, has been generally regarded as more in touch with the people — with the voters — and therefore more closely the representative of the people, than the senatorial or the longer-term body of the legislature. If the senate, consisting of 40 members, may, with the governor, decide by recognition what persons, whether elected or not, are members of the house of representatives, and what body, whether elected or not, is the house of representatives, then a majority of the senate, with the governor, being only 22 officials, may overthrow the constitutional house of representatives, and abolish 125 officials, such officials being the members of the larger body or branch of the legislative assembly. If the action of the governor and the senate can do that now, then two years ago Governor Humphrey and the senate, which was almost unanimously of his own political party, might have recognized a minority of the other house, and with such recognition could have reëlected Senator John J. Ingalls to the United States senate, and defeated Senator Peffer, and could have carried on all business, under the rule of recognition. If the present governor and senate may do this now, another governor and another senate may follow the example; and hereafter, for all time, with the sanction of this court, the legislature will be composed of the governor and one house, recognizing and communicating with some other body, whether lawfully elected or not. The election of the second body will then be useless, unnecessary, abortive. Under such a practice, we would have two houses in name, but one only in fact; the one subservient to those that recognized it, but not inde-

pendent, and not representing fully all the people.    Either
we would have such an anomalous condition of affairs, or
else, at every organization of the legislature or of either house,
we would have at the capital of the state the clash of resound-
ing arms, and the contention of armed forces.    In such a case,
force, and force only, would rule, and not law.    At such a
condition we stand appalled; and, if a doctrine contrary to that
here announced be maintained, such a condition of affairs will
follow.    In this country, in this state, the law, not physical
force, governs.    Loyalty to law is the first—the paramount
—duty of every citizen.

It is argued on behalf of the doctrine giving the governor
and senate the arbitrary determination, beyond judicial con-
trol, as to what body is the house or *de facto* house of rep-
resentatives, that power must be lodged somewhere; and as
officials, and especially superior officials, are presumed to do
their duty, it is unjust to apprehend serious consequences
from unusual, fraudulent or illegal methods which such offi-
cers might pursue.    .Yet this rule, so declared, is not will-
ingly applied in the same argument to boards of canvassers,
(who have been designated in contemptuous language as "re-
turning boards merely,") although such boards of canvassers,
within the decisions of this court, are subject to judicial su-
pervision and control.    If we may presume that officials will
fully perform their duty, then such presumption favors boards
of canvassers, as much as other officials, and therefore the
certificates issued by such boards, especially by a state board
of canvassers, composed of state officers, ought to be looked
upon in the first instance as having been issued rightfully
and lawfully.    It is inconsistent and illogical, especially with-
out proof, to suppose that a state board of canvassers, in is-
suing certificates to the members elected to the legislature,
have not acted honestly, impartially, and legally.    We com-
mend to all suggesting that force or men shall rule, rather
than law, the acts and words of the historic Agesilaus.    When
that Spartan general, renowned for all time, was, after years
of desperate effort, upon the very threshold of success over

his ancient enemies, the Persians, he was suddenly recalled to Sparta, to the defense of that nation against threatened assault of new enemies, but recently friends. Upon the instant, he answered, obedient to the call of his country, and, leaving a field of operations pregnant with victory, he returned, to meet the call of duty. He sent this message:

*"Agesilaus to the Ephori, greeting:* We have reduced part of Asia, put the barbarians to flight, and made great preparations for the war in Ionia; but, as you order me to return, I am not far behind this letter, and would anticipate it, if possible. I received the command, not for myself, but for my country and its allies. I know that a general does not deserve or really fulfill the duties of that name but when he suffers himself to be guided by the laws and the ephori, and obeys the magistrates."

And by this obedience, the historian declares, he demonstrated the truth of what was said: "That at Sparta the laws ruled men, and not men the laws."

In conclusion, speaking for myself alone, and not for my brethren on the bench, I adopt substantially the language of Chief Justice Agnew, of the supreme court of Pennsylvania, when, with a courage and firmness worthy of John Hampden, in upholding the dignity and independence of his court, he said:

"On no ground of the constitution, law, public justice, state policy, or sound reason, can I discover any exemption of any officer in the state, high or low, from the common duty all citizens owe to the due administration of justice. I cannot abnegate a power intrusted to me by the people, and will return to them my commission, unsullied by any dereliction of duty, rather than abase this court, and pay obeisance at the shrine of unwarranted power or unconstitutional authority."

The petitioner will be remanded.

JOHNSTON, J., concurring.

ALLEN, J., dissenting: At the time the decision in this case was announced, I expressed orally my dissent from the conclusions reached by the majority of the court, and stated some of the reasons which then occurred to me why I could not concur in the conclusions reached by my brethren. I now proceed in a more deliberate manner to consider the very grave questions involved herein.

There is no difference of opinion among us as to the power of the court to release from restraint any person unlawfully restrained of his liberty, no matter what the pretense of authority may be. The principal divergence of opinion is as to the lawful scope of our inquiry, and as to the rules by which this court must be governed in inquiries affecting the integrity of the legislative department of the state government. It is conceded that if George L. Douglass was the speaker of the house of representatives at the time the warrant under which the petitioner was arrested was issued, and, in issuing such warrant, acted under the authority of the house of representatives of this state, the petitioner is lawfully in the custody of Clevenger, and should not be discharged under the proceedings in this case. That the court has authority to inquire into the legality of the arrest, and therefore to declare whether or not George L. Douglass is speaker of the house of representatives, there is no question; but the main controversy centers on the question whether this court is bound to follow the action of the political departments of the state government, or whether it may institute an inquiry of its own, and may decide for itself whether George L. Douglass or J. M. Dunsmore is speaker of the house of representatives. I do not regard it as accurate to say that this is a question arising between two contending bodies, each claiming to be the house of representatives, because each of these two bodies concedes the right of most of the individual members of the other body to seats in the legislature, and each of them retains on its own roll of members of the house most of the names of those composing the other body. The question presented is

as to which of these two men is speaker of the house. It is conceded that but one man can hold the office of speaker at a given time. Two men claim to be both *de jure* and *de facto* speaker. While this court is lawfully called upon to decide whether George L. Douglass is in fact the speaker, the limits of its inquiry and the rules by which it must be governed in determining that question are the principal subjects of contention. It was conceded on the argument that a direct proceeding could not be maintained, either by one of these two contending bodies against the other to determine its right to exercise the functions of the house of representatives, or by one of these men, who each claims to be the speaker of the house, for the purpose of determining their respective rights to the office of speaker, although this court has undoubted original jurisdiction in actions of *quo warranto*. Why does this distinction exist? This court, at its present session, has been called on to determine the rights of two persons each of whom claims to be the county commissioner of a remote county, and has heard the evidence and arguments in the case. Why may it not entertain a similar action for the purpose of determining the respective rights of these two men who claim to be the speaker of the house of representatives? Can any other answer be given than that the rights of Douglass and Dunsmore are determined elsewhere, and that the questions involved in the inquiry into their respective rights are questions which the constitution and laws have for good and sufficient reasons withdrawn from the consideration of this court? It is an anomaly in jurisprudence to hold that, in an action where the right of a party is collaterally drawn in question, the court may enter on a line of inquiry which it would be prohibited from pursuing in a direct proceeding, in which the parties interested were participants, and were afforded ample opportunity to present their claims and protect their rights.

In order to arrive at the reasons which have influenced the framers of our constitution to withdraw inquiries of this kind from the consideration of this court, and to place the deter-

mination of questions similar to these in other hands, it becomes necessary to examine the fundamental law, the general framework of our state government, and also briefly to recur to the leading points in the development of free government in English-speaking countries, and the division of powers among the several coördinate departments which have been found so essential to the preservation of the rights and liberties of the people. Though the constitution of the United States and the constitutions of the several states of the union are the works of the people of this country, they are yet modeled largely after the institutions of England, the common law of which country is still the law of this and most other states of the union, except so far as it has been modified by our constitution, statutes, and the peculiar conditions and wants of the people of the state. Paragraph 7281 of the General Statutes provides: "The common law, as modified by constitutional and statutory law, judicial decisions, and the conditions and wants of the people, shall remain in force in aid of the General Statutes of this state." In an autocratic government, the executive, legislative and judicial powers are all vested in the same person. In England, the king originally decided cases in person, and for many centuries the court records were made to recite the presence of the king himself, in person, long after the king had ceased to have anything to do with proceedings in the courts; and to this day the judges are theoretically appointed by the crown, though the recommendations of the ministry are now accepted by the queen. The legislative branch of the government in England has been for many centuries made up of a house of lords, who were hereditary legislators, and the house of commons, who were chosen by the people under a more or less restricted right of suffrage. The judges all derived their appointments and their powers from, and as representatives of, the crown; but parliament gradually forced upon the king a recognition of its rights, and has gradually extended its powers to such an extent that it is now the ruling power in England. At an early period, the sovereign insisted on the right to determine

who should be summoned to parliament, but the house resented such interference, and succeeded in asserting and maintaining its right to be the sole and exclusive judge of the election and qualification of its own members. It would neither submit to any interference by the crown, nor by the judges, who were the creatures of the crown. Though the reasons for this rule may not appear to be as strong in a state where all branches of our government are elective, still the framers of the constitution have seen fit to embody in the fundamental law a provision which it required long years of conflict for the British parliament to establish as its right. Section 1 of article 2 of the constitution provides that "the legislative power of this state shall be vested in a house of representatives and senate." Section 8 reads: "A majority of each house shall constitute a quorum. Each house shall establish its own rules; and shall be judge of the elections, returns and qualifications of its own members." The legislatures in the several states of the union have powers corresponding generally to the powers of the British parliament. They are the instruments through which the people express their supreme will in making the laws, subject, however, to the veto power vested in the executive, and the limitations of the constitution. Section one of article one provides: "The executive department shall consist of a governor, lieutenant governor, secretary of state, auditor, treasurer, attorney general, and superintendent of public instruction, who shall be chosen by the electors of the state at the time and place of voting for members of the legislature, and shall hold their offices for the term of two years, from the second Monday of January next after election, and until their successors are elected and qualified." Section 3 provides: "The supreme executive power of the state shall be vested in a governor, who shall see that the laws are faithfully executed." The executive and legislative constitute what are commonly denominated the political departments of the state government. It is they, and they alone, who as representatives of the people have the power to enact, change and amend the

laws in any manner they may see fit, provided they do not transcend the limits of their powers, as fixed by the constitution. They may create and abolish courts; they may prescribe rules and regulations by which courts shall be governed, as well as establish the laws fixing the rights of private individuals, and prescribe punishment for infractions of the code which they establish. What, then, is the proper place of the judiciary, and what are the limits of their functions? They are defined by article 3, from which we quote:

"SECTION 1. The judicial power of this state shall be vested in a supreme court, district courts, probate courts, justices of the peace, and such other courts inferior to the supreme court as may be provided by law; and all courts of record shall have a seal to be used in the authentication of all process.

"SEC. 2. The supreme court shall consist of one chief justice and two associate justices, a majority of whom shall constitute a quorum, who shall be elected by a majority of the electors, and whose term of office after the first shall be six years. At the first election the chief justice shall be chosen for six years, one associate justice for four years, and one for two years.

"SEC. 3. The supreme court shall have original jurisdiction in proceedings in *quo warranto, mandamus,* and *habeas corpus,* and such appellate jurisdiction as may be provided by law. It shall hold one term each year at the seat of government, and such other terms at such places as may be provided by law, and its jurisdiction shall be coextensive with the state."

It will be observed that the constitution gives to the supreme court original jurisdiction in only three classes of cases, and for all other jurisdiction it must look to the lawmaking power. It may have much or little, according as the legislature shall determine. It has jurisdiction in this case by virtue of the section of the constitution last quoted. The district courts are by statute given general jurisdiction of all matters, civil and criminal, with some slight exceptions. By section 8 of article 3 of the constitution, it is provided that "the probate court in each county" shall have jurisdiction in cases of *habeas corpus.* We thus see that this

court has precisely the same jurisdiction in an action of *habeas corpus* arising in this county that the district and probate courts of this county have. This court and the probate court, however, derive jurisdiction from the constitution, while the district court receives its power at the hands of the legislature. No provision of the constitution or the laws made thereunder prescribes any other or different rules for the government of this court in an action of this kind than are prescribed for the government of a probate court. The only difference in the powers of each is that the probate court is limited to one county, while the supreme court has jurisdiction coextensive with the state.

This court has seen fit to take testimony as to what transpired on the 10th day of January, when the legislature convened. It has taken testimony as to what persons were elected representatives. It has received in evidence a list from the office of the secretary of state for the purpose of showing what persons were elected to seats in the house. It has received and considered the oaths of office of various persons claiming the right to be members of the house. It has heard witnesses testify as to what occurred in representative hall at the time George L. Douglass and J. M. Dunsmore claim respectively to have been elected speaker. It has also received, not from the office of the secretary of state, but from the hands of Frank L. Brown, who claims to be clerk of the house of representatives, certain printed documents, which he claims are the journals of the house, though not printed by the state printer, and upon these, as evidence, this court proceeds to determine who is the speaker of the house. If this court may do so, then the district court or probate judge of this county may also sit in judgment in the same manner in a similar case, and may proceed with the same inquiry, and along the same lines. More than this, if the question as to what constitutes the house of representatives, and as to who is the presiding officer thereof, is a subject for judicial inquiry in collateral proceedings, the humblest judicial officer in the state would seem to have the right, whenever any act of the legislature is challenged as in-

valid because such legislature is not composed of persons duly authorized to act as legislators, to proceed with just such an inquiry as has been carried on in this case.    To sanction such practices is to overturn our system of government, and to place the lawmaking power, which has the right, and has from time immemorial exercised the right, to prescribe rules and regulations for the government of the judiciary, under the control and dominion of the courts; and in this case this court undertakes to prescribe for one branch of the legislature a rule which shall govern its action, in direct and pointed contravention of that provision of the constitution which says "each house shall establish its own rules."    Whence does this court get the right or the authority to say what rules shall govern the house of representatives in its organization?    No such power was ever possessed by the courts of England; no such power has ever been exercised by the courts of any English-speaking country.    Even the supreme lawmaking power itself—both branches of the legislature—and the executive combined would be powerless in the face of the provisions of the constitution to prescribe any rule which would be binding on any future house of representatives or senate with reference to its own modes of organization or procedure.

It is not the province of this court to decide every question.    Only judicial questions are proper subjects of its cognizance.    Every department of the government, and every officer in every department of the government, in the transaction of his duties, must decide questions.    Questions of expediency, of public policy, of changes and modifications of the criminal law, of rules governing private rights, of the power and jurisdiction of the courts, of their modes of procedure, are questions to be decided by the lawmaking power. Questions of expediency in the execution of the laws and in the performance of the functions of the executive department are to be determined by the governor and the other executive officers charged with those duties.    Generally speaking, it is the province of the court to declare what the law is, and to apply it to the determination of questions of private right.

Generally speaking, the courts have nothing to do with matters of policy, or with the determination of questions as to the expression of the popular will.    In order to determine what are judicial questions and what are political questions, it is necessary to review the practices of the departments of the government and the decisions of the courts.

The early case of *Penn v. Lord Baltimore*, 1 Ves. sr. 444, was an action brought on articles of agreement which had been entered into between William Penn and Lord Baltimore, in reference to establishing the boundaries to their respective provinces in America.    The bill was for the specific performance and execution of the articles.    It was objected that the court had no jurisdiction, because the suit related to the boundaries of political provinces, and that the jurisdiction was in the king and council, and not in the court.    Lord Chancellor Hardwicke, while he entertained jurisdiction and decided the case, did so upon the ground that the action arose on a contract between the parties as individuals, and in the opinion uses this language:

"It is certain that the original jurisdiction in cases of this kind, relating to boundaries between provinces, and dominion and proprietary government, is in the king and council. . . .    This court therefore has no original jurisdiction on the direct question of the original right of the boundaries; but this bill does not stand in need of that; it is founded on articles in England under seal for mutual consideration, which gives jurisdiction to the king's courts, both law and equity, of the subject-matter."

The case of the *Nabob of the Carnatic v. East India Company*, 1 Ves. jr., 370, and 2 Ves. jr., 56, was an action brought for a discovery and accounting by the company for certain revenues derived from provinces over which the nabob had held sway, but from which, under a treaty with the company, they had collected the revenue.    It was objected that the nabob was a sovereign prince of a foreign country, and that under the authority of the act of parliament the company had been given power to make peace or war with the natives of India, not Christians, as should be most for their advan-

tage; that the transactions between them were between sovereign powers, and were of a political nature, which the court had no jurisdiction to determine. After elaborate argument, the court sustained this objection and dismissed the bill, Lord Commissioner Eyre saying:

"It is a case of mutual treaty between persons acting in that instance as states, independent of each other; and the circumstance that the East India Company are mere subjects with relation to this country has nothing to do with that. The case upon which the court proceeds is introduced by the answer, which has had added a great number of particulars to the case, by introducing the other treaty which explains the first, and it was not merchantable in its nature, but political."

In the case of *Foster v. Neilson*, 2 Pet. 306, the question as to the boundaries of a tract of land ceded by Spain to France by the treaty of St. Ildefonso was in question. In delivering the opinion of the court, Chief Justice Marshall used the following language:

"In a controversy between two nations concerning national boundaries, it is scarcely possible that the courts of either should refuse to abide by the measures adopted by its own government. There being no common tribunal to decide between them, each determines for itself its own rights, and if they cannot adjust their differences peaceably, the right remains with the strongest. The judiciary is not that department of the government to which the assertion of its interests against foreign powers is confided, but its duty commonly is to decide upon individual rights according to those principles which the political departments of the nation have established."

In *Williams v. Insurance Co.*, 13 Pet. 420, Mr. Justice McLean, delivering the opinion of the court, says:

"And can there be any doubt that, when the executive branch of the government, which is charged with her foreign relations, shall in its correspondence with a foreign nation assume a fact in regard to the sovereignty of any island or country, it is conclusive on the judicial department? And in this view it is not material to inquire, nor is it the province of the court to determine, whether the executive be right or wrong. It is enough to know that in the exercise of his con-

stitutional functions he has decided the question. Having done this under the responsibilities which belong to him, it is obligatory on the people and government of the nation."

The leading case in this country on the main point in controversy is that of *Luther v. Borden et al.*, reported in 7 How., p. 1. That case grew out of the Dorr rebellion in Rhode Island. It was a suit brought by Martin Luther, a citizen of Massachusetts, against the defendants, for damages occasioned by trespasses alleged to have been committed by the defendants in Rhode Island. The defendants justified their acts, claiming that they were done under the lawful orders of an officer of the militia in whose company they were enrolled. The state of Rhode Island did not adopt a constitution after the revolutionary war, as most of the colonies did, but continued on under the old charter government. In 1841, an attempt was made to hold an election and form a new government. A convention was called, constitution framed, and election held for its ratification; state officers were elected, and an attempt was made to install the new government. The old charter government refused to recognize these proceedings, and refused to recognize the new officers. The militia were called out, and a period of great excitement followed. On the trial of this action, the defendants sought to prove the establishment of the new government with Dorr at its head. Testimony tending to prove these facts was rejected by the court, and the principal matter considered by the supreme court of the United States was as to whether the court could take testimony on that question. Two governments, two legislatures and two governors were claiming the right to act at the same time. The president of the United States, however, recognized the old charter government. The opinion in the case, delivered by Chief Justice Taney, is directly in point in this case, as bearing on the right of the court to enter into the consideration of a political question on which the executive department has acted. I quote from his language:

"Certainly the question which the plaintiff proposed to raise

15 — 50 KAS.

by the testimony he offered has not heretofore been recognized as a judicial one in any of the state courts. In forming the constitutions of the different states, after the declaration of independence, and in the various changes and alterations which have since been made, the political department has always determined whether the proposed constitution or amendment was ratified or not by the people of the state, and the judicial power has followed its decision. In Rhode Island, the question has been directly decided. Prosecutions were there instituted against some of the persons who have been active in the forcible opposition to the old government. And in more than one of the cases evidence was offered on the part of the defense similar to the testimony offered in the circuit court, and for the same purpose; that is, for the purpose of showing that the proposed constitution had been adopted by the people of Rhode Island, and had, therefore, become the established government, and consequently that the parties accused were doing nothing more than their duty in endeavoring to support it. But the courts uniformly held that the inquiry proposed to be made belonged to the political power and not to the judicial; that it rested with the political power to decide whether the charter government had been displaced or not; and when that decision was made, the judicial department would be bound to take notice of it as the paramount law of the state, without the aid of oral evidence or the examination of witnesses; that, according to the laws and institutions of Rhode Island, no such change had been recognized by the political power; and that the charter government was the lawful and established government of the state during the period in contest, and that those who were in arms against it were insurgents, and liable to punishment. This doctrine is clearly and forcibly stated in the opinion of the supreme court of the state in the trial of Thomas W. Dorr, who was the governor elected under the opposing constitution, and headed the armed force which endeavored to maintain its authority. Indeed, we do not see how the question could be tried and judicially decided in a state court.

"The fourth section of the fourth article of the constitution of the United States provides that the United States shall guarantee to every state in the union a republican form of government, and shall protect each of them against invasion, and, on the application of the legislature or of the executive (when the legislature cannot be convened), against domestic

violence.    Under this article of the constitution, it rests with
congress to decide what government is the established one in
a state.    For as the United States guarantees to each state a
republican government, congress must necessarily decide what
government is established in the state before it can determine
whether it is republican or not; and when the senators and
representatives of a state are admitted into the councils of the
union, the authority of the government under which they are
appointed, as well as its republican character, is recognized by
the proper constitutional authority ; *and its decision is binding
on every other department of the government, and could not be
questioned in a judicial tribunal.*    It is true that the contest
in this case did not last long enough to bring the matter to
this issue; and as no senators or representatives were elected
under the authority of the government of which Mr. Dorr
was the head, congress was not called upon to decide the con-
troversy.    *Yet, the right to decide is placed there, and not in
the courts.*"

In this case, Mr. Justice Woodbury dissented, but not on
the ground of any disagreement with the majority of the
court on this particular question.    On the contrary, he takes
occasion to expressly concur in that particular.    He says:

"I concur with the rest of the court in the opinion that
the other leading question — the validity of the old charter
at that time — is not within our constitutional jurisdiction.
These two inquiries seem to cover the whole debatable ground,
and I refrain to give an opinion on the last question, which
is merely political, under a conviction that, as a judge, I pos-
sess no right to do it, and not to avoid or conceal any views
entertained by me concerning them, as mine, before sitting
on this bench, and as a citizen, were frequently and publicly
avowed.    It must be very obvious, on a little reflection, that
the last is a mere political question.    Indeed, large portions
of the points subordinate to it, on this record, which have
been so ably discussed at the bar, are of a like character,
rather than being judicial in their nature and cognizance; for
they extend to the power of the people, independent of the
legislature; to make constitutions, to the right of suffrage
among different classes of them in doing this, to the author-
ity of naked majorities, and other kindred questions, of such
high political interest as during a few years to have agitated
much of the union, no less than Rhode Island.    *But, for-*

tunately for our freedom from political excitements in judicial duties, this court can never with propriety be called on officially to be the umpire in questions merely political. The adjustment of these things belongs to the people and their political representatives, either in the state or general government. These questions relate to matters not to be settled on strict legal principles. They are adjusted rather by inclination, or prejudice, or compromise, often. Some of them succeed or are defeated even by public policy alone, or mere naked power, rather than intrinsic right. There being so different tastes as well as opinions in politics, and especially in forming constitutions, some people prefer foreign models, some domestic, and some neither; while judges, on the contrary, for their guides, have fixed constitutions and laws, given to them by others, and not provided by themselves. And those are no more Locke than an Abbe Sieyes, but the people. Judges, for constitutions, must go to the people of their own country, and must merely enforce such as the people themselves, whose judicial servants they are, have been pleased to put into operation.

"Another evil, alarming and little foreseen, involved in regarding these as questions for the final arbitrament of judges would be, that in such an event all political privileges and rights would, in a dispute among the people, depend on our decision finally. We would possess the power to decide against as well as for them; and, under a prejudiced or arbitrary judiciary, the public liberties and popular privileges might thus be much perverted, if not entirely prostrated. But, allowing the people to make constitutions and unmake them, allowing their representatives to make laws and unmake them, and without our interference as to their principles or policy in doing it, yet, when constitutions and laws are made and put in force by others, then the courts, as empowered by the state or the union, commence their functions, and may decide on the rights which conflicting parties can legally set up under them, rather than about their formation itself. Our power begins after theirs ends. Constitutions and laws precede the judiciary, and we act only under and after them, and as to disputed rights beneath them, rather than disputed points in making them. We speak what is the law—*jus dicere;* we speak or construe what is the constitution, after both are made; but we make, or revise or control neither. The disputed rights beneath constitutions already made are to be

governed by precedents, by sound legal principles; by positive legislation, clear contracts, moral duties, and fixed rules. They are, *per se,* questions of law, and are well suited to the education and habits of the bench. But the other disputed points in making constitutions, depending often, as before shown, on policy, inclination, popular resolves, and popular will, and arising not in respect to private rights—not what is *meum* and *tuum*—but in relation to politics, they belong to politics, and they are settled by political tribunals, and are too dear to a people bred in the school of Sydney and Russell for them ever to intrust their final decision, when disputed, to a class of men who are so far removed from them as the judiciary; a class, also, who might decide them erroneously as well as right, and if in the former way, the consequences might not be able to be averted except by a revolution, while a wrong decision by a political forum can often be peacefully corrected by new elections or instructions in a single month. And if the people, in the distribution of powers under the constitution, should ever think of making judges supreme arbiters in political controversies, when not selected by, nor frequently amenable to, them, nor at liberty to follow such various considerations in their judgments as belong to mere political questions, they will dethrone themselves and lose one of their own invaluable birthrights; building up in this way —slowly, but surely—a new sovereign power in the republic, in most respects irresponsible, and unchangeable for life, and one more dangerous, in theory at least, than the worst elective oligarchy in the worst of times. . . .

"The subordinate questions which also arise here in connection with the others, such as whether all shall vote in forming or amending those constitutions who are capable and accustomed to transact business in social and civil life, and not others; and whether, in great exigencies of oppression by the legislature itself, and refusal by it to give relief, the people may not take the subject into their own hands, independent of the legislature; and whether a simple plurality in number, on such an occasion, or a majority of all, or a larger proportion, like two-thirds or three-fourths, shall be deemed necessary and proper for a change; and whether, if peacefully completed, violence can afterwards be legally used against them by the old government, if that is still in possession of the public property and public records; whether what are published and acted on as the laws and constitution of a state were made

by persons duly chosen or not, were enrolled and read according to certain parliamentary rules or not, were in truth voted for by a majority or two-thirds — these and several other questions equally debatable and difficult in their solution are in some aspects a shade less political. But they are still political. They are too near all the great fundamental principles in government and are too momentous ever to have been intrusted by our jealous fathers to a body of men like judges, holding office for life, independent in salary, and not elected by the people themselves."

In the case of *The State of Georgia v. Stanton,* 6 Wall. 50, the supreme court of the United States, again affirmed the same doctrine as laid down in the Borden case, the syllabus in which case reads as follows:

"1. A bill in equity filed by one of the United States to enjoin the secretary of war and other officers who represent the executive authority of the United States from carrying into execution certain acts of congress, on the ground that such execution would annul and totally abolish the existing state government of the state, and establish another and different one in its place — in other words, would overthrow and destroy the corporate existence of the state, by depriving it of all the means and instrumentalities whereby its existence might, and otherwise would, be maintained — calls for a judgment upon a political question, and will therefore not be entertained by this court.

"2. This character of the bill is not changed by the fact that in setting forth the political rights sought to be protected, the bill avers that the state has real and personal property, (as, for example, the public buildings, etc.,) of the enjoyment of which, by the destruction of its corporate existence, the state will be deprived; such averment not being the substantive ground of the relief sought."

In this case Mr. Justice Nelson, in delivering the opinion of the court, said:

"The distinction between judicial and political power is so generally acknowledged in the jurisprudence both of England and of this country, that we need do no more than refer to some of the authorities on the subject. They are all in one direction. . . . That these matters, both as stated in the body of the bill, and in the prayers for relief, call for the

judgment of the court upon political questions, and upon rights, not of persons or property, but of a political character, will hardly be denied. For the rights for the protection of which our authority is invoked are the rights of sovereignty, of political jurisdiction, of government, of corporate existence as a state, with all its constitutional powers and privileges. No case of private rights or private property infringed, or in danger of actual or threatened infringement, is presented by the bill in a judicial form, for the judgment of the court. . . Having arrived at the conclusion that this court, for reasons above stated, possesses no jurisdiction over the subject-matter presented in the bill for relief, it is unimportant to examine the question as it respects jurisdiction over the parties defendant."

In the case of *Jones v. United States*, 137 U. S. 212, Mr. Justice Gray, speaking for the supreme court, said:

"Who is the sovereign, *de jure* or *de facto*, of a territory, is not a judicial, but a political question, the determination of which, by the legislative and executive departments of any government, conclusively binds the judges, as well as all other officers, citizens and subjects of that government. This principle has always been upheld by this court, and has been affirmed under a great variety of circumstances. (*Gelston v. Hoyt*, 3 Wheat. 246, 324; *United States v. Palmer*, 3 id. 610; *The Divina Pastora*, 4 id. 52; *Foster v. Neilson*, 2 Pet. 253, 307, 309; *Keane v. McDonough*, 8 id. 308; *Garcia v. Lee*, 12 id. 511, 520; *Williams v. Suffolk Insurance Co.*, 13 id. 415; *United States v. Yorba*, 1 Wall. 412, 423; *United States v. Lynde*, 11 id. 632, 638.)

"It is equally well settled in England. (*The Pelican*, Edw. Adm., appx. 'D;' *Taylor v. Barclay*, 2 Sim. 213; *Emperor of Austria v. Day*, 3 De Gex, F. & J. 217, 221, 223; *Republic of Peru v. Peruvian Guano Co.*, 36 Ch. D. 489, 497; *Republic of Peru v. Dreyfus*, 38 id. 348, 356, 359.)"

So late as October, 1891, the same high court, in *In re Cooper*, which grew out of the controversy between the United States and Great Britain over their respective rights to the waters of Behring sea, reaffirms the doctrine laid down in the cases cited. The case grew out of the capture of a British sealer in Behring sea, 59 miles from land. The attorney general of Canada, with the knowledge and approval of the imperial

government of Great Britain, requested the aid of the court for the claimant, a British subject, and sought to submit the controversy to the supreme court of the United States; but it appeared that the vessel had been taken under the orders of the executive department, and the court declined to take jurisdiction, and refused to interfere with the action of the political department. Chief Justice Fuller, after commenting on the treaty under which Alaska was acquired, and the act of Congress of March 2, 1889, says:

"If this be so, the application calls upon the court, while negotiations are pending, to decide whether the government is right or wrong, and to review the actions of the political departments upon the question, contrary to the settled law in that regard."

The chief justice cites *Foster v. Neilson,* 2 Pet. 253; *Williams v. Suffolk Ins. Co.,* 3 Sumn. 270; 13 Pet. 415; *Luther v. Borden,* 7 How. 1; *Georgia v. Stanton,* 6 Wall. 50; *Jones v. United States,* 137 U. S. 202; *Nabob of Carnatic v. East India Co.,* 1 Ves. jr. 371; same case, 2 id. 56; *Barclay v. Russell,* 3 id. 424; *Penn v. Lord Baltimore,* 1 Ves. sr. 444; and proceeds in this case:

"Her Britannic majesty's attorney general of Canada has presented, with the knowledge and approval of the imperial government of Great Britain, a suggestion on behalf of the claimant. . . . We are not insensible of the courtesy implied in the willingness thus manifested that this court should proceed to the decision on the main question argued for the petitioner, nor do we permit ourselves to doubt that under such circumstances the decision would receive all the consideration that the utmost good faith would require; but it is very clear that, presented as a political question merely, it would not fall within our province to determine it."

In *Cæsar Griffin's Case,* (Chase's Decisions, page 412,) Chief Justice Chase said:

"When the functionaries of the state government existing in Virginia at the commencement of the late civil war took part, together with a majority of the citizens of the state, in rebellion against the government of the United States, they

ceased to constitute a state government for the state of Virginia which could be recognized as such by the national government. Their example of hostility to the union, however, was not followed throughout the state. In many counties the local authorities and majority of the people adhered to the national government; and representatives from these counties soon after assembled in convention at Wheeling, and organized a government for the state. This government was recognized as the lawful government of Virginia by the executive and legislative departments of the national government; and this recognition was conclusive upon the judicial department."

The case of *United States v. Ballin*, 144 U. S. 1, which holds the Reed rule, adopted by the national house of representatives, to be valid, is entirely in harmony with the cases cited, so far as it affects this particular question.

Let us now consider the views of the great text writers who have expounded the provisions of the constitution, and the decisions of the courts of last resort of the several states; and in doing so let us steadily keep in mind the fact that a controversy exists as to the organization of one of the political departments of the state, and that the question that we are to determine now is, upon whom rests the responsibility of deciding which is the legal organization? and whether that question is a judicial one, or a political one, to be determined by the other political departments. Judge Story, in his work on the Constitution, in § 374, says:

"In order to clear the question of all minor points, which might embarrass us in the discussion, it is necessary to suggest a few preliminary remarks. The constitution contemplating the grant of limited powers, and distributing them among various functionaries, and the state governments, with their functionaries, being clothed with limited powers, subordinate to those granted to the general government, whenever any question arises as to the exercise of any power by any of these functionaries under the state or federal government, it is of necessity that such functionaries must·in the first instance, decide upon the constitutionality of the exercise of such power. It may arise in the course of the discharge of the functions of any one or of all of the great departments of government, the executive, the legislative, and the judicial. The officers

of each of these departments are equally bound by their oaths of office to support the constitution of the United States, and are, therefore, conscientiously bound to abstain from all acts which are inconsistent with it. Whenever, therefore, they are required to act in a case not hitherto settled by any proper authority, these functionaries must, in the first instance, decide, each for himself, whether, consistently with the constitution, the act can be done. If, for instance, the president is required to do any act, he is not only authorized but required to decide for himself whether, consistently with his constitutional duties, he can do the act. So, if a proposition be before congress, every member of the legislative body is bound to examine and decide for himself whether the bill or resolution is within the constitutional reach of the legislative powers confided to congress. And in many cases the decision of the executive and legislative departments, thus made, become final and conclusive, being from their very nature and character incapable of revision. Thus, in measures exclusively of a political, legislative or executive character, it is plain that as the supreme authority, as to these questions, belongs to the legislative and executive departments, they cannot be reëxamined elsewhere."

In a note to this section, Mr. Jefferson is quoted as saying;

"My construction is, that each department of the government is truly independent of the others, and has an equal right to decide for itself what is the meaning of the constitution in the laws submitted to its action, and especially when it is to act ultimately and without appeal."

President Lincoln, in his inaugural address, said:

"I do not forget the position assumed by some, that constitutional questions are to be decided by the supreme court; nor do I deny that such decisions must be binding, in any case, upon the parties to a suit, as to the object of that suit, while they are also entitled to very high respect and consideration in all parallel cases by all other departments of the government. And while it is obviously possible that such decision may be erroneous in any given case, still the evil effect following it, being limited to that particular case, with the chance that it may be overruled and never become a precedent for other cases, can better be borne than could the evils of a different practice. At the same time, the candid citizen must confess that if the policy of the government

upon vital questions affecting the whole people is to be irrevocably fixed by decisions of the supreme court, the instant they are made in ordinary litigation between parties in personal actions, the people will have ceased to be their own rulers, having to that extent practically resigned their government into the hands of that eminent tribunal."

President Jackson, in 1832, in his veto message on the act for a recharter of the Bank of the United States, said:

"If the opinion of the supreme court covered the whole ground of this act, it ought not to control the coördinate authorities of this government.    The congress, the executive and the court must, each for itself, be guided by its own opinion of the constitution.    Each public officer who takes an oath to support the constitution swears that he will support it as he understands it, and not as it is understood by others. It is as much the duty of the house of representatives, of the senate and of the president to decide upon the constitutionality of any bill or resolution which may be presented to them for passage or approval, as it is of the supreme judges when it may be brought before them for judicial decision. The opinion of the judges has no more authority over congress than the opinion of congress has over the judges; and, on that point, the president is independent of both.    The authority of the supreme court must not, therefore, be permitted to control the congress or the executive when acting in their legislative capacities, but to have only such influence as the force of their reasoning may deserve."

With the rulings of the supreme court of the United States on this question, all of the state courts that have been called on to decide similar questions concur.    The supreme court of the state of Pennsylvania, in the case of *Kerr v. Trego*, 47 Pa. St. 292, which was brought to determine which of two contending bodies of men constituted the common council of the city of Philadelphia, while entertaining jurisdiction of that case, takes occasion to say:

"In all cases of this kind, at least in all bodies that are under law, the law is that where there has been an authorized election for the office in controversy, the certificate of election, which is sanctioned by law or usage, is the *prima facie* written title to the office, and cannot be set aside only by a contest

in the forms prescribed by law. This is not now disputed. No doubt this gives great power to dishonest election officers, but we know no remedy for this but the choice of honest men. When party fealty is a higher qualification than honesty or competency, we must expect fraud and force to rule; and a man must be an Ajax or a Ulysses to be qualified for office. On the division of a body that ought to be a unit, the test of which represents the legitimate, social succession is, which of them has maintained the regular forms of organization according to the laws and usages of the body, or, in the absence of these, according to the laws, customs and usages of similar bodies in like cases, or in analogy to them. This is the uniform rule in such cases. It is always applied in the case of church divisions, and was so applied by us three times last year in the church cases already alluded to. *The courts can never apply it to divisions in the supreme legislature, because that body is subject to no judicial authority, and cannot be."*

Judge Cooley, in his work on Constitutional Limitations, beginning on page 50, says:

"We have already seen that we are to expect in every constitution an apportionment of the powers of government. We shall also find certain duties imposed upon the several departments, as well as upon specified officers in each, and we shall likewise discover that the constitution has sought to hedge about their action in various ways, with a view to the protection of individual rights, and the proper separation of duties. And whenever anyone is called upon to perform any constitutional duty, or to do any act in respect to which it can be supposed that the constitution has spoken, it is obvious that a question of construction may at once arise, upon which some one must decide before the duty is performed or the act done. From the very nature of the case, this decision must commonly be made by the person, body or department upon whom the duty is imposed, or from whom the act is required."

Then again, on page 51:

"In these and the like cases our constitutions have provided no tribunal for the specific duty of solving in advance the questions which arise. In a few of the states, indeed, the legislative department has been empowered by the constitution to call upon the courts for their opinion of the constitutional validity of a proposed law, in order that, if it be adjudged

without warrant, the legislature may abstain from enacting it. But those provisions are not often to be met with; and judicial decisions, especially upon delicate and difficult questions of constitutional law, can seldom be entirely satisfactory when made, as they commonly will be, under such calls, without the benefit of argument at the bar and of that light upon the question involved which might be afforded by counsel learned in the law and interested in giving them a thorough investigation. It follows, therefore, that every department of the government, and every official of every department, may at any time, when a duty is to be performed, be required to pass upon a question of constitutional construction. Sometimes the case will be such that the decision when made must, from the nature of things, be conclusive and subject to no appeal or review, however erroneous it may be in the opinion of other departments or other officers; but in other cases the same question may be required to be passed upon again before the duty is completely performed. The first of these classes is where, by the constitution, a particular question is plainly addressed to the discretion or judgment of some one department or officer, so that the interference of any other department or officer, with a view to the substitution of its own discretion or judgment in the place of that to which the constitution has confided the decision, would be impertinent and intrusive. Under every constitution, cases of this description are to be met with; and, though it will sometimes be found difficult to classify them, there can be no doubt, when the case is properly determined to be one of this character, that the rule must prevail which makes the decision final."

Chancellor Kent opens his eleventh lecture, found in Vol. I of his Commentaries, page 221, with these words:

"The power of making laws is the supreme power in a state, and the department in which it resides will naturally have such a preponderance in the political system, and act with such mighty force upon the public mind, that the line of separation between that and the other branches of the government ought to be marked very distinctly, and with the most careful precision."

And again, on page 235 of the same volume, he says:

"Each house is made the sole judge of the election, return and qualifications of its members. The same power is vested in the British house of commons, and in the legislatures of

the several states; and there is no other body known to the
constitution, to which such a power might safely be trusted.
It is requisite to preserve a pure and genuine representation,
and to control the evils of irregular, corrupt and tumultuous
elections; and as each house acts in these cases in a judicial
character, its decisions, like the decisions of any other court
of justice, ought to be regulated by known principles of law,
and strictly adhered to, for the sake of uniformity and cer-
tainty."

In the case of *Gormley v. Taylor*, 44 Ga. 76, the supreme
court of Georgia uses the following language:

"No evil could be more offensively aggressive on the rights
of the people than the assumption by the judiciary of powers
not delegated to their rightful jurisdiction.  To lodge in the
opinions of a few men, no matter how far removed from
the passions of the hour, the rights of the people in the cre-
ation of government and decision of affairs of state, was not
the intention of the people.  Constitutions and laws precede
the judiciary, and we decide questions arising out of them
after they are made, not before.  We restrain the legislature
within the limitations set to its powers.  But we may not set
up our opinions as to the decision of the legislature upon
questions not purely legal.  The constitution prescribes the
manner of passing laws, and the legislature must pursue the
mode prescribed.  The constitution divides powers, and the
coördinate branches must stay within the prescribed limits.
If this were not so, the judiciary might declare an act void,
and the legislature might impeach the judiciary, as happened
in Illinois, for the decision.  The intention of the constitu-
tion is to divide the powers, and let each move independently
in its orbit, all revolving round the constitution in their ap-
propriate sphere, like the planetary systems round the sun
and each kept in place by the central power which moves the
whole in harmony.  .  .  .  I find involved in this decision
of the court a reversal of the judgment of the legislature as
to the *status* of the state under reconstruction.  This embraces
a political as well as legal question, and it would be an osten-
tatious parade of learning to go through the decisions of the
courts excluding political questions involving the principles
of government from judicial jurisdiction.  The very question
made by Governor Jenkins before the supreme court at Wash-
ington, on the constitutionality of the reconstruction acts,

admonishes me of the fact that these matters were, while regarded by the profession of Georgia plainly and palpably unconstitutional at the time, nevertheless *political* in their character, and *refused* a hearing at the bar of that tribunal.''

In the case of *Railroad Co. v. Little*, 45 Ga. 372, the same court said:

" It is not only the right, but the solemn duty, of the courts to pass upon the constitutionality of laws.  But the constitutionality of a law and the legality of a legislature which passed it are wholly different things.  Over the former, the judiciary has jurisdiction; over the latter, in my judgment, it has not. Very serious question has been made whether courts, in their inquiries into the constitutionality of laws, are not confined to an examination of the law itself, as it appears on the statute books.  It has been contended by learned judges that while courts may inquire if the provisions of a law are contrary to the constitution, and (still keeping to the act as it appears upon its face) whether the body of it conforms to the title, and whether there be more than one subject-matter, etc., that this exhausts their authority.  They cannot go behind the act itself, examine the journals of the two houses, or learn from other sources whether the legislature conformed, in its passage, to the constitutional requirements as to the mode and manner in which bills shall be introduced, read, and voted upon.  And this limitation upon the power of the judiciary would seem entirely consistent with section 32 of our bill of rights, which provides 'that *legislative* acts, in violation of this constitution, are void, and the judiciary shall so declare them.'  There is an obvious distinction between a 'legislative act' and the mode in which that act has been introduced, read, and voted upon. But though, as I have said, this distinction has been drawn. I am inclined to think the weight of authority is in favor of the right of the courts to go, at least, to the journals, and inquire if they show the proper and constitutional proceedings to have been had *on the passage of the law*.  But the cases are uniform that the journals are conclusive, however untrue in fact, and nothing will be heard in contradiction of them; and this upon principles of public policy, and respect of 'one branch of the government for the other, as well as upon the further principle that even courts, in the search after truth, recognize finalities behind which they will refuse to look.  But, as I have said, the question made in this case is not really

*In re* Gunn, *Petitioner.*

upon the constitutionality of the law, as to its provisions, or its title, or even as to the mode in which it was introduced, read, and voted upon, but upon the constitutionality of the legislature itself, upon its authority to pass any acts. Being, as it is claimed, in session contrary to the constitution, it was not at the time a legislative body at all, but a mere mob, incapable of making laws of any kind. Is it competent for the courts to decide upon the legality of a session of the legislature? I think not. . . . Necessarily, the courts must decide what is the law, what is the legal will of the lawmaking power. But if they have the right to go behind this, and to inquire whether the lawmaking power is itself legal, they become, in effect, the supreme power in the state. A case may be supposed of a body — a mere public meeting — undertaking to pass laws, and it is asked if the courts, when the acts of such a body are pleaded as law, must not inquire into the rightfulness of the claim of the body to be a lawmaking power. In such a case the inquiry by the courts would be, not the rightfulness of the authority, nor its conformity to any written code of constitutional law, but whether it was in *fact* the legislative department of the government, recognized as such by the people, or by whatever final arbiter has power to enforce its edicts. In other words, courts do not make governments, or decide upon their validity. If they cannot recognize as rightful the lawmaking power, which is, in fact, supreme, they must get out of the way, and not attempt, by their feeble arm, to stay the tide of revolution. (*Luther v. Borden*, 7 How. 1.)

"But there is another ground which, though it assumes the right of the courts to pass upon the legality of the legislature directly, is fatal to the position taken against this law. It is a settled rule, that even where courts have power to inquire into the right of an officer to perform official acts, they will not do so collaterally. They will freely investigate the legality of any particular act, but they will never, in so doing, inquire into the right of the officer to act, as such, at all. The rule is uniform, that the acts of an officer, otherwise legal, cannot be attacked on the ground of any illegality in his appointment, or on the ground that, though he is an officer in fact, he is not so according to law. Is not the general assembly, actually in session, entitled from the courts to at least the same measure of consideration as they grant to a constable or a justice of the peace?"

In New Hampshire, the justices of the supreme court of

judicature were requested by the house of representatives to give their opinion whether the governor had the constitutional authority to issue to anyone a summons to appear as a senator elect. The court answering (see 56 N. H. 577) said:

"If a mistake, or even an intentional wrong, should be committed by the executive, the remedies under our form of government are ample and prompt; the wrong to be suffered temporary. If, on the other hand, a precedent of interference by one department with the discharge of its duties by another should be established by the form of a judicial decision, a dangerous blow would, in our judgment, be struck at one of the most vital principles of our system of government, the consequences of which no one could foretell, and which no intelligent and candid citizen could fail to see must be lasting and pernicious."

The opinion of the justices contained in 70 Me. 585, and also the case of *Prince v. Skillin*, 71 Me. 361, are referred to by the chief justice. The constitution of Maine, (art. 6, § 3,) defining the judicial power of the supreme court, reads as follows: "They shall be obliged to give their opinion upon important questions of law, and upon solemn occasions, when required by the governor, council, senate, or house of representatives." No similar provision is found in the constitution of this state, and such provisions are not common. Under this provision of the constitution, there would seem to be no question as to the duty of the court to answer questions of this kind, when requested so to do by a political department of the state; and it will be noted that there is a marked difference between answering questions of this character at the solicitation of a political department and answering them at the request of parties to ordinary litigation. In that case, however, there were not only two bodies of men, each claiming to be the house of representatives, but also two bodies respectively claiming to be the state senate. These cases, however, are authorities squarely against the position taken by this court, that parties holding certificates of election, whether elected or not in fact, and whether in fact qualified under the constitution to sit as members of the house, are entitled to organize

16 — 50 KAS.

without reference to the very right of the matter.   In Maine, the returns of the elections of members of the legislature are made to the governor and council, who thereupon examine them and issue to the members who appear to be elected, as it is there denominated, a summons to attend the legislature.   In this state, a canvassing board, consisting also of the governor and certain state officers, issue what is denominated a "certificate of election."   The two documents are intended to serve precisely the same purpose, viz., to furnish evidence that the person receiving it is entitled to a seat in the legislature.   No one disputes the proposition, so far as I am aware, that the certificate, or summons, as the case may be, furnishes *prima facie* evidence of right to the seat; but *prima facie* evidence must always give way to stronger and better evidence when it exists.   We quote from the opinions of the justices (70 Me. 585):

"Holders of summonses which are void for the reason that the governor and council have failed to correctly perform the constitutional obligation resting upon them have no right to take a part in the organization or in any subsequent proceedings of the house to which they are wrongfully certificated. They are not in fact members.   But the members rightfully elected, as shown by the official returns, and the opinion of court upon the propositions heretofore by the governor presented to the court, are entitled to appear and act in the organization of the houses to which they belong, unless the house and senate, in judging of the election and qualification of members, shall determine to the contrary.   A member without a summons, who appears to claim his seat, is *prima facie* entitled to equal consideration with a member who has a summons issued in violation of law.   He is not to be deprived of the position belonging to him on account of the dereliction of those whose duty it was to have given him the usual summons.   The absence of that evidence may be supplied by other evidence of membership.   The house and senate have the same right to consider and determine whether, in the first instance, such persons appear to have been elected, and finally, whether they were in fact elected, as they have of any and all the persons who appear for the purpose of composing their respective bodies.   .   .   .

"In neither case did the senate or house itself act upon the question of their membership. Both the senate and house (meaning the bodies assembled to be organized as such) were debarred from any action thereon by the conduct of the presiding secretary and clerk. The assumption of such officers,. that no questions should be entertained relative to the rights. of persons whose names are not upon the rolls furnished by the secretary of state, but who were claimants of seats, was unwarrantable. The statute of 1869, embodied in the Revised Statutes, chapter 2, section 25, cannot preclude either the senate or house from amending and completing the rolls of membership, according to the facts. Each house has the constitutional right to organize itself. The form provided for aid and convenience in effecting the organization does not confer upon a temporary presiding officer such conclusive power.

"We have not failed to carefully consider the act of 1869, chapter 67, incorporated in the Revised Statutes, chapter 2, § 25; and so far as it declares that 'no person shall be allowed to vote or take part in the organization of either branch of the legislature as a member, unless his name appears upon the certified roll of that branch of the legislature in which he claims to act,' we think it clearly repugnant to the constitution, which declares that each house shall be the judge of the election and qualification of its own members. It aims to control the action of each within its constitutional power till after a full organization, with a majority determined and fixed by the governor and council. By their action in granting certificates to men not appearing to be elected, or refusing to grant certificates to men clearly elected, they may constitute each house with a majority to suit their own purposes, thus strangling and overthrowing the popular will, as honestly expressed by the ballot. The doctrine of that act gives to the executive department the power to rob the people of the legislature they have chosen, and force upon them one to serve its own purposes. It poisons the very foundation of legislation, and tends to corrupt the legislative department of the government. It strikes a deathblow at the heart of popular government and renders its foundation and great bulwarks — the will of the people, as expressed by the ballot — a farce. Each house has the same power, and is charged with the same duty, to declare the election of its own members and organize in any legitimate way as before the passage of that act. . . .

"Question 9. To make up the legal quorum required on any vote in either house, can the votes of any persons be counted, who, though summoned, do not appear to be elected by the official returns under the constitution, and the decision of the court? Answer. Not if the attention of the house is called to the fact that such persons are illegally summoned, and objection is seasonably made to the counting of such persons for the purpose of making up a quorum; and the house does not act upon the question of their admissibility."

In the case of *Prince v. Skillin,* 71 Me. 369, we find the following language:

" It is claimed that the decision of the governor and council acted as a final canvassing board, and that their final action constitutes an estoppel upon all other branches of the government, except the houses of the legislature in regard to the membership of those bodies. This is not so. The object of all investigations is to arrive at true results. . . .

" In accordance with these views, it has been uniformly held by this and all other courts where the question has arisen, that the decision of the canvassing board is only *prima facie* evidence; that the real title to the office depends upon the votes cast; and that the tribunal before which the question arises will investigate the facts of the election, the votes cast, and the legality of the action of the canvassing board. (*People v. Cook,* 8 N. Y. 67; *People v. Vail,* 20 Wend. 12; *The State v. Governor,* 1 Dutch. 348; *People v. Judson,* 55 N. Y. 525.) . . .

"The underlying principle is that the election, and not the return, is the foundation of the right to an elective office, and hence it has been held competent to go behind the ballot box, and purge the returns by proof that votes were received and counted which were cast by persons not qualified to vote." (*People v. Pease,* 27 N. Y. 45.) "Freedom of inquiry in investigating the title to office," observes Andrews, J., in *People v. Judson,* 55 N. Y. 531, "tends to secure fairness in the conduct of elections, faithfulness and integrity on the part of returning officers, and it weakens the motive to fraud or violence by diminishing the chances that they may prove successful in effecting the objects for which they are usually employed."

In the case of *Hughes v. Felton,* 11 Colo. 489, the validity of an act establishing the superior court of Denver was at-

tacked. The objection made was not to the mode of its passage, nor to the subject-matter apparent on the face of the act, but because it was claimed that the legislature which enacted it was not a legal or constitutional body. The supreme court of Colorado, following the unbroken current of authorities on this question, uses the following language:

"From what has already been said, it is plain to be seen that a determination of the main proposition contended for involves a decision of questions which this court has no authority to decide, and which it is prohibited from deciding by an express provision of the constitution lodging such power elsewhere. The members of the legislature thus assailed met at the time and place provided therefor by law, and then and there organized the two houses in the manner required by law. In doing this, each house necessarily judged of the election and qualifications of its members. The two houses thus organized recognized each other as a component part of the legislature of the state, and they received full recognition as such by the executive branch of the government. They chose two persons to represent the state of Colorado in the senate of the United States, who were afterwards admitted to seats as members of that distinguished body; and in all other respects the said assembly acted and was recognized as the legislature of the state. It is a general, if not universal, rule, that courts, in determining the validity or invalidity of a legislative act, do not, for the purpose of impeaching such act, permit of or consider evidence outside of the act itself, the enrolled bill, and the journals of the two houses. (*Division of Howard Co.*, 15 Kas. 195, and cases there cited.) For these reasons the proposition advanced is not tenable."

In the case of *Robertson v. The State, ex rel.*, 109 Ind. 79, this question was most exhaustively considered. The question at issue was the title to the office of lieutenant governor of Indiana. The plaintiff, Smith, claimed that in January, 1887, he was elected president of the senate; that one Manson was elected lieutenant governor in November, 1884, and held the office until July, 1886, when he vacated it by accepting a federal office; that on the 2d of November, 1886, the respondent was voted for and claimed to be elected lieutenant governor; that he thereupon took the oath of office, and

intruded into the office of lieutenant governor, and it was alleged in the complaint that the speaker of the house of representatives recognized Robertson as lieutenant governor. Suit was brought by injunction in the circuit court of Marion county, in which the state capitol is located, to restrain Robertson from exercising the duties of the office of lieutenant governor, and an appeal taken from the decision of that court to the supreme court. Separate opinions were filed by the various members of the court on the original hearing, and also by the chief justice and Judge Niblack on the petition for a rehearing. Chief Justice Elliott, after having delivered the opinion of the court, in his individual opinion says:

"I fully concur in the opinion of my brother Niblack, that the courts have no jurisdiction of the subject-matter of this action, and as the subject has been by him so fully and so ably discussed little can be added. I began the investigation of this question with the impression that the courts had jurisdiction of the subject-matter, but I leave it with the firm conviction that they have not. This impression arose from a belief that it is better and safer that such controversies as this should be settled by some other tribunal than the legislature; but, while still impressed with that belief, I am compelled to yield to the settled rules of the law and the clear words of the constitution. Whatever may be the views of a court or judge upon a question of constitutional policy, the expressed will of the people, as written in their constitution, must be obeyed and enforced. I am convinced that the framers of the constitution have conferred upon the general assembly exclusive authority over such controversies as this, although, regarded as a question of policy, I am persuaded that it would have been wiser to have entrusted the authority to some other tribunal. The makers of the constitution had power to vest the authority in the legislature, and they have done it. To their judgment all must yield. The grant of power to the legislature cannot be defeated upon the presumption that it will not be justly exercised. On the contrary, it is the duty of the judiciary to assume that legislators will faithfully and impartially perform the duty imposed upon them by the constitution they have solemnly sworn to support. Courts must accord to the legislature the same solemn sense of duty, and the same conscien-

tious resolution to perform it, unmoved by improper motives, that they can claim for themselves. In *Brown v. Buzan,* 24 Ind. 194, it was said:

"'The judiciary ought to accord to the legislature as much purity of purpose as it would claim for itself; as honest a desire to obey the constitution, and, also, a high capacity to judge of its meaning. . . . Our own court has recognized the general principle that it is often best to intrust higher power to officers whose terms are short.'

"In *Brown v. Buzan,* supra, it was said:

"'Thus, to whatever extent this court might err, in denying the rightful authority of the lawmaking department, we would chain that authority for a long period at our feet. It is better and safer, therefore, that the judiciary, if err it must, should not err in that direction. If either department of the government may slightly overstep the limits of its constitutional powers, it should be that one whose official life shall soonest end. It has the least motive to usurp power not given, and the people can sooner relieve themselves of its mistakes.'

"This reasoning supplies grounds for sustaining the policy of distributing the power of settling contests for office; for, if that power is lodged in the legislature, the people can, at short and often-recurring intervals, rebuke where rebuke is needed, and approve where approval is merited. . . . In many instances powers of a judicial nature are conferred upon the legislature, and it has always been held that, where such a power is conferred, it is exclusive and supreme. No other tribunal can share in its exercise, nor can any court control it. (*People v. Mahaney,* 13 Mich. 481, 492; *The State v. Gilmore,* 20 Kas. 551; *The State v. Tomlinson,* 20 id. 692; *Dalton v. The State,* 43 Ohio St. 652; *Smith v. Myers,* 9 N. E. Rep. [Ind. Sup. Ct.] 692, and cases cited.) . . . A high tribunal has been designated by the people to determine all contests for the office of lieutenant governor. There the people have placed that great power, and there it must rest until the people in their sovereign capacity shall change their constitution."

And in the same case, on a petition for a rehearing, Judge Niblack, on page 158 id., says:

"If an act of the present general assembly, whether passed at the regular or some special session, shall come before us, signed by the appellant on behalf of the senate, and otherwise duly certified and approved, it will be our duty to assume that the appellant was, at the time he affixed his signature, the acting and qualified lieutenant governor of the state, and that he has been so recognized by the two houses of the general assembly. On the other hand, when an act of the cur-

rent general assembly shall come before us, signed by the relator, Smith, or some other person, as president *pro tempore* of the senate, we will be required to assume that the person so signing was elected to preside over the senate at a time and under circumstances which authorized his election. So that the senate settles for us, and not we for it, who, for any occasion, is its proper presiding officer."

The supreme court of Texas, in the case of *Wright v. Fawcett,* 52 Tex. 206, says:

"To decide the result of an election is a question of a different character; part of the process of political organization, and 'not a question of private right.' (*Hulseman v. Rems,* 41 Pa. St. 396; and see *Arbury v. Beavers,* 6 Tex. 469, and *Baker v. Chisholm,* 3 id. 157; *Walker v. Tarrant Co.,* 20 id. 16.) Where the law has provided a mode of deciding cases of contested elections, designed to be final, the courts have no authority to adjudicate such cases, other than that the law may give to them. (*Batman v. McGowan,* 1 Metc. 533; *Grier v. Shackelford,* 3 Brev. 490; *Skerrett's Case,* 2 Pars. 509, as reported in Brightly's Leading Cases on Elections, p. 320; *Ewing v. Filley,* 43 Pa. St. 389.)"

All are familiar with what took place when the result of the presidential election of 1876 was in dispute. The question as to what tribunal had power to decide the result of that election was widely discussed, and the view was generally entertained by members of all political parties that not only had the supreme court no power to decide the controversy, but that it was beyond the power of Congress to abdicate its sole and exclusive right to count the votes and declare the result. The electoral commission was established with the vain hope that a nonpartisan decision of the grave questions involved might be obtained by having certain judges of the supreme court of the United States pass their opinions on the questions involved. The result of the commission was a sad disappointment to those who believed the judiciary to be free from partisan bias. While the conclusions of the commission were received and abided by in congress, they were merely acquiesced in as the most practical means of solving the great complication; and the whole proceeding was a clear recognition

of the main point before us now for our consideration, viz., that political questions are to be decided by the political departments of the government alone, and that the judiciary, in all such cases, must follow, and not lead.

It is not every question, even of a judicial nature, that under our constitution is to be decided by the courts. Section 27, article 2, of the constitution, reads: "The house of representatives shall have the sole power to impeach. All impeachments shall be tried by the senate, and when sitting for that purpose the senators shall take an oath to do justice according to the law and the evidence. No person shall be convicted without the concurrence of two-thirds of the senators elected." By paragraphs 2735 and 2736 of the General Statutes of 1889, it is provided: "That all contests over the election of state officers, justices of the supreme or district courts, shall be tried by the senate." Doubtless the reason which actuated the legislature in making the senate the court to try contests of this kind was, that such contests are political in their nature, and though they involve the rights of individuals to the possession and emoluments of public offices, yet the public have such a deep interest in the result of such contests, and they become so generally the subject of political agitation and discussion, that it is better that a political branch of the government should be responsible for the decision, than that a court should run the risk of being charged with partisanship in the decision of such controversies. The framers of our own, and, so far as I am aware, not only the national, but all state constitutions, have clearly foreseen that impeachments will frequently, if not usually, precipitate political agitation, excitement, and strife; and the power to present articles has therefore wisely been lodged in one branch of the lawmaking department and the trial in the other. Can it be that the framers of our constitution, having given to each branch of the legislature the exclusive power to judge of the elections and qualifications of its own members, intended that the judiciary should have power indirectly to judge of the very existence of the house itself? It seems to me clearly

not. Section 5 of article 1 of the constitution provides that—

"He [the governor] may, on extraordinary occasions, convene the legislature by proclamation, and shall, at the commencement of every session, communicate, in writing, such information as he may possess in reference to the condition of the state, and recommend such measures as he may deem expedient."

Section 6 provides that—

"In case of disagreement between the two houses in respect to the time of adjournment, he may adjourn the legislature to such time as he may think proper, not beyond its regular meeting."

In section 14, article 2, of the constitution it is provided that—

"Every bill and joint resolution passed by the house of representatives and senate, shall, within two days thereafter, be signed by the presiding officers, and presented to the governor; if he approve, he shall sign it; but if not, he shall return it to the house of representatives, which shall enter the objections at large upon its journal and proceed to reconsider the same."

The governor is thus required to communicate with the senate and house, and of necessity must promptly decide what body of men is the house.

The rule of our government is, that the three great coördinate departments are independent of each other, and that each matter which is intrusted to one of those departments shall be determined by that department alone without interference from another; and, as the decision of this court is in its nature final, the judiciary ought to be most careful of all to nicely observe the boundaries of its own authority. It is presumed that those who administer each department of the government will act honestly and from equally pure and lofty motives. It is needless to multiply authorities on this question. The supreme court of Pennsylvania, in the case of *Railroad Co. v. Cooper*, 33 Pa. St. 284, said:

"Here again, and under another aspect, the sincerity and

honesty of the legislature, in the performance of their duties, is attempted to be made a question of judicial cognizance; and again we say that we have no jurisdiction of such a question, and can have no right to express any official opinion in relation to it. Official morality in us requires that we shall not assume authority to judge of the official morality of the legislature. For the faithfulness and honesty of their public acts, we repeat, they are responsible to the public alone, and not by means of a trial before the courts."

The supreme court of Ohio, in the case of *Dalton v. The State, ex rel.*, 43 Ohio St. 680, says: "The jurisdiction of each house to decide upon the election, returns and qualifications of its own members is supreme and exclusive." (Citing Cooley, Const. Lim. 133; *The State v. Jarrett*, 17 Md. 309; *People v. Mahaney*, 13 Mich. 481.) No court of the state has, nor is it possible under our present constitution to clothe any court of the state with, the power to . . . decide as to the election of any candidate to either house. (See *Slack v. Jacobs*, 8 W. Va. 612, where the authorities are extensively collated and reviewed. Also, *Humboldt Co. v. Co. Commissioners*, 6 Nev. 30; *The State v. Harmon*, 31 Ohio St. 250.)

Recurring now to the exclusive control by each house of the legislature over the election and qualification of its members, we will consider some cases decided by this court. In the case of *The State v. Gilmore*, 20 Kas. 551, it appears that Gilmore was chosen a member of the lower house of the legislature in 1876. W. L. Martin, as relator, commenced an action in the name of the state against Gilmore in August, 1877, while Gilmore was a member of the state legislature, holding the office of representative of the 54th representative district, alleging that he was guilty of being in a state of intoxication, produced by strong drink, voluntarily taken, and asked that he be removed from his office, under the provisions of chapter 122 of the Laws of 1875. The opinion was delivered by Mr. Justice BREWER, and from it I quote:

"The constitution declares (article 2, § 8) that 'each house shall be judge of the elections, returns and qualifications of its own members.' This is a grant of power, and constitutes

each house the ultimate tribunal as to the qualifications of its own members. The two houses acting conjointly do not decide. Each house acts for itself, and by itself; and from its decision there is no appeal, not even to the two houses. And this power is not exhausted when once it has been exercised, and a member admitted to his seat. It is a continuous power, and runs through the entire term. At any time, and at all times during the term of office, each house is empowered to pass upon the present qualifications of its own members. By § 5 of the same article, acceptance of a federal office vacates a member's seat. He ceases to be qualified, and of this the house is the judge. If it ousts a member on the claim that he has accepted a federal office, no other court or tribunal can reinstate him. If it refuses to oust a member, his seat is beyond judicial challenge. This grant of power is, in its very nature, (and so as to any other disqualification,) exclusive; and it is necessary to preserve the entire independence of the two houses. Being a power exclusively vested in it, it cannot be granted away or transferred to any other tribunal or officer. It may appoint a committee to examine and report, but the decision must be by the house itself. It, and it alone, can remove. Perhaps, also, it might delegate to a judge or other officer outside its own body, power to examine and report upon the qualifications of one of its members. But neither it, nor the two houses together, can abridge the power vested in each house separately of a final decision as to the qualifications of one of its members, or transfer that power to any other tribunal or officer. And an act which purported to grant to the district court power to remove from office must be construed as not embracing members of the legislature; or, if its language specifically names or necessarily includes them, then as to them the act is unconstitutional."

In the case of *The State, ex rel., v. Tomlinson*, 20 Kas. 692, Chief Justice HORTON, delivering the opinion of the court, says:

"The attempt to determine the title of the defendant as a member of the legislature in this manner must necessarily fail, for the simple reason that we cannot and ought not to take jurisdiction of the case. We are powerless to enforce any judgment of ouster against a member of the legislature. While the constitution has conferred the general judicial power of the state upon the courts and certain officers speci-

fied, there are certain powers of a judicial nature which, by the same instrument, are expressly conferred upon other bodies or officers, and among them is the power to judge of the elections, returns and qualifications of members of the legislature. This power is exclusively vested in each house, and cannot by its own consent, or by legislative action, be vested in any other tribunal or officer. This power continues during the entire term of office. (Sec. 8, article 2, State Const.; *The State v. Gilmore*, ante, p. 551.)

"Within certain constitutional restrictions, the executive, legislative and judicial powers of the state are independent and supreme; and neither has the right to enter upon the exclusive domain of the other. We should be passing beyond the limits of our own power, to judge of the election or qualifications of a member of the legislature; and as the constitution has expressly confided this power to another body, we must leave it where it has been deposited by the fundamental law. If we are at liberty to interfere in this case, or, if with consent of the legislature we assume jurisdiction, we may review all similar decisions of that body, and in the end bring the legislative power of the state in conflict with the judiciary. The objections to such a course are so strong and obvious, that all must acknowledge them. . . .

"It is insisted, upon the authority of *Prouty v. Stover*, 11 Kas. 235, that this court has expressed the right to make inquiry into the fact whether the district from which a member of the legislature is admitted exists or not, and, if it does not exist, the member may be ousted by the courts. In that case, it was only decided that where the legislature was sitting as an electoral body, in a contest concerning the validity of an election by such body, the courts were not precluded by the action of the house in admitting members from inquiry into the legality of certain representative districts, and the rights of the members admitted to seats from these districts to vote at such election. That decision is not in conflict with the view here stated, viz.: That we have no jurisdiction, in a proceeding like this, to oust a person from his seat as a representative, after he has been declared and adjudged to be a member of the house by the power and tribunal having the exclusive authority to hear and determine that question. (*O'Ferrall v. Colby*, 2 Minn. 180; McCr. Elect., § 515; *Hiss v. Bartlett*, 3 Gray, 468; *People v. Mahaney*, 13 Mich. 481.)"

Before proceeding to a consideration of the particular facts

in this case, let us first.determine the proper limits of judicial inquiry. The testimony of the principal actors in the struggle to obtain control of the organization of the house on the 10th of January was taken before the court, subject to objection, and with the understanding that the question as to its admissibility was reserved, to be passed on at the time of the decision of this case. That this procedure was wholly unwarranted, and that no such testimony should have been received by the court, is entirely clear from the authorities. I shall not attempt a complete review of the cases, which are very numerous upon the point, but shall content myself with referring to a few of them. In the case of *The State, ex rel., v. Smith,* 44 Ohio St. 348, it was contended that an act of the legislature was invalid because the senate was composed of less than a quorum of duly-elected members. It was claimed that 17 members of the senate, being less than a quorum, had four other persons, who were not elected, sworn in, and that the 21 persons acting together, in the absence of 19 duly-elected senators, passed the act in question. The court says:

"Counsel have exhibited unusual industry in looking up the various cases upon this question; and, out of a multitude of citations, not one is found in which any court has assumed to go beyond the proceedings of the legislature, as recorded in the journals required to be kept in each of its branches, on the question whether a law had been adopted. And, if reasons for this limitation upon judicial inquiry in such matters have not generally been stated, it doubtless arises from the fact that they are apparent. Imperative reasons of public policy require that the authenticity of laws should rest upon public memorials of the most permanent character. They should be public, because all are required to conform to them; they should be permanent, that rights acquired to-day upon the faith of what has been declared to be the law shall not be destroyed to-morrow, or at some remote period of time, by facts resting only in the memory of individuals. One of the earliest cases on the subject was that of *The King v. Arundel,* Hobart, 109. It involved the question whether a private statute had been enacted. The court there held that the act could only be tried by itself—its enrollment in the chancery,

the chancery being then, as the office of the secretary of state is with us, the depository of the laws.    The court said : ' When the act is passed the journal is expired.'    Many cases follow this decision, adopting the attested enrollment of the law as conclusive on the question of its passage.    *Pangborn v. Young*, 32 N. J. Law, 29, is an instructive case on the reason and policy of the rule.    (See, also, *People v. Devlin*, 33 N. Y. 269 ; *People v. Commissioners*, 54 id. 276 ; *Eld v. Gorham*, 20 Conn. 8 ; *Sherman v. Story*, 30 Cal. 258 ; *Louisiana State Lottery Co. v. Richoux*, 23 La. An. 743 ; *The State v. Swift*, 10 Nev. 176 ; *Speer v. Plank Road Co.*, 22 Pa. St. 376.)

"There are numerous cases in the decisions of the different states to the effect that the journals of the legislature may be noticed by courts on the question whether the bill became a statute or not.    (*Opinion of the Justices*, 52 N. H. 622 ; *Judicial Opinion*, 35 id. 579 ; *People v. Mahaney*, 13 Mich. 481 ; *Moody v. The State*, 48 Ala. 115 ; *Grob v. Cushman*, 45 Ill. 119 ; *Board of Supervisors v. Heenan*, 2 Minn. 330 ; *In re Roberts*, 5 Colo. 528.)    The latter presents an extensive collection of the cases.    But, as before stated, none have been found in which the courts have, for any purpose affecting the validity of a statute, gone beyond such permanent memorials of its enactment.

"The case of *The State v. Francis*, 26 Kas. 724, is cited and relied on by counsel for relators.    But it does not sustain them.    There the house of representatives of Kansas had, by law, at that time, but 125 members ; it had, in fact, 129. Four of these had, by law, no seats in the house, and could in no event be entitled to participate in its proceedings ; they were simply supernumeraries.    The journal showed that the concurrence of three, at least, of these supernumerary members was requisite to the passage of the law in question, and that all of them voted for it.    The court took notice of these facts appearing upon the journal, and of the further fact, that, as a matter of law, the house then consisted of 125 members only, and held that the bill did not become a statute.    In no case, however, is the rule that limits judicial inquiry in questions of this kind to the journals of the legislature, and excludes all parol testimony, more strongly stated.    The language used is as follows :

"'In our opinion, the enrolled statute is very strong presumptive evidence of the passage of the act and of its validity, and that it is conclusive evidence of such regularity and validity, unless the journals of the legislature show clearly, conclusively, and beyond all doubt, that the

act was not passed regularly and legally. . . . If there is any room to doubt as to what the journals of the legislature show, if they are merely silent or ambiguous, or if it is possible to explain them upon the hypothesis that the enrolled statute is correct and valid, then it is the duty of the courts to hold that the enrolled statute is valid; but in this state, where each house is required by the constitution to keep and publish a journal of its proceedings, we cannot wholly ignore such journals as evidence.'

"That the invalidating facts must clearly and beyond reasonable doubt appear from the journal, is sustained by *Osburn v. Staley,* 5 W. Va. 85. . . . As to the averment that the passage of the act was part of a conspiracy, entered into between the president of the senate, and 17 of the members, carried into effect in absence from the state of a majority of the members of the senate, it is sufficient to say that such suggestions have frequently been made for the purpose of inducing judicial inquiry into the conduct of legislative bodies, but the inquiry has as frequently been declined by the courts as not only indecorous, but as subversive of the independence of the legislature as a coördinate branch of the government. There is no authority for it in the constitution and laws of this state, and it is opposed to the practice and policy of our system of government. (*Slack v. Jacob,* 8 W. Va. 613; *McCulloch v. The State,* 11 Ind. 431; *Wright v. Defrees,* 8 id. 298; *Evans v. Brown,* 30 id. 514; *Sunbury & E. Rld. Co. v. Cooper,* 33 Pa. St. 278; *Harpending v. Haight,* 39 Cal. 202.)

"In *Miller v. The State,* 3 Ohio St. 484, it is said by Thurman, J.: 'A disposition to disregard it [the constitution] is no more to be imputed to the legislative than to the judicial department of the government, and ought not to be imputed to either.' 'And,' it is said by Cooley, 'although it has sometimes been urged at the bar that the courts ought to inquire into the motives of the legislature where fraud and corruption were alleged, and annul their action if the allegations were established, the argument has in no case been acceded to by the judiciary, and they have never allowed the inquiry to be entered upon.' (Const. Lim. *187.)"

See, also, *The State v. Moffitt,* 5 Ohio, 363; *Koehler v. Hill,* 60 Iowa, 545.

In the case of *Division of Howard Co.,* 15 Kas. 194, this question was considered by this court, and I quote from the syllabus:

"1. *Legislative Records; Journals and Enrolled Bills.* The legislative journals and the enrolled bills are the only records

required by the constitution and laws to be kept for the purpose of showing any of the legislative proceedings; and hence, they must import absolute verity, and be conclusive proof as to whether any particular bill has passed the legislature, when it passed, how it passed, and whether it is valid or not. The engrossed bills of the two houses are not required to be made records, nor portions of any record. Therefore, where the legislative journals and the enrolled bill of a particular act of the legislature apparently show that the bill was regularly passed by the legislature, signed by the proper officers of each house, signed and approved by the governor, and filed in the office of the secretary of state, as an enrolled law, it will be held that such enrolled bill is valid and conclusive evidence of the law as contained in said bill, notwithstanding it may appear from an engrossed bill of the house, (not contained in the journal of either house,) and other extrinsic evidence, that a mistake was made in enrolling said bill, and that the enrolled bill omitted one important section, which was contained in the bill as it passed the two houses.

"2. *Courts; Judicial Notice; Published Laws; Enrolled Bills; Journals.* The courts will take judicial notice, without proof, of all the laws of the state; and, in doing so, will take judicial notice of what the books of published laws contain, of what the enrolled bills contain, of what the legislative journals contain, and, indeed, of everything that is allowed to affect the validity or meaning of any law in any respect whatever."

See, also, *City of Topeka v. Gillett,* 32 Kas. 437; same case, 4 Pac. Rep. 800.

There is much conflict in the authorities as to whether the courts may go behind the enrolled bill for the purpose of determining the validity of an act of the legislature, but as our constitution (§ 10, article 2) requires each house to keep and publish a journal of its proceedings, I concur in the opinion heretofore expressed by this court, that this court may examine the journal for the purpose of informing itself as to what the action of each house was in fact. I also fully concur with the opinion expressed in the case of *Division of Howard County,* that it is unnecessary to introduce the journal in evidence, as the court will take judicial notice of its contents. From rea-

son and authority, I then conclude that all testimony offered in this case with reference to the doings of the legislature was incompetent, and improperly received.

The question then arises, Of what journal shall this court take judicial notice? The law requires the journal to be printed by the state printer, and delivered to the secretary of state. In this case the publication was presented by Frank L. Brown, who, it is claimed, was clerk of the house of representatives, not published by the state printer, nor otherwise authenticated than by oral testimony. How shall the court be enlightened as to whether or not this is the journal of the house? This court takes judicial notice of who is governor of this state; of the fact that the senate is in session. It seems to me clearly that it must take judicial notice of the fact that the governor and the senate are in communication with the house of representatives. It must take judicial notice as to what organization has been recognized by them. It is clearly shown in this case that J. M. Dunsmore has been recognized as speaker of the house of representatives by the governor, the senate, secretary of state, state printer, official state paper, auditor, and treasurer; and, if the position taken by the majority of the court is correct, that this is substantially a contention between two bodies of men, each claiming to be the house of representatives, that body presided over by J. M. Dunsmore has received full recognition from the senate, and each and all of the officials named. There was, then, a complete state government, with no question as to the right of those persons who filled the various offices in the executive branches or in the senate. The only question raised was as to the rights of the officers of the house of representatives, and as to the right of certain persons whose seats were contested to sit as members of the house. Unless it follows the decision of the governor and senate, the only way this court can possibly determine who is speaker of the house of representatives is by determining first who were members of the house on the 10th day of Jaunary; and, second, what those members did in perfecting the organization of the house.

Whence does this court derive its power to determine what, it must be apparent to all, is purely a political question? Let it be conceded for the purposes of this case that the house, which, under the constitution, alone has power to decide who are its members, refuses to so decide: does that confer the power on this court? Certainly not. Yet, in no other manner can this court possibly determine, nor has the majority of this court attempted to determine, who is speaker of the house in any other manner than by going directly into the question who were elected members of the body.

The chief justice cites from the work of McCrary on Elections and also from Cushing's Law and Practice of Legislative Assemblies. Were we members speaking on the floor of the house with reference to the rights of other members, I concede the propriety of citing there these authorities, or any other authorities bearing on the question of the rights of persons to sit in that house; but the right of a person to a seat in the house of representatives is not, and never can be, the subject of trial here, and it seems to me that the reasons why such right cannot be tried indirectly are still more forcible than the reasons why it cannot be tried directly. The majority of this court holds that a certificate of election entitles the holder to participate in the organization of the house; yet the very body of men in whose favor this court so holds, before the attempted election of Mr. Douglass as speaker, declared that Joseph Rosenthal, *who did not hold a certificate of election,* whom the records of the office of the secretary of state showed was not elected a member of that house, was a member of that house, and admitted him to a seat therein. Thus, if this body is the house of representatives, being the tribunal which has authority under the constitution to determine who are entitled to sit as its members, it has established and declared a rule directly the reverse of the rule laid down by this court. Why did this so-called "Douglass house" admit Rosenthal to his seat? It was because he was in fact elected by the people of his district as such member. Does this court hold that that action was wrong? If that action was right, why should

not the list furnished from the secretary of state's office be purged of *all* its errors, as well as this one error in Rosenthal's case? If Rosenthal, who has no certificate, and no record in the secretary of state's office to back him, may sit merely because it is the will of the people that he shall sit, why may not Rice, Gleason, White, Helstrom, Goodvin, Brown and Morrison also take part in the election of a speaker, if they were in fact elected by the people of their districts? Who shall determine this question — the house itself, or this court? If Campbell of Doniphan, Sherman, of Shawnee, Elting, of Ness, Bowers, of Grant, and Chrisman, of Chautauqua, were, under the constitution of this state, disqualified from sitting in that body, how can this court say, merely because they have certificates, merely because the figures in the office of the secretary of state show that they received a majority of the votes cast in their respective districts, that they shall participate in the proceedings of the house, in direct violation of the fundamental law of the state? If this court has not power to decide according to the very right of the matter, and has not power to go behind certificates erroneously issued, records falsely made, and infractions of the fundamental law of the land, of what value is it as a tribunal to determine any such question?

The governor and senate, in determining which of these bodies they should coöperate with, were not bound down by any such narrow, inequitable rule as that declared by this court, but were free to investigate for themselves; and it was their duty, as the political representatives of the people of the state of Kansas, to see that their will — the will of the people — was carried out in this matter; to see that it be not defeated by any jugglery of returns, or by any disregard of the fundamental law of the land, as declared in the constitution and the numerous authorities above cited. The presumptions in favor of their integrity, of their patriotism, are just as great as are the presumptions in favor of this court; and, as an added security to the people that their wishes shall be respected, the governor is accountable to them at the next regu-

lar election, and the senate two years later.  The members of this court, however, are exempt, after their election, from being subjected to popular censure for a period of six years. It may be noticed that the tenure of office of the judiciary is generally much longer elsewhere than in this state, and the judges of the courts of the United States hold for life.  We have seen that the courts, both of England and of this country, by an unbroken line of decisions, from the early case of *Penn v. Lord Baltimore*, to the very latest utterances in the United States, have steadily maintained the doctrine that the courts have no jurisdiction to decide political questions.  Can there be any doubt that the question which this court has undertaken to decide is a political question?  We are not here considering even the private rights of Douglass and Dunsmore to enjoy the privileges and emoluments of the office of speaker, for neither one of them is before the court; but we are determining the question which of two contending political organizations is entitled to the control of the house of representatives of this state.  This is the very pith and marrow of this controversy.  Were it not a struggle for political supremacy, but merely a contest over private rights, can it be imagined for a moment that we should have witnessed scenes of violence, and been on the verge of civil war?  It is patent to every one that the control of the house of representatives of this state was one of the leading subjects of political agitation in this state, not only prior to and during the election last fall, but has been a constant source of public agitation and discussion ever since the election.  The question as it has been presented to us by the oral testimony in the case shows that Mr. Douglass claims to be speaker as the representative of one political organization, and Mr. Dunsmore as representative of the other; that each of these gentlemen was nominated by a caucus of his political adherents in the house, and that each one claims his election as having resulted from the carrying into effect of such caucus nomination.  The mind of man cannot conceive a question more clearly political in its nature than this is.

The case of *Martin, Governor, v. Ingham,* 38 Kas. 641, is cited. Instead of that case being an authority in support of the position maintained in this case, it seems to me to be rather the reverse. I quote from the opinion:

"The only acts of public functionaries which the courts ever attempt to control, by either injunction or *mandamus,* are such acts only as are in their nature strictly ministerial; and a ministerial act is one which a public officer or agent is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, and without regard to his own judgment or opinion concerning the propriety or impropriety of the act to be performed. . . .

"Now, it is true, with some exceptions, that the legislature cannot exercise judicial or executive power, that the courts cannot exercise legislative or executive power, and that the executive department cannot exercise legislative or judicial power; but it is not true that they are entirely separate from each other, or independent of each other, or that one of them may not in some instances control one of the others. The most of the jurisdiction possessed by the courts depends entirely upon the acts of the legislature, and the entire procedure of the courts, civil and criminal, is prescribed by the legislature. . . .

"Now, while many of the duties imposed upon the governor in the organization of new counties, and possibly all of them, except certain ones prescribed by the new provisions above quoted, are still ministerial, yet some of these duties prescribed by these new provisions are certainly not ministerial. Some of them relate to the investigation of supposed frauds, and precisely that kind of frauds which we are now asked to investigate in the injunction case; and clearly such duties are not ministerial. Hence, as some of the duties imposed upon the governor in the organization of new counties are ministerial and some of them are not, and as the courts will not by *mandamus* or injunction control any of the acts of officers except such as are purely ministerial, and will not control even them when any other plain and adequate remedy exists, it follows that it must be shown clearly and conclusively in the particular case that the acts of the governor sought to be controlled are not only purely ministerial acts, but also, that no other plain and adequate remedy exists. Also, as we have already stated, all presumptions are in favor of

the good faith and honesty of the governor.    It will not only
be presumed that he has in the past performed honestly and
faithfully all his duties, but it will also be presumed that he
will in the future honestly and faithfully perform the same;
and these presumptions will continue until it is clearly, con-
clusively and affirmatively shown otherwise.    And in favor
of the chief executive officer of the state these presumptions
should be considered as of the strongest character; indeed,
much stronger than any kindred presumptions in favor of in-
ferior officers."

It is said, in the opinion filed by the chief justice, that the
Georgia and Pennsylvania cases were cited in that case.    It
is true that *Lowe v. Towns*, 8 Ga. 372, was cited in that case.
The cases we have cited in 44 and 45 Georgia were not re-
ferred to by the court.    So the case of *Hartranft's Appeal*, 85
Pa. St. 433, was cited, but the Pennsylvania case above quoted
was not mentioned; but it will be noticed that, in this very
case of *Martin v. Ingham*, this court refused to grant a *man-
damus* against the governor, and reversed the decision of the
district court granting an injunction, on the expressed ground
that some of the duties which it was sought to control the
governor in the discharge of were not purely ministerial, but
were discretionary; and, however the reasoning in that case
in certain portions of the opinion may appear favorable to the
position taken in this, the judgment rendered by this court
was against the exercise or attempted exercise of any control
over the actions of the governor.

In the case of *The State, ex rel., v. Francis*, 26 Kas. 724,
also cited, this court said:

"In many of the states of this union it is held that the en-
rolled statutes are conclusive evidence of the due passage and
validity of the acts purporting to be embodied in them.    See
authorities cited in the case of *Division of Howard County*,
15 Kas. 211; and *The State v. Swift*, 10 Nev. 176, cited in
the case of *Comm'rs of Leavenworth Co. v. Higginbotham*, 17
Kas. 78.    .    .    .

"In our opinion, the enrolled statute is very strong pre-
sumptive evidence of the regularity of the passage of the act
and of its validity, and that it is conclusive evidence of such

regularity and validity, *unless the journals of the legislature show clearly, conclusively and beyond all doubt that the act was not passed regularly and legally.*"

The distinction between the power of this court to keep the legislative and the executive within the limits fixed by the constitution, to declare void any unconstitutional act, and the power to declare the legislature itself void, seems to have been lost sight of. The right of this court to declare unconstitutional acts void is not questioned; nor is the right of this court to declare any unwarranted assumption of power on the part of the legislature, or either house thereof, void, doubted. The distinction is clearly indicated in the opinion delivered by Mr. Justice BREWER in the case of *Prouty v. Stover*, 11 Kas. 235, from which I quote:

"Defendants claim that this court cannot look beyond the action of the house to inquire whether persons admitted as members were legally entitled to seats. Article 2, § 8, declares that each house 'shall be judge of the elections, returns and qualifications of its own members.' Its determination is not the subject of appeal or review. It is final, and concludes everyone. But what is included in this power? Does the power to judge of the qualifications of its members include the power to increase such membership? Can it enlarge its members without limit? Is it like an academy of science, or a lodge of Odd Fellows, capable of indefinite expansion? If the law fixed the number of senators at 25, could those 25 admit 25 more, on pretense of judging 'of the elections and qualifications of its own members,' and thus create a senate of 50 members? If this power exists, how easily could a partisan majority secure to itself a two-thirds vote by simply admitting new members. To create a representative or senatorial district requires a law — the consent of both houses. Neither house by itself can create a district, and then admit some one to represent it. The district must exist before it can be represented. Otherwise one house could usurp the functions of both. And if one house can admit members above the limit prescribed by law, why may it not above the constitutional limit? *But when the district exists, then the decision of the house as to who shall represent that district is conclusive and final.* It determines who was elected; whether the returns are sufficient, and also whether the party

elected has the proper qualifications. *Over all these matters its jurisdiction is ample, its determination final."*

The case of *Burnham v. Morrissey*, 14 Gray, 226, is cited. This case merely upholds the right of the court to decide on *habeas corpus* as to the legality of a commitment by the speaker of the house for a contempt. This power has not been questioned in this case. The case of *The State v. Cunningham*, 51 N. W. Rep. (Wis.) 725, and 53 id. 35, merely holds that an action to enjoin the secretary of state from publishing notices of election of members of the senate and assembly, under a claim that an act of the legislature under which the notices were about to be published was unconstitutional, was not a political, but a judicial question. The court, on page 53 of 53 N. W. Rep., cites *Marbury v. Madison*, 1 Cranch, 137, and quotes approvingly the language of Mr. Justice Orton, as follows:

"Mr. Justice Orton, in the same case, speaking for the whole court, said: 'But it is sufficient that these questions are judicial and not legislative. The legislature that passed the act is not assailed by this proceeding, nor is the constitutional province of that equal and coördinate department of the government invaded. The law itself is the only object of judicial inquiry, and its constitutionality is the only question to be decided.'"

The various passages cited from McCrary on Elections do not reach the contention in this case. The question as to what shall be decided by the political departments of the government and what by the judicial, is not the subject being treated of by the author. The case cited from the 53 Northwestern Reporter, 944, seems to be a mistake, as it has no application whatever in this case. The Montana case of *The State v. Kinney*, 23 Pac. Rep. 733, merely holds that a person holding a certificate of election to the legislature, against whom a contest had been filed, but whose rights had not been determined by the legislature, was entitled to his pay after the legislature adjourned. None of the cases cited by the chief justice, none of the cases to which our attention was

called on the hearing, assert the doctrine that the judiciary may, under any circumstances, unless it be where the constitution expressly requires them to give their opinions when asked, decide political questions. It is said that Douglass was elected speaker because he received the votes. In Rosenthal's case, decided by this court only in January last, it was held that this court had no power to require the canvassing board, after it had performed its duties and adjourned, to reconvene and correct a manifest error; and Chief Justice HORTON, in delivering the opinion in that case, said:

"If it be said that this leaves Rosenthal without any remedy, and that the law in some way ought to furnish him a remedy for the wrong committed against him, we answer that, if this be true, it is the fault of the legislature, not the fault of the state board of canvassers, nor of the courts. But it is not wholly true. While Rosenthal may not obtain from the state board his certificate, yet he has a remedy before the house of representatives, even if not a complete one. The jurisdiction of each house to decide upon the elections, returns, and qualifications of its own members is clearly given by the constitution and the statutes. That body, with the general consent of its members, can admit him to his seat at once, or, if it so determines, it can delay his admission until full investigation is had of his claims. It may, it is true, act arbitrarily and refuse him his legal rights, but this is hardly probable. This proceeding, if successful, would have only given him the certificate — the *prima facie* written title to the office. The proceeding in this court is not a contest between Rosenthal and Stubbs, nor can we try the title to the office. The house of representatives has the exclusive power to decide who have been elected members to its body."

This court has now proceeded to decide, and has decided, that a quorum of legally-elected members of the house elected George L. Douglass speaker. How does it reach that conclusion? By holding that those persons who hold certificates of election were members of the legislature, entitled to elect a speaker, without reference to the question whether they were duly elected or not, and without reference to the question whether they were qualified or not. In other words, this

court has said that if they were returned they were entitled to sit, without reference to the question of election or qualification; but the constitution says that the house itself shall judge of the elections, returns and qualifications of its members. Before the alleged election of Mr. Douglass, the evidence before us shows that there was no determination of the rights of any of the contestants, in any manner, except Rosenthal's alone. It shows that no opportunity was afforded of presenting objections, even, for the consideration of the house. There was nothing like order or regularity on either side in the proceedings from which it is claimed on the one hand that Mr. Douglass was elected, and on the other that Mr. Dunsmore was chosen. In the Maine case referred to, the judges argue with great force that it is those who were elected who shall sit, rather than those holding certificates. I shall not attempt to express an opinion here as to the rights of contesting members to seats in the house, but shall merely call attention to the questions properly before the house to be determined. It was alleged that four of the 64 who are said to have voted for Mr. Douglass were postmasters, and therefore disqualified to sit; and the journal of the Douglass house shows that two of those men, at least, were postmasters up to the 31st day of December last. Section 5 of article 2 of the constitution reads:

"No member of congress or officer of the United States shall be eligible to a seat in the legislature. If any person, after his election to the legislature, be elected to congress or elected or appointed to any office under the United States, his acceptance thereof shall vacate his seat."

The case of *Privett v. Bickford*, 26 Kas. 52, is cited as an authority sustaining the proposition that, if a disability be removed between the date of the election and the commencement of the term, the person chosen is still entitled to his seat. The constitutional provision then before the court is very different in its terms from the one above quoted, and reads as follows:

"And no person who has ever voluntarily borne arms

against the government of the United States, or in any manner voluntarily aided or abetted in the attempted overthrow of said government, except all persons who have been honorably discharged from the military service of the United States since the 1st day of April, A. D. 1861, provided that they have served one year or more therein, shall be qualified to vote or hold office in this state until such disability shall be removed by a law passed by a vote of two-thirds of all the members of both branches of the legislature."

It will be apparent at a glance that this provision applies to the *status* of the individual at the time he is to hold office, and not at the time he is to be elected, while the provision with reference to members of the legislature applies to his capacity to be chosen, and of course must refer to the time the choice is made. This view is fully sustained by authorities. (*Searcy v. Grow*, 15 Cal. 117; *The State v. Clark*, 3 Nev. 566; *Carson v. McPhetridge*, 15 Ind. 327.)

Section 4 of article 2 of the constitution reads:

"No person shall be a member of the legislature who is not at the time of his election a qualified voter of and a resident in the county or district for which he is elected."

It is claimed that one of the 64 members by whose votes Mr. Douglass claims to be speaker was not a resident of the state, but had taken a claim in Oklahoma, and was both at the time of his election and at the time of the session of the legislature a resident of that territory. It is also claimed that six others of the persons who voted for Mr. Douglass, although holding certificates of election in due form, were not in fact elected by the electors of their respective districts. It is manifestly improper for me, entertaining the views I do on this question, to express an opinion as to the rights of these individuals to seats in the legislature. I may, however, call attention to the fact that the question as to the eligibility of the candidate for an office is one which the canvassing board can never pass upon, as, under all of the rulings of this court, its sole duty is to compile the returns and declare the result from the statements returned to it. It is manifest that the canvassing board, in the performance of its duty, will issue

certificates to ineligible or disqualified persons as well as to
those who are eligible and qualified to hold office. Now, sup-
pose the people of certain districts, because of their great ad-
miration for the distinguished persons whom I will name,
and because of their desire to be represented by men of great
ability, should by a majority of the votes in their respective
districts elect William E. Gladstone and Prince Bismarck to
represent them in the legislature, and certificates should be
regularly issued to them: would any person contend that they
might participate in the organization of the house because
they held certificates? Will anyone claim that a citizen of
Missouri who holds a certificate of election, even though he
were in fact elected, has a right to participate in any proceed-
ing of the legislature of this state?

Now, if these four members who are claimed to have been
postmasters at the time of the election, and this one person
who is alleged to have been a citizen of Oklahoma, were, in
law, for these reasons, ineligible to be chosen as members of
the legislature, whence comes the quorum of 63 or more legal
votes by which Mr. Douglass was elected speaker? And if
these six persons whose election is denied were not in fact
elected, though they held certificates, how many votes which
should be counted were cast for Mr. Douglass? It may be
said, and it is assumed, that all of these persons had a right
to vote, and were legal members of the legislature; but where
is the power vested to decide this question? Before this court
can hold that Mr. Douglass is speaker of the house of repre-
sentatives, it must hold that the five persons objected to as
disqualified were qualified, and thereby assume the power con-
ferred by the constitution on the house alone to judge of the
qualifications of its own members; if it holds that the six
persons, whom it is claimed were not in fact elected, were
elected, it must assume the power given by the constitution
to the house itself to judge of the election of its members; and
when this court assumes to say that a certificate, or a certifi-
cate and the record in the secretary of state's office, are the
ultimate and final proofs as to the right of an individual to

participate in the organization of the house, it assumes the power given by the constitution to that house to judge of the returns of its members.   It seems to me that the rule as declared is in its nature arbitrary and unjust, and tends to consequences far more mischievous than the rule established by the constitution.   Much has been said with reference to the constitutional house of representatives.   The constitution makes no provision whatever with reference to certificates of election.   The mode of ascertaining and declaring the result of an election is purely a statutory matter.   Certificates are issued, not in pursuance of a provision of the constitution, but in pursuance of a statute, and were the statute to establish any rule by which the articles of the constitution above quoted were contravened, that statute would be void.   Only 54 members whose rights to seats were not contested at the time voted for Mr. Douglass.   It is unnecessary to inquire how many voted for Mr. Dunsmore.   It may be that all of the 58 who are said in the opinion to have been duly-qualified members were in fact such or not.   A member of the senate or house is, in my judgment, always a political representative of the people, and the question as to his election, return and qualifications is always a political question, to be determined by the political departments of the state government.

Was Mr. Douglass, at the time this writ was issued, in possession of the office of speaker of the house of representatives?   In other words, was he an officer *de facto?*   The term *de facto* is defined by Burrill:   "Of fact; from, arising out of, or founded on, fact; in fact; in deed; in point of fact; actually; really."   The proposition is stated with much force that there cannot be two *de facto* officers holding the same office at the same time.   This proposition seems almost axiomatic.   A *de facto* officer is one who is in possession of the office in such manner that he can discharge the duties thereof. The speaker of the house of representatives has various duties to discharge.   He is the presiding officer of the house, and as such presiding officer discharges such duties as ordinarily devolve on the presiding officer of any deliberative

body; but, in order to give any effect to the deliberations of the body over which he presides, as a branch of the law-making department of the state, he must be able to communicate in his official capacity with the senate and with the governor. Neither he, nor the body over which he presides, can possibly be in full possession of the powers respectively of speaker and house until their rights are recognized by the governor and the senate. It is shown in this case that neither the senate nor the governor, nor any executive department of the state, would recognize Mr. Douglass as such speaker. On the other hand, it is clearly shown that the senate, the governor, lieutenant governor, secretary of state, auditor, treasurer and state printer have recognized J. M. Dunsmore as the speaker of the house, and have gone on transacting public business with him as though he were in fact and of right the speaker, and have recognized the body over which he presides as the duly- and legally-constituted house of representatives. It is well known, not only to the legal profession but to the general public, that when the legislature is in session, this course of recognition and intercommunication between the governor and the two coördinate departments of the legislature must go on daily; and it has gone on from the 12th day of January to the time of this trial without cessation. And when we consider the fact that these are the coördinate political departments of the government, and that under the authorities hereinbefore cited, it is they, and they alone, who must decide political questions, can there be a doubt that, as a legal proposition, J. M. Dunsmore is *de facto* speaker of the house?

In the history of American politics, many of the most critical crises have developed in contests over the election of a speaker of the house of representatives of the United States, and over the presiding officers of the houses of the various state legislatures. Wherever political parties are nearly equal in strength, the contest for mastery centers on the organization of the legislative departments, and this it is that makes the election of a speaker of the house of representatives so

peculiarly a political question, and for this reason, most of all, should controversies of this kind be withdrawn from the consideration of the courts, whose procedure should always be calm and deliberate, in accordance with fixed and settled principles, and entirely freed from those influences which have been found by experience too often, if not usually, bias the judgment of the strongest minds.   In the case of *The State v. Williams,* 5 Wis. 308, it was held that courts take notice of the accession to office of officers under the constitution, and, while they remain in office and exercise the duties thereof, regard them as officers *de facto.*   Generally, as respects third persons, the acts of an officer *de facto* are to be recognized as valid.   Where a governor continued to hold over after the expiration of his term, and after taking the oath of office by his rightful successor on the assumption of his election and under the certificate of the state canvassers, and so continued the acting governor, his approval of an act of the legislature was held valid, as the act of an officer *de facto.*

The supreme court of Connecticut, in *The State v. Carroll,* 30 Conn. 449, lays down the rule with reference to *de facto* officers as follows (19 Am. Dec. 66):

"An officer *de facto* is one whose acts, though not those of a lawful officer, the law upon principles of policy and justice will hold valid, so far as they involve the interests of the public and third persons, where the duties of the officer are exercised: (1) Without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people without inquiry to submit to or invoke his action, supposing him to be the officer he assumed to be; (2) under color of a known and valid appointment or election, but where the officer has failed to conform to some precedent, requirement, or condition, as to take an oath, give a bond, or the like; (3) under color of a known election or appointment, void because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power or defect being unknown to the public; (4) under color of an election or

appointment by or pursuant to a public, unconstitutional law, before the same is adjudged to be such."

And this definition is substantially recognized and adopted by nearly all the adjudications in the American courts of the present day. (*Braidy v. Theritt,* 17 Kas. 468; *Ellis v. N. C. Institution,* 68 N. C. 432; *Threadgill v. T. C. C. Rld. Co.,* 73 id. 178; *People v. Stanton,* 73 id. 546; *Burke v. Elliott,* 4 Ired. 355; *Brown v. Lunt,* 37 Me. 423; *People v. Lieb,* 85 Ill. 484; *Pierce v. Weare,* 41 Iowa, 378; *McLean v. The State,* 8 Heisk. 22; *Fowler v. Bebee,* 9 Mass. 231; *Sheehan's Case,* 122 id. 445; *Mallett v. U. S. G. & S. M. Co.,* 1 Nev. 188; *Ex parte Norris,* 8 S. C. 408, decided in 1876 (where the validity of a pardon issued by Wade Hampton, while acting as *de facto* governor of South Carolina, was before the supreme court of that state for determination); *Carleton v. People,* 10 Mich. 250; *Clark v. Commonwealth,* 29 Pa. St. 129; *Commonwealth v. McCombs,* 56 id. 436; *The State v. Williams,* 5 Wis. 308.) But I do not deem it necessary to multiply authorities on the question as to when a person becomes an officer *de facto.* There can be no doubt under any rule that has been declared by any court that J. M. Dunsmore was, at the time this case was heard, the *de facto* speaker of the house of representatives, unless the body over which he presided was not composed of a sufficient number of lawfully-chosen representatives to constitute the house; and the only way in which his *status,* as such officer *de facto,* has been attacked, is by attacking the right of persons to sit in that house. In other words, we have had on trial, not the rights of one member individually to participate in the organization, but the rights of large numbers of persons acting collectively; and the court has decided the right of 64 persons in a lump to sit and vote in the house on its organization, while refusing to inquire into the right of any one of the 64 individuals to his seat. I conclude then:

1. That all inquiries in a court of justice as to validity of any act of the legislature, or of either house thereof, is confined to the act itself, the journals of the house, and to such other records and permanent memorials as are provided by

18—50 KAS.

law; and that in no case can any court of justice, from the highest to the lowest, take the oral testimony of witnesses as to what transpired in the hall of the house of representatives in its organization or in the transaction of its business.

2. That the constitution vests in the house of representatives the sole and exclusive power to judge of the elections, returns and qualifications of its own members, and that the house cannot be divested of that power by anything less than an amendment to the state constitution.

3. That a certificate of election is but *prima facie* evidence of the election of the holder, and is neither conclusive on that fact, nor on the question as to the eligibility or qualifications of the holder, but that all these questions are to be determined by the house under its own rules, at such time and in such manner as it sees fit. That any declaration of this court as to the rules which must control a legislative body at its organization, or as to the force of such certificates, is an unwarranted expression on a subject over which courts have no jurisdiction.

4. That the question as to what body of men is the house of representatives at any given time is a political question, and can never be a proper subject of judicial inquiry.

5. The speaker of the house of representatives derives his authority solely from the house, and his title to that office cannot be drawn in question nor determined by any court or tribunal other than the house itself.

6. Where two different organizations are effected, each claiming to be the house of representatives, each having a person chosen as its speaker, each including within its numbers many persons whose rights to sit as members of the house are unquestioned, together with other persons whose rights are questioned, a political question is presented as to which of those two contending bodies and officers is in fact and in law the house and the speaker thereof.

7. Political controversies can only be determined by the political departments of the government; and while the constitution of the state does not contemplate such a condition of

things, nor provide in express terms a tribunal before which their respective claims can be heard and determined, yet, under an unbroken chain of authorities in all countries where the common law prevails, the recognition of one of those bodies by the other political departments of the government, viz., the governor and the senate, is conclusive on the judiciary.

8. The decision of the governor and the senate is just as binding and conclusive where they refrain from enforcing their decisions by force as though they resorted to violence and bloodshed. In a country where laws are supreme, a premium should never be offered to induce violence, but a decision made by the lawfully-constituted authorities should always be acquiesced in by all good citizens.

For these reasons, I conclude that this court must take judicial notice that George L. Douglass was neither in fact nor in law speaker of the house of representatives, and had no authority to issue the warrant under which the petitioner is held.